Case No. 22-16149

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

WILLIAM MCMEIN EHART, Jr., Individually and as Personal Representative of the Estate of Maureen Anne Ehart, Deceased,

*Plaintiff-Appellee*,

v.

LAHAINA DIVERS INC. and CORY DAM,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Hawaii
No. 21-cv-00475 SOM-KJM
Hon. Susan Oki Mollway

---

## APPELLANTS' OPENING BRIEF

---

Ralph J. O'Neill, Esq.
Jamie C.S. Madriaga, Esq.
Matthew A. Hemme, Esq.
MacDonald Rudy O'Neill & Yamauchi, LLP
1001 Bishop Street, Suite 2800
Telephone: (808) 523-3080
*ralphoneill@macdonaldrudy.com*
*jmadriaga@macdonaldrudy.com*
*matthemme@macdonaldrudy.com*

*Attorneys for Appellants*
LAHAINA DIVERS, INC. and
CORY DAM

## DISCLOSURE STATEMENT

Pursuant to FRAP 26.1(a), Defendant-Appellant Lahaina Divers Inc. states that it does not have a parent company, and no publicly traded company owns any of its stock.

Date: October 3, 2022.

MacDONALD RUDY O'NEILL & YAMAUCHI, LLP

*/s/ Jamie C.S. Madriaga*
RALPH J. O'NEILL, ESQ.
JAMIE C.S. MADRIAGA, ESQ.
MATTHEW A. HEMME, ESQ.

*Attorneys for Defendants-Appellants*
LAHAINA DIVERS, INC. and
CORY DAM

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT .........................................................3

    I.    JURISDICTION OF THE DISTRICT COURT .............................3

    II.    APPELLATE JURISDICTION ............................................... 4

    III.    TIMELINESS OF THE APPEAL................................................ 6

STATUTORY AUTHORITIES...............................................................7

ISSUES PRESENTED ...........................................................................7

STATEMENT OF THE CASE ............................................................... 8

    I.    NATURE OF THE CASE ................................................... 8

        A.    The Eharts Signed Liability Waivers Releasing the Defendants' Liability for Personal Injury or Wrongful Death Due to the Defendants' Negligence............................................................ 9

        B.    Mrs. Ehart Disappeared While Participating in a Snorkeling Activity at Molokini ..............................................................10

    II.    PROCEDURAL HISTORY ........................................... 11

        A.    Mr. Ehart Filed a Lawsuit, and Appellants Asserted Waiver and Release as an Affirmative Defense ........................................ 11

        B.    Mr. Ehart Moved to Strike Appellants' Affirmative Defense of Waiver and Release on the Basis that 46 U.S.C. § 30509 Voided the Liability Waivers ..............................................................12

        C.    Appellants Argued the Majority View that 46 U.S.C. § 30509 Only Applies to Common Carriers—Not a Recreational Vessel Departing from and Returning to the Same Port to Engage in Voluntary Snorkeling and Scuba Diving Activities .................14

i

D.  The District Court Determined that 46 U.S.C. § 30509 Voided the Liability Waivers and Entered an Order Striking Appellants' Second Affirmative Defense of Waiver and Release ................ 14

E.  The District Court Rejected Appellants' Motion for Reconsideration of Its Order Striking the Affirmative Defense of Waiver and Release and Appellants' Alternative Request to Certify the Issue for Interlocutory Appeal ............................... 17

SUMMARY OF THE ARGUMENT ................................................. 18

STANDARD OF REVIEW ............................................................. 21

ARGUMENT ................................................................................. 22

I.   THE DISTRICT COURT ERRED IN HOLDING THAT 46 U.S.C. § 30509 APPLIES TO THE DAUNTLESS to invalidate the liability waivers .......................................................................... 22

A.  The District Court's Interpretation of the Plain Language in 46 U.S.C. § 30509 Is Erroneous ............................................. 23

B.  The Order Unnecessarily Relied on Congressional Intent Given the Plain Language of the Statue and Then Erred in Interpreting Legislative Intent to Apply § 30509 to All Vessels Transporting Passengers Whose Voyages Have a Nexus to the United States ............................................................................ 30

C.  The District Court Misconstrued the Importance of the Vessel's Purpose and How it Affects the Application of § 30509 ............................................................................ 37

D.  The District Court Disregarded Extensive Case Law Indicating Releases Waiving Negligence in Recreational Water Activities Are Enforceable Under Maritime Law, a Uniform Body of Law ............................................................................ 42

II.  BECAUSE THE DISTRICT COURT ERRED IN INTERPRETING 46 U.S.C. § 30509, THE DISTRICT COURT ALSO ERRED IN

STRIKING APPELLANTS' SECOND AFFIRMATIVE DEFENSE
OF WAIVER AND RELEASE ........................................................49

CONCLUSION...................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Ass'n of Cruise Passengers, Inc. v. Carnival Cruise Lines, Inc.*,
911 F.2d 786 (D.C. Cir. 1990) ........................................................... 29, 34

*Animal Legal Def. Fund v. United States Dep't of Agric.*,
933 F.3d 1088 (9th Cir. 2019) ........................................................ 25, 30

*Aparicio v. Swan Lake*,
643 F.2d 1109 (5th Cir. 1981) ............................................................... 5

*Armstrong v. Wilson*,
124 F.3d 1019 (9th Cir. 1997) ............................................................... 6

*Brozyna v. Niagara Gorge Jetboating, Ltd.*,
2011 WL 4553100 (W.D.N.Y. Sept. 29, 2011) .................................... 45

*Carlisle v. Ulysses Line Ltd., S.A.*,
475 So. 2d 248 (Fla. Dist. Ct. App. 1985) ........................................ 41

*Carman Tool & Abrasives, Inc. v. Evergreen Lines*,
871 F.2d 897 (9th Cir. 1989) ................................................................ 5

*Charnis v. Watersport Pro, LLC*,
2009 WL 2581699 (D. Nev. May 1, 2009) ............................. 35, 44, 46

*Cobb v. Aramark Sports & Ent. Servs., LLC*,
933 F. Supp. 2d 1295 (D. Nev. 2013) ............................................ 46, 49

*Cook v. Crazy Boat of Key W., Inc.*,
949 So. 2d 1202 (Fla. Dist. Ct. App. 2007) .................................... 27, 44

*Courtney v. Pacific Adventures*,
5 F. Supp. 2d 874 (D. Haw. 1998) ........ 13, 15, 19, 20, 23, 28, 31, 35, 40, 42, 45, 47

*Cutchin v. Habitat Curacao-Maduro Dive Fanta-Seas, Inc.*,
1999 WL 33232277 (S.D. Fla. Feb. 8, 1999) ...................................... 43

*El Pollo Loco, Inc. v. Hashim*,
    316 F.3d 1032 (9th Cir.2003) ......................................................... 21, 22

*Hambrook v. Smith*,
    2015 WL 3480887, (D. Haw. June 2, 2015) ........................... 13, 15, 23, 31, 42, 47

*Harper v. U.S. Seafoods LP*,
    278 F.3d 971 (9th Cir. 2002) ............................................................... 48

*Hopkins v. The Boat Club, Inc.*,
    866 So. 2d 108 (Fla. Dist. Ct. App. 2004)........................................... 44

*In re Aramark Sports & Ent. Servs., LLC*,
    2012 WL 3776859 (D. Utah Aug. 29, 2012)........................................45

*In re Hanford Nuclear Rsrv. Litig.*,
    534 F.3d 986 (9th Cir. 2008) ............................................................... 22

*In re Mission Bay Jet Sports, LLC*,
    570 F.3d 1124 (9th Cir. 2009)................................................................ 3

*In re Royal Caribbean Cruises Ltd.*,
    991 F. Supp. 2d 1171 (S.D. Fla. 2013) .................................................41

*Jerome v. Water Sports Adventure Rentals & Equip., Inc.*,
    2013 WL 1499046 (D.V.I. Apr. 12, 2013) ........................................... 46

*Johnson v. Royal Caribbean Cruises, Ltd.*,
    449 F. App'x 846 (11th Cir. 2011) ......................................... 38, 39, 40

*Lowe v. S.E.C.*,
    472 U.S. 181, 105 S.Ct. 2557 (1985) ...................................................27

*Matter of Carpe Diem 1969 LLC*, No.,
    2019 WL 3413841 (D.V.I. July 29, 2019) ............................................47

*McCoy v. Pac. Spruce Corp.*,
    1 F.2d 853 (9th Cir. 1924)................................................................... 26

*Moore v. Am. Scantic Line*,
    121 F.2d 767 (2d Cir. 1941)................................................................. 40

*Moragne v. States Marine Lines, Inc.*,
   398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970) ........................................... 48

*Mullaney v. Hilton Hotels Corp.*,
   634 F. Supp. 2d 1130 (D. Haw. 2009) .................................................................. 6

*Nicole Morgan v. Water Toy Shop, Inc.*,
   2018 WL 1725550 (D.P.R. Mar. 30, 2018) ......................................................... 46

*Olivelli v. Sappo Corp.*,
   225 F. Supp. 2d 109 (D.P.R. 2002)......................................................... 43, 46, 49

*Olmo v. Atl. City Parasail, LLC*,
   2016 WL 1728964 (D.N.J. Apr. 28, 2016) ..................................................... 39, 46

*Oran v. Fair Wind Sailing, Inc.*,
   2009 WL 4349321 (D.V.I. Nov. 23, 2009).................................................... 45, 46

*Piche v. Stockdale Holdings, LLC*,
   51 V.I. 657 (D.V.I. Mar. 24, 2009)...................................................................... 44

*Rodriguez v. SeaBreeze Jetlev LLC*,
   2022 WL 3639305 (N.D. Cal. June 23, 2022) .................................32, 37, 47, 48

*Rogers v. Alaska S. S. Co.*,
   249 F.2d 646 (9th Cir. 1957).................................................................................. 4

*Shultz v. Florida Keys Dive Center, Inc.*,
   224 F.3d 1269 (11th Cir. 2000) ...........................15, 20, 32, 36, 37, 38, 39, 40, 43,

*Small v. Carnival Corp.*,
   2020 WL 13401894 (S.D. Fla. Sept. 4, 2020) .................................................... 49

*Smolnikar v. Royal Caribbean Cruises Ltd.*,
   787 F.Supp.2d 1308 (S.D. Fla. 2011) ................................................................. 41

*State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld*,
   921 F.2d 409 (2d Cir. 1990)................................................................................ 48

*United States v. $133,420.00 in U.S. Currency*,
   672 F.3d 629 (9th Cir. 2012) .............................................................................. 21

*United States v. Butler*,
   297 U.S. 1, 56 S.Ct. 312 (1936) ............................................................... 29

*United States v. Lillard*,
   935 F.3d 827 (9th Cir. 2019) ...................................................................... 30

*Vision Air Flight Serv., Inc. v. M/V Nat'l Pride*,
   155 F.3d 1165 (9th Cir. 1998) ...................................................................... 5

*Waggoner v. Nags Head Water Sports, Inc.*,
   141 F.3d 1162 (4th Cir. 1998) ............................................................... 36, 42

*Wallis v. Princess Cruises, Inc.*,
   306 F.3d 827 (9th Cir. 2002) ......................................................... 4, 5, 6, 24

*Whittlestone, Inc. v. Handi–Craft Co.*,
   618 F.3d 970 (9th Cir.2010) (reviewing ..................................................... 22

*Witkowski v. Niagara Jet Adventures, LLC*,
   2020 WL 486876,n.4 (W.D.N.Y. Jan. 30, 2020) ................................... 27, 47

## STATUTES

28 U.S.C. § 1292(a)(3) ...................................................................... 4, 5, 6

28 U.S.C. § 1292(b) ............................................................................... 6

28 U.S.C. § 1333(1) ............................................................................... 3

46 U.S.C. § 183c (now 46 U.S.C. § 30509).......15, 16, 17, 18, 19, 22, 24, 31, 32, 36,
   38 40, 41, 42, 43, 44

46 U.S.C. § 30502.............................................. 16, 19, 20, 31, 34, 35

46 U.S.C. § 30505.............................................................................35

46 U.S.C. § 30509….....2, 3, 7, 8, 9, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24,
   25, 26, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 39, 39, 41, 42, 45, 46, 47, 49, 50

46 U.S.C. § 40102................................................20, 26, 29, 34, 36

## RULES

Fed.R.App.P. 4(a)(1)(A) ............................................................................ 7

Fed.R.App.P. 4(a)(4)(A)(vi) .................................................................... 7

Fed.R.Civ.P. 54(b) ................................................................................... 6

Fed.R.Civ.P. 9(h)(1) ................................................................................ 3

Fed.R.Civ.P. 60 ....................................................................................... 6

Local Rules of Practice for the United States District Court for the District of
Hawai'i 60.1 ....................................................................................... 6

## MISCELLANEOUS

BLACK'S LAW DICTIONARY (11th ed. 2019) ..................................... 34, 38

Bryan A. Garner, *Garner's Modern English Usage, the Authority on Grammar, Usage,
and Style* (4th ed. 2016) ..................................................................... 27

MERRIAM-WEBSTER.COM DICTIONARY .................................... 25, 26, 28

## INTRODUCTION

The case arises from a tragedy involving Maureen Ehart ("**Mrs. Ehart**") who disappeared while participating in a snorkeling/scuba diving excursion at Molokini Crater ("**Molokini**") off the coast of Maui, Hawai'i with her husband Plaintiff-Appellee William McMein Ehart, Jr. ("**Mr. Ehart**"). Mrs. Ehart is presumed to have died, and Mr. Ehart brought a wrongful death lawsuit, individually, and on behalf of Mrs. Ehart's Estate,[1] against Defendant-Appellant Lahaina Divers, Inc. ("**Lahaina Divers**"), the owner of the recreational vessel M/V DAUNTLESS ("**DAUNTLESS**") that brought Mr. and Mrs. Ehart from Lahaina Harbor to Molokini for snorkeling or scuba diving; Defendant-Appellant Cory Dam ("**Mr. Dam**"), the captain of the DAUNTLESS; Lahaina Dive and Surf, LLC ("**LDS**"), the DAUNTLESS's operator that employs the individual defendants; and SCUBA instructors Kaitlin Miller ("**Ms. Miller**") and Julianne Cricchio ("**Ms. Cricchio**").[2] The lawsuit alleges claims of ordinary negligence and gross negligence.

---

[1] For purposes of this brief, any reference to Mr. Ehart's claims refers to both Mr. Ehart's individual claims and those brought on behalf of Mrs. Ehart's Estate.

[2] Lahaina Divers and Mr. Dam ("**Appellants**") are the only appellants because the defendant SCUBA instructors and Defendant LDS did not answer Mr. Ehart's First Amended Complaint until after the entry of the rulings relevant to this appeal. (*See* 2-ER-86). However, the District Court established the law of the case, and this

1

Because (1) Mr. and Mrs. Ehart both signed a "Lahaina Divers Participant Information and Release" ("**Liability Waiver**") that waives any claims of ordinary negligence against Lahaina Divers and Mr. Dam, and (2) the clear majority, if not all, courts have held waivers for recreational water activities are enforceable under maritime law, Lahaina Divers and Mr. Dam asserted waiver and release as their second affirmative defense in their Answer to the Complaint.

Mr. Ehart filed a motion to strike Lahaina Divers' and Mr. Dam's second affirmative defense that argued that 46 U.S.C. § 30509 prohibits the "owner, master, manager, or agent of a vessel transporting passengers between ports in the United States" from limiting liability for "personal injury or death caused by the negligence or fault of the owner or the owner's employees or agents." Although the plain language and legislative history indicate 46 U.S.C. § 30509 applies only to vessels providing essential services (*i.e.,* common carriers like steamships, cruises, or ferries), the United States District Court for the District of Hawai'i (the "**District Court**"): (a) applied § 30509 to the <u>DAUNTLESS</u>, which supports voluntary, recreational snorkeling and scuba diving activities, and departs from and returns to the same port, (b) voided the Liability Waivers, and (c) struck Lahaina

---

appeal affects the rights of Lahaina Divers, Mr. Dam, LDS, Ms. Miller, and Ms. Cricchio (collectively, "**Defendants**").

Divers' and Mr. Dam's affirmative defense of waiver and release.

As a result, Lahaina Divers and Mr. Dam have lost the opportunity to argue a material defense recognized under maritime law—that Mr. Ehart waived his ordinary negligence claims—which would require Mr. Ehart to prove a higher degree of culpability to sustain his gross negligence claims. Lahaina Divers and Mr. Dam appeal the District Court's order[3] to the extent that the Order: (1) holds that 46 U.S.C. § 30509 applies to the <u>DAUNTLESS</u> to invalidate the Liability Waivers, and (2) strikes the affirmative defense of waiver and release as the law of the case.

## JURISDICTIONAL STATEMENT

## I. JURISDICTION OF THE DISTRICT COURT

None of the parties disputes that the District Court has admiralty jurisdiction over this case pursuant to 28 U.S.C. § 1333(1) and Rule 9(h)(1) of the Federal Rules of Civil Procedure ("**FRCP**"). Mrs. Ehart disappeared in navigable waters while snorkeling, which (1) had the potential to disrupt maritime commerce, and (2) is an activity that has a "significant relationship to traditional maritime activity." *In re Mission Bay Jet Sports, LLC*, 570 F.3d 1124, 1126 (9th Cir. 2009).

---

[3] Order Denying Motion to Dismiss; Order Granting Motion to Strike Affirmative Defenses Asserting Waiver/Release and Assumption of the Risk (the "**Order**") (1-ER-14-51).

## II.    APPELLATE JURISDICTION

The United States Court of Appeals for the Ninth Circuit (the "**Ninth Circuit**") has jurisdiction over the District Court's Order (1-ER-14-51) pursuant to 28 U.S.C. § 1292(a)(3) because the interlocutory admiralty order "determine[es] the rights and liabilities of the parties" that are "substantive in nature," rather than procedural, and goes to "the merits of the controversies between [the parties]." *Rogers v. Alaska S. S. Co.*, 249 F.2d 646, 649 (9th Cir. 1957). The stricken affirmative defense of waiver and release is material to Lahaina Divers' and Mr. Dam's argument that the Liability Waivers are enforceable under maritime law and, thus, preclude Mr. Ehart's claims of ordinary negligence. Although the Order does not establish Lahaina Divers' and Mr. Dam's actual liability for ordinary negligence, the Order invalidated the Liability Waivers and deemed it the law of the case that none of the defendants can argue that these maritime contracts limit their liability as to ordinary negligence.

Although "§ 1292(a)(3) is an exception to the final judgment rule and, therefore, is construed narrowly," the Ninth Circuit has previously exercised jurisdiction under § 1292(a)(3) in interlocutory appeals, such as this one, where the appellants asserted an affirmative defense based on the existence of a maritime contract limiting their liability. *See Wallis v. Princess Cruises, Inc.*, 306 F.3d 827,

4

832–34 (9th Cir. 2002) (jurisdiction to review validity and applicability of provision limiting liability on common carrier's passenger ticket); *Vision Air Flight Serv., Inc. v. M/V Nat'l Pride*, 155 F.3d 1165, 1168 (9th Cir. 1998) (holding district court erred in limiting liability of the defendants when contrary evidence could bar limitation of liability under maritime law); *Carman Tool & Abrasives, Inc. v. Evergreen Lines*, 871 F.2d 897, 899 (9th Cir. 1989) (exercising jurisdiction to determine if district court properly limited potential liability under Carriage of Goods by Sea Act).

The Ninth Circuit has noted that "[l]imitation of liability provisions are common in maritime cases" and that requiring a determination of actual liability to exercise jurisdiction under § 1292(a)(3) "would make interlocutory appeals impossible in many admiralty cases, and would do so in precisely those cases where such appeals are most needed." *Wallis*, 306 F.3d at 834.

The Order prejudices Lahaina Divers' and Mr. Dam's substantive rights because they (and the other defendants') have no further opportunity to assert an affirmative defense that is generally available under maritime law, and which could eliminate their liability for ordinary negligence. *See Aparicio v. Swan Lake*, 643 F.2d 1109, 1113 n.6 (5th Cir. 1981) (order denying or prejudicing substantive rights

5

appealable under § 1292(a)(3)).[4] Thus, this is the type of case in which an

interlocutory appeal as a matter of right is most needed.[5]

## III.    TIMELINESS OF THE APPEAL

This appeal is timely. The District Court entered its Order on May 10, 2022.

(1-ER-14-51). On June 7, 2022, Lahaina Divers and Mr. Dam filed a motion for

partial reconsideration of the Order (ECF No. 62) under FRCP Rule 54(b) and

Rule 60.1 of the Local Rules of Practice for the United States District Court for the

District of Hawai'i, which provides the grounds for reconsideration of

interlocutory orders and indicates FRCP Rule 60 governs a motion for

---

[4] If the Ninth Circuit does not exercise jurisdiction over the District Court's Order, Appellants must defend against Mr. Ehart's claims of ordinary negligence in addition to Mr. Ehart's claims of gross negligence, which require proving recklessness and conscience indifference that evidence may reveal did not occur. If the evidence demonstrates that Appellants' conduct does not rise to the level of gross negligence, as it stands, the case will continue when it could potentially conclude sooner if the Liability Waivers bar claims of ordinary negligence. *Wallis*, 306 F.3d at 842 (affirming granting of summary judgment on intentional infliction of emotional distress claim where wife overheard worker on crew hypothesizing that her husband had died and would be sucked under the ship and chopped up by the ship's propellers). *See also Mullaney v. Hilton Hotels Corp.*, 634 F. Supp. 2d 1130, 1155 (D. Haw. 2009) (granting summary judgment on gross negligence claim because conduct was not "aggravated" or "outrageous").

[5] Although the District Court denied Appellants' permissive request to certify the issue of striking the waiver-and-release affirmative defense for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), the District Court's denial does not prevent Appellants from appealing an interlocutory admiralty order as a matter of right under 28 U.S.C. § 1292(a)(3). *Armstrong v. Wilson*, 124 F.3d 1019, 1021 (9th Cir. 1997) ("We have held that a denial of permission to appeal under § 1292(b) does not foreclose appeal under § 1292(a), where a litigant can meet the requirements of § 1292(a).").

reconsideration of a case-dispositive order. Pursuant to Rule 4(a)(4)(A)(vi) of the Federal Rules of Appellate Procedure ("**FRAP**"), Lahaina Divers and Mr. Dam timely filed their motion for partial reconsideration no later than 28 days following entry of the Order. On July 13, 2022, the District Court entered its Order denying Lahaina Divers' and Mr. Dam's motion for partial reconsideration (1-ER-68), triggering the 30-day period to file a notice of appeal. Fed.R.App.P. 4(a)(1)(A). On July 29, 2022, sixteen days later and within the 30-day window, Lahaina Divers and Mr. Dam timely filed their Notice of Interlocutory Appeal. (2-ER-335-37).

## STATUTORY AUTHORITIES

All relevant statutory authorities appear in the Addendum to this brief.

## ISSUES PRESENTED

1. Whether the District Court erred in holding that under maritime law, 46 U.S.C. § 30509, which "prohibits waivers with respect to vessels transporting passengers between ports in the United States," applies to a recreational vessel that (a) traveled from and back to the same port, and (b) has the main purpose of assisting voluntary scuba and snorkeling excursions. (1-ER-29).

2. Whether the District Court's legal interpretation of 46 U.S.C. § 30509 caused the District Court to err in striking Lahaina Divers' and

Mr. Dam's second affirmative defense of waiver and release, which is now the law of the case and makes the affirmative defense unavailable to all of the named defendants. (1-ER-15). *See also supra* n.2.

## STATEMENT OF THE CASE

## I. NATURE OF THE CASE

No one disputes that a tragedy occurred in this case. But this appeal is important because it addresses the denial of Defendants' substantive right, *supra* n.2, to assert a material affirmative defense that might eliminate Defendants' liability for ordinary negligence before trial. The District Court applied 46 U.S.C. § 30509 to a recreational vessel that (a) traveled from and back to the same port, and (b) has the main purpose of assisting voluntary scuba and snorkeling excursions. The resulting Order (1) disregards the ordinary meanings of the words in the statute, (2) unnecessarily relies on and misinterprets the legislative history of § 183c (now § 30509), and (3) undermines the fundamental importance of maintaining uniformity in federal maritime law by rejecting the clear majority of decisions, which have enforced recreational vessel waivers and limited application of § 30509, or its predecessor statute, to vessels that are in the business of transporting passengers (*i.e.*, common carriers like a cruise ship, steamship, or ferry). Indeed, only two other decisions, both from a single district court judge in

the U.S. District of Hawai'i, have applied § 30509, or its predecessor statute, to invalidate liability waivers for voluntary, recreational, or inherently risky marine activities. Because the <u>DAUNTLESS</u> is a dive vessel and is not a common carrier, § 30509 does not apply to invalidate the Liability Waivers that the Eharts signed.

### A. The Eharts Signed Liability Waivers Releasing the Defendants' Liability for Personal Injury or Wrongful Death Due to the Defendants' Negligence

The Eharts lived in California and scheduled a weeklong vacation to the island of Maui in Hawai'i for September 2021. (2-ER-320; 2-ER-327).

In July 2021, a couple of months before their Maui vacation, the Eharts booked a Lahaina Divers' scuba and snorkeling activity at Molokini, a popular tourist destination located less than three miles off the southern shore of Maui. Mr. Ehart signed a Liability Waiver to participate in the scuba diving activity (2-ER-327-31), and Mrs. Ehart signed a Liability Waiver to participate in the excursion as a snorkeler. (2-ER-320-24).

The Liability Waivers entitled "LAHAINA DIVERS PARTICIPANT INFORMATION AND RELEASE" contain language in all caps and bold text that releases Defendants from liability for supervision of certified divers and snorkelers; under the heading "LIABILITY RELEASE FOR SUPERVISION OF CERTIFIED DIVERS AND SNORKELERS" is a paragraph, also in all caps and

bold font, that notified the Eharts that the Liability Waivers released their rights to sue Defendants for personal injury or wrongful death resulting from Defendants' negligence. (2-ER-320-21; 2-ER-327-28).

> **LIABILITY RELEASE FOR SUPERVISION OF CERTIFIED DIVERS AND SNORKELERS**
>
> THIS IS A RELEASE OF YOUR RIGHTS TO SUE LAHAINA DIVE & SURF, LLC AND/OR LAHANA DIVERS, INC. (LDS/LDI), AND ITS OWNERS, EMPLOYEES, AGENTS AND ASSIGNS FOR PERSONAL INJURIES OR WRONGFUL DEATH THAT MAY DURING THE FORTHCOMING DIVE ACTIVITY AS A RESULT OF THE INHERRISKS ASSOCIATED WITH SCUBA DIVING AND/OR SNORKEUNG OR AS A RESULT OF NEGLIGENCE.

(*Id.*) The Liability Waivers contain additional language in all caps requiring the Eharts to confirm their intent to release Lahaina Divers and Mr. Dam from liability for personal injury and wrongful death; the paragraph underneath in all caps and bold print states that the signer has read the contents of the Liability Waiver before signing it. (2-ER-321; 2-ER-328).

> ☑   * 12. IT IS MY INTENTION BY THIS INSTRUMENT TO EXEMPT. RELEASE AND HOLD HARMLESS LDS/LDI AND ALL RELATED ENTITIES AS DEFINED ABOVE FROM ALL LIABILITY WHATSOEVER FOR PERSONAL INJURY, PROPERTY DAMAGE. AND WRONGFUL DEATH CAUSED BY NEGLIGENCE.
>
> I HAVE FULLY INFORMED MYSELF OF THE CONTENTS OF THIS INFORMATION AND RELEASE BY READING IT BEFORE I SIGNED IT ON BEHALF OF MYSELF AND MY HEIRS.

(*Id.*)

## B. Mrs. Ehart Disappeared While Participating in a Snorkeling Activity at Molokini

In the early morning on September 14, 2021, at Lahaina Harbor, the Eharts, along with 15 other participants, boarded the <u>DAUNTLESS</u>, which supports

Lahaina Divers' recreational operations by bringing participants to locations such as Molokini for snorkeling or scuba diving activities. The crew of the DAUNTLESS consisted of Mr. Dam, the Captain, and Ms. Miller and Ms. Cricchio, two SCUBA instructors who also serve as deckhands.

After the DAUNTLESS arrived at Molokini and the crew secured the vessel to a mooring buoy, Ms. Miller and Ms. Cricchio each led a group of SCUBA divers, one of which included Mr. Ehart, on dives exploring Molokini. Meanwhile, Mr. Dam remained on the DAUNTLESS while three snorkeling participants, including Mrs. Ehart, entered the water to snorkel.

As SCUBA divers started to surface, Mr. Dam assisted them back onto the DAUNTLESS. During this time, Mrs. Ehart disappeared. The crew searched for Mrs. Ehart but could not locate her. Emergency responders from the U.S. Coast Guard and the County of Maui joined the search efforts, which they suspended four days later. Mrs. Ehart is presumed to have died.

## II.    PROCEDURAL HISTORY

### A.    Mr. Ehart Filed a Lawsuit, and Appellants Asserted Waiver and Release as an Affirmative Defense

Approximately two months after Mrs. Ehart disappeared, Mr. Ehart filed a lawsuit against Lahaina Divers and Mr. Dam alleging the following causes of action: (1) wrongful death on account of gross negligence, (2) wrongful death on account of

11

simple negligence, (3) survival damages on account of gross negligence, (4) survival

damages on account of simple negligence, (5) reckless infliction of emotional

distress, and (6) negligent infliction of emotional distress. (2-ER-87-108;

*see supra* n.2).

Because the Eharts voluntarily executed the Liability Waivers to participate

in Lahaina Divers' snorkeling and scuba activities, Lahaina Divers' and Mr. Dam's

Answer to Complaint filed January 28, 2022 (2-ER-109-19), asserted the following

as their second affirmative defense: "Plaintiff's Decedent and Plaintiff waived and

released the claims that Plaintiff asserts in this action." (2-ER-117, ¶ 37).

### B. Mr. Ehart Moved to Strike Appellants' Affirmative Defense of Waiver and Release on the Basis that 46 U.S.C. § 30509 Voided the Liability Waivers

Mr. Ehart filed "Plaintiff's Motion Re: Pre-Accident Release of Liability"

that requested the District Court enter an order: (1) voiding the Liability Waivers

signed by the Eharts as a matter of law pursuant to 46 U.S.C. § 30509(a), and

(2) striking Lahaina Divers' and Mr. Dam's second affirmative defense of waiver

and release. (ECF No. 31-0).

Mr. Ehart argued an expansive reading of 46 U.S.C. § 30509(a), which

prohibits the owner, master, or agent of a vessel "***transporting passengers between***

***ports in the United States***" from limiting their liability for personal injury or death

caused by their negligence. 46 U.S.C. § 30509(a) (emphasis added). Mr. Ehart contended that he satisfied the requirements of § 30509 because the <u>DAUNTLESS</u> transported the Eharts between Lahaina Harbor, a port, and Molokini, which he contended qualified as a port. (2-ER-67:2-6).

Alternatively, Mr. Ehart argued that even if Molokini is not a port, he had still satisfied § 30509 because the <u>DAUNTLESS</u> traveled from Lahaina Harbor and back to Lahaina Harbor, and the case *Courtney v. Pacific Adventures*, 5 F. Supp. 2d 874, 879 (D. Haw. 1998) had held that "between ports in the United States" only requires a "nexus" between the voyage and a port in the United States, not two different ports. (2-ER-63:17-24; 67:17-68:1; 68:21-24).

While Mr. Ehart recognized that other courts interpreting maritime law had enforced waivers for marine recreational activities and limited application of § 30509 to common carriers, Mr. Ehart contended that his interpretation effectuated Congressional intent. (2-ER-63:15-16; 68:1-11). Mr. Ehart relied solely on *Courtney* and that judge's subsequent ruling in *Hambrook v. Smith*, 2015 WL 3480887, (D. Haw. June 2, 2015), to support his view that § 30509(a) applies to the <u>DAUNTLESS</u> even though the dive boat is not a common carrier.

### C. Appellants Argued the Majority View that 46 U.S.C. § 30509 Only Applies to Common Carriers—Not a Recreational Vessel Departing from and Returning to the Same Port to Engage in Voluntary Snorkeling and Scuba Diving Activities

In their March 18, 2022 memorandum in opposition to Mr. Ehart's motion to strike (ECF No. 39), Lahaina Divers and Mr. Dam argued that § 30509 did not apply to the DAUNTLESS because (1) the plain language of § 30509 indicates that the section applies to common carriers that transport passengers between ports; (2) the legislative history of § 30509 supports Lahaina Divers' and Mr. Dam's reading; and (3) the majority, if not all, of the courts evaluating this issue have applied § 30509 (or its predecessor §183c) only to common carriers, not recreational boats like the DAUNTLESS.

### D. The District Court Determined that 46 U.S.C. § 30509 Voided the Liability Waivers and Entered an Order Striking Appellants' Second Affirmative Defense of Waiver and Release[6]

On April 11, 2022, the District Court held a hearing on Mr. Ehart's motion to strike. (*See generally* 2-ER-53-85). Just five months after Mr. Ehart filed his lawsuit and before Ms. Cricchio, Ms. Miller, or LDS had answered the First

---

[6] The Order also (1) denied Defendants Julianne Cricchio and Kaitlin Miller's Motion to Dismiss, (2) struck Appellants' third affirmative defense premised on the assumption of the risk, and (3) rejected the application of Hawaiʻi's recreational activity liability statute to void the Liability Waivers. Lahaina Divers and Mr. Dam do not address these issues, which are not part of Appellants' appeal.

Amended Complaint, the District Court entered its May 10, 2022 Order that granted Mr. Ehart's motion to strike Lahaina Divers' and Mr. Dam's affirmative defense of waiver and release; the Order held that 46 U.S.C. § 30509(a)(1)(A) "prohibits waivers with respect to vessels transporting passengers between ports in the United States" including the <u>DAUNTLESS</u>; therefore, § 30509 prohibited the Liability Waivers signed by the Eharts. (1-ER-27-46).

The District Court acknowledged "the multiple cases" cited by Lahaina Divers and Mr. Dam that had held "dive boats differ from steamships, and that Congress was not thinking of dive boat excursions when it enacted § 183c(a) (now § 30509)."[7] (1-ER-31, 45). But the District Court rejected over two decades of case law in favor of adopting the "nexus between the voyage and the United States" rationale in *Courtney* (1-ER-44) and *Hambrook*'s belief that Congress intended to prohibit all vessel waivers involving passenger transportation. (1-ER-45). The

---

[7] The District Court acknowledged that *Shultz v. Florida Keys Dive Center, Inc.*, 224 F.3d 1269 (11th Cir. 2000) contradicted the court's ruling. However, the Order's criticism of *Shultz* demonstrated that the District Court erroneously believes that the United States Court of Appeals for the Eleventh Circuit ("**Eleventh Circuit**") applies § 30509 depending on what a person on a vessel was doing at the time an incident occurred. On the contrary, the Eleventh Circuit's decisions demonstrate that the Eleventh Circuit finds the purpose of the vessel significant in evaluating the statute. (*See* 1-ER-45-46). *See infra* Argument § I.C.

15

Order applied § 30509 to the <u>DAUNTLESS</u> and invalidated the Liability Waivers based on the following:

- Congress stated that the Shipowners' Limitation of Liability Act ("**LOLA**") "applies to seagoing vessels and vessels used on lakes or rivers or in inland navigation, including canal boats, barges, and lighters" in 46 U.S.C. § 30502, which means that § 30509 prohibits liability waivers for the same vessels listed in § 30502. (1-ER-35).

- Mr. Ehart satisfied the ordinary meaning of "transporting passengers because the <u>DAUNTLESS</u> transported the Eharts from Lahaina to Molokini. (1-ER-35-37).

- The <u>DAUNTLESS</u>'s voyage from Lahaina Harbor back to Lahaina Harbor satisfied "between ports in the United States" because:

  - the definitions of "between," "port," and the plural use of "ports" does not require a literal statutory reading that necessitates the involvement of two different ports (1-ER-37-40), and

  - the legislative history of § 183c demonstrated that Congress intended to include all waivers for passengers being transported by ship, as Congress had discussed: (a) stopping practices like printing provisions limiting liability on the back of steamship tickets, and (b) the *General*

*Slocum* steamship disaster that killed 957 of the 1,388 passengers during a voyage from a harbor to a picnic area and back to the harbor. (1-ER-41-44).

**E.** **The District Court Rejected Appellants' Motion for Reconsideration of Its Order Striking the Affirmative Defense of Waiver and Release and Appellants' Alternative Request to Certify the Issue for Interlocutory Appeal**

On June 7, 2019, Lahaina Divers and Mr. Dam filed Defendants' Motion for (A) Partial Reconsideration of Order Dated May 10, 2022 (ECF. No. 45) or (B) in the Alternative, Certification of Interlocutory Appeal. (ECF No. 62.) The motion requested that the Court reconsider its Order striking Lahaina Divers' and Mr. Dam's affirmative defense of waiver and release. Because the District Court first discussed the *General Slocum* disaster in the Order, the parties did not have an opportunity to brief the District Court on why a disaster involving a common carrier does not support the conclusion that Congress intended to apply § 183c (now § 30509) to a recreational vessel departing from and returning to the same port.

On July 13, 2022, the District Court entered its Order Denying Motion and Alternative Motion to Certify an Interlocutory Appeal. (1-ER-2-13). The District Court held that even if it had considered the historical background of the *General*

17

*Slocum* provided by Lahaina Divers and Mr. Dam that it would not have changed the Order striking Appellants' affirmative defense of waiver and release. (1-ER-6).

## SUMMARY OF THE ARGUMENT

46. U.S.C. § 30509 (previously § 183c) prohibits the owner, master, or agent of a vessel "***transporting passengers between ports in the United States, or between a port in the United States and a port in a foreign country***" from limiting their liability for personal injury or death caused by their negligence. Although a common carrier is the type of vessel that transports passengers between ports in the United States (*e.g.,* steamships, cruise ships, ferries), the District Court applied § 30509 to the <u>DAUNTLESS</u>, a dive vessel supporting a voluntary, recreational marine activity. Due to the erroneous interpretation of § 30509, the Order invalidated the Liability Waivers signed by the Eharts and struck Lahaina Divers' and Mr. Dam's second affirmative defense of waiver and release. The Order constitutes error for the following reasons.

First, the Order ignored the ordinary meaning of the words in the statute. Although § 30509 describes common carriers, the Order applied the statute to ***all vessels transporting passengers where the voyage has a nexus to the United States***. Because the <u>DAUNTLESS</u> was "transporting passengers" when the dive boat transported the Eharts from Lahaina Harbor to Molokini and intended to return to

18

Lahaina Harbor, and the voyage had a nexus to the United States, the Order held § 30509 applied. The Order's analysis disregarded the ordinary meaning of "between" and the plural word "ports" by permitting Lahaina Harbor, the same port, to satisfy the requirements of § 30509. Although the Order's "nexus" interpretation rendered "between ports" and "between a port in the United States and a port in a foreign country" superfluous, the Order held a literal interpretation would result in an absurd reading of the statute since Congress intended to apply § 30509 to all vessels transporting passengers in the United States.

Second, the District Court erred by (a) searching for evidence of Congressional intent when the plain language indicates § 30509 applies to common carriers, and (b) misinterpreting the legislative history of § 183c (now § 30509). The Order reasoned that testimony regarding (i) a steamship disaster, and (ii) an intent to stop steamships from printing provisions limiting their liability on the back of steamship tickets justified broadly applying § 30509 to "seagoing vessels and vessels used on lakes or rivers or in inland navigation, including canal boats, barges, and lighters" listed in 46 U.S.C. § 30502, which another U.S. District of Hawai'i judge did in *Courtney*. The Order ignored the fact that the testimony related to common carriers, not recreational vessels like the DAUNTLESS. The Order (and *Courtney*) also neglected the limiting language in § 30502 "[e]xcept as otherwise

19

provided", which prevents applying the vessels listed in § 30502 to § 30509 when § 30509 only applies to "vessels transporting passengers between ports in the United States…." Furthermore, a definition of "common carrier" in Title 46 related to Regulation of Ocean Shipping, 46 U.S.C. § 40102, uses similar language as § 30509 in describing transporting passengers between a port in the United States and a port in a foreign country, and this similarity supports Lahaina Divers' and Mr. Dam's interpretation that § 30509 applies to common carriers.

Third, the Order erred by minimizing the significance of a vessel's purpose and conflating (i) vessels with a transportation purpose that may include a recreational component with (ii) vessels with a recreational purpose that may carry participants as part of an activity. The Order inaccurately stated that the Eleventh Circuit's opinion in *Shultz*—followed by the majority of other courts that have analyzed this issue—held that "whether a waiver is void or enforceable under § 30509 turns on when the negligence occurred or what a person on a vessel was doing." However, the case law cited by the Order indicates that the Eleventh Circuit, and the cases cited by *Courtney*, related to common carriers that held recreational activities—not recreational vessels that carried participants as part of a recreational maritime activity. Application of § 30509 does not depend on whether a vessel is carrying passengers but rather on whether the vessel's purpose is to

20

transport passengers, as common carriers have historically had an increased responsibility towards passengers and generally must transport all paying passengers.

Fourth, in rejecting over two decades of decisions that have held recreational vessel waivers are enforceable, the Order erred by neglecting trial courts' obligation to maintain the uniformity of maritime law.

Lastly, the Order erred in using its erroneous legal interpretation of § 30509 as a basis for determining that the affirmative defense of waiver and release is "clearly insufficient" and warrants the "severe measure" of striking the affirmative defense of waiver and release. Because admiralty law recognizes the enforceability of the Liability Waivers, the Order should be vacated as to Lahaina Divers' and Mr. Dam's second affirmative defense; as the law of the case, the Order has prejudiced all Defendants.

## STANDARD OF REVIEW

The District Court's legal interpretation determining the applicability of 46 U.S.C. § 30509 is reviewed de novo. *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 637 (9th Cir. 2012) (reviewing district court's interpretation of FRCP de novo). A motion to strike an affirmative defense pursuant to Rule 12(f) is reviewed for an abuse of discretion. *El Pollo Loco, Inc. v.*

*Hashim,* 316 F.3d 1032, 1038 (9th Cir.2003). However, review of whether an

affirmative defense is inapplicable as a matter of law is reviewed de novo. *In re*

*Hanford Nuclear Rsrv. Litig.,* 534 F.3d 986, 1000 (9th Cir. 2008) (reviewing de

novo the district court's conclusion that affirmative defense was unavailable as a

matter of law); *Whittlestone, Inc. v. Handi–Craft Co.,* 618 F.3d 970, 973 (9th

Cir.2010) (reviewing district court's interpretation of contract that led to district

court striking damages asserted in complaint).

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN HOLDING THAT 46 U.S.C. § 30509 APPLIES TO THE <u>DAUNTLESS</u> TO INVALIDATE THE LIABILITY WAIVERS

Section § 30509 of the LOLA, formerly 46 U.S.C. § 183c(a), states:

(a) Prohibition.—

(1) In general.—***The owner, master, manager, or agent of a vessel transporting passengers between ports in the United States, or between a port in the United States*** and a port in a foreign country, may not include in a regulation or contract a provision limiting—

(A) the liability of the owner, master, or agent for personal injury or death caused by the negligence or fault of the owner or the owner's employees or agents; or

(B) the right of a claimant for personal injury or death to a trial by court of competent jurisdiction.

46 U.S.C. § 30509(a) (emphasis added). Thus, an "owner [or] master… of a vessel transporting passengers between ports in the United States may not include in a … contract[,] a provision limiting— (A) the liability of the owner [or] master … for personal injury or death caused by the negligence or fault of the owner or the owner's employees or agents; or (B) the right of a claimant for personal injury or death to a trial by court of competent jurisdiction." 46 U.S.C. § 30509.

The District Court's application of § 30509 to the DAUNTLESS is erroneous because the Order: (1) ignored the ordinary meanings of the words in the statute and renders some of the language superfluous; (2) unnecessarily relied on legislative analysis regarding the implementation of the statute and then speculated that Congress intended for the statute to apply to all vessels transporting passengers; (3) minimized the importance of the purpose of the vessel in determining the scope of the statute; and (4) relied on *Courtney* and *Hambrook*, two decisions from the same judge in the District of Hawai'i, when the majority, if not all, of the other courts examining the statute over the last two decades have held that waivers for recreational water activities are enforceable under maritime law.

### A.    The District Court's Interpretation of the Plain Language in 46 U.S.C. § 30509 Is Erroneous

The Order states § "30509 voids the waivers the Eharts signed only

23

if all of the statute's terms are satisfied" and that *Wallis*, 306 F.3d at 835, is

"instructive" because the Ninth Circuit refused to apply § 183c "when the vessel

was not transporting passengers between ports of the United States or between any

such port and foreign port;" the cruise "did not touch a United States port."

(1-ER-32). Lahaina Divers and Mr. Dam agree that the applicability of the statute

turns on "whether the facts of this case satisfy the language of § 30509 in light of

the basic canons of statutory construction." (1-ER-32).

However, the Order strained the canons of statutory construction to hold

that 46 U.S.C. § 30509(a) applies to the <u>DAUNTLESS</u>, a dive vessel that

transported passengers out from and back to the same port, Lahaina Harbor.

The Order (1) ignores the ordinary meaning of "a vessel transporting

passengers between ports in the United States" that refers to a common carrier;

(2) renders the word "between" meaningless by requiring a single port to satisfy

"between ports in the United States"; and (3) makes the phrases "between ports

in the United States" and "between a port in the United States and a port in a

foreign country" surplusage by only requiring a "nexus between the voyage and the

United States" to apply § 30509. (1-ER-44).

First, the Order erred in using a rudimentary analysis of "transporting

passengers" to conclude that § 30509 applied not only to common carriers but to

all vessels transporting passengers. (1-ER-35-37). According to the Order, "transport" means "to transfer or convey from one place to another," and "there is no dispute that the Eharts were passengers." (1-ER-36-37). The District Court then broadly applied § 30509 to the DAUNTLESS because the dive vessel was "transporting passengers" when it "convey[ed] the Eharts from Lahaina Harbor to Molokini Crater and then intended to return them to Lahaina Harbor." (1-ER-37).

Lahaina Divers and Mr. Dam have no qualms with the Order consulting dictionary definitions, which is "the usual course" when the LOLA does not define the words. *Animal Legal Def. Fund v. United States Dep't of Agric.*, 933 F.3d 1088, 1093 (9th Cir. 2019) ("To determine the ordinary meaning of a word, 'consulting common dictionary definitions is the usual course.'") (citation omitted). However, the Order failed to analyze the ordinary meaning of the entire phrase "a vessel transporting passengers between ports in the United States" before concluding that § 30509 applies to all vessels transporting passengers. The ordinary meanings of the words in § 30509 refer to a "vessel that ***transports***[8] [transfers or conveys from one place to another] passengers ***between***[9] [from one to another of] ***ports***[10]

---

[8] The Order included this definition of "transport" from the Merriam-Webster Dictionary. (1-ER-36).

[9] The Order included the following definitions of "between" from the American Heritage Dictionary of the English Language and the Merriam-Webster dictionary:

[harbors with piers or docks]. If giving effect to every word used in the statute, § 30509 refers to a vessel that carries passengers from one harbor with piers or docks to another harbor with piers or docks; the vessel described is a common carrier (*e.g.,* a cruise ship, steamship, or ferry). *See* 46 U.S.C. § 40102; *McCoy v. Pac. Spruce Corp.*, 1 F.2d 853, 855 (9th Cir. 1924) ("A common carrier is generally defined as one who, by virtue of his calling and as a regular business, undertakes ***to transport persons*** or commodities ***from place to place***, offering his services to such as may choose to employ him and pay his charges.") (emphasis added).

Second, the Order erred in construing "between ports of the United States" to include the DAUNTLESS departing from Lahaina Harbor and returning to Lahaina Harbor. (1-ER-37-41). Although the District Court examined the dictionary definitions of "between" and "port," the District Court's interpretation disregarded the ordinary meaning of the phrase "between ports" to justify allowing a single port to satisfy § 30509; this reading renders the word

"[i]n or through the position or interval separating" and "[c]onnecting spatially" or "in the time, space, or interval that separates." (1-ER-38). Although not listed in the Order, the Merriam-Webster dictionary also contains the definition "from one to another" and lists as an example: "air service *between* Miami and Chicago." *Between*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/between (last visited Sept. 30, 2022).

[10] The Order included this definition of "port" from the *Glossary of Shipping Terms* at 80. (1-ER-39).

"between" meaningless and strips the substantive plural from ports, converting it into the singular. Indeed, "*between* is commonly said to be proper with two things" although "good writers commonly use *between* with more than two elements." Bryan A. Garner, *Garner's Modern English Usage, the Authority on Grammar, Usage, and Style* 111 (4th ed. 2016). (2-ER-334). Furthermore, if "ports" only refers to a single port, the word "between" in the phrase "between ports of the United States" is superfluous because "between" is "a word that necessarily provides context indicating that the plural cannot include the singular in this instance." *Witkowski v. Niagara Jet Adventures, LLC*, No. 16-CV-856, 2020 WL 486876, at *4 n.4 (W.D.N.Y. Jan. 30, 2020). *See also Cook v. Crazy Boat of Key W., Inc.*, 949 So. 2d 1202, 1203 (Fla. Dist. Ct. App. 2007) ("[W]e reject [the] contention that the statutory language "between ports of the United States" can be interpreted to apply to trips out from one port and back to that same port as it contradicts the plain language of the statute."). *See also Lowe v. S.E.C.*, 472 U.S. 181, 207, n.53, 105 S.Ct. 2557, 2572 n.53 (1985) ("[W]e must give effect to every word that Congress used in the statute.").

It is also worth noting that the District Court adopted the definition of "transport"—meaning "to transfer or convey from one place to another"—which by itself conveys moving from one port to a different port given that "another"

means "different or distinct from the one first considered." (1-ER-36-37). *Another*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/another (last visited Sept. 25, 2022). Although the Order discusses transporting passengers from Lahaina Harbor to Molokini, the District Court declined to reach the issue of whether Molokini was a port, so the DAUNTLESS did not transport passengers between one port and another port of the United States. (1-ER-37, 39 n.3).

Third, the Order erred in following the minority opinion *Courtney* and concluding that the phrases "between ports in the United States" and "between a port in the United States and a port in a foreign country" only require a "nexus between the voyage and the United States." (1-ER-44). If § 30509 only requires a nexus with the United States, Congress could have written "nexus between the voyage and the United States."[11] But it did not. Alternatively, Congress could have eliminated existing language in the statute to effectuate its intent. But it did not. As shown below, "between ports" and "or between a port in the United States and a

---

[11] The Order asserts that Congress could have written the phrase "between different ports" if Congress meant for Appellants' interpretation of "between ports" to mean different ports. (1-ER-41). The District Court's reasoning applies equally to the Order's "nexus between the voyage and the United States" interpretation.

port in a foreign country" (in red and strikethrough effect) have no meaning in

 30509 if the statute is meant only to require a nexus to the United States.

> (a) Prohibition. --

>> **(1) In general.** --The owner, master, manager, or agent of a vessel transporting passengers ~~between ports~~ in the United States~~, or between a port in the United States and a port in a foreign country~~, may not include in a regulation or contract a provision limiting--

46. U.S.C. § 30509(a)(1). Congress could have effectuated the District Court's

interpretation in the instant case with far fewer words if it had instead written:

"The owner, master, manager, or agent of a vessel transporting passengers in the

United States.…"

Because it is a fundamental principle to avoid interpretations that make text

meaningless, the logical conclusion is that "between ports in the United States"

and "between a port in the United States and a port in a foreign country" refer to a

common carrier that transports passengers between two different ports. *United*

*States v. Butler*, 297 U.S. 1, 65, 56 S.Ct. 312, 319 (1936) ("These words cannot be

meaningless, else they would not have been used."). *See also* 46 U.S.C. § 40102,

*infra*, at 33-34; *Am. Ass'n of Cruise Passengers, Inc. v. Carnival Cruise Lines, Inc.*, 911

F.2d 786, 792 (D.C. Cir. 1990) ("We hold that a cruise line is a common carrier

within the meaning of § 3(6) of the Shipping Act, except insofar as it travels only between foreign ports.").

**B.** **The Order Unnecessarily Relied on Congressional Intent Given the Plain Language of the Statue and Then Erred in Interpreting Legislative Intent to Apply § 30509 to All Vessels Transporting Passengers Whose Voyages Have a Nexus to the United States**

Because the language of 46. U.S.C. § 30509 indicates that it applies only to common carriers, analysis of legislative history is unnecessary. *Animal Legal Def. Fund*, 933 F.3d at 1093 ("If the language has a plain meaning or is unambiguous, the statutory interpretation inquiry ends there.") (citation omitted); *United States v. Lillard*, 935 F.3d 827, 834 (9th Cir. 2019) ("If the statutory language lacks a plain meaning, we may 'employ other tools, such as legislative history, to construe the meaning of ambiguous terms.'") (citation omitted).

However, the Order unnecessarily delved into Congressional intent because the District Court determined that a "literal reading" of "ports" to require two different ports "would compel an odd result." (1-ER-38-40). The Order reasoned that § 30509 would prohibit a waiver for a short journey transporting passengers between two different ports of the United States, but § 30509 would not prohibit a waiver "if the same vessel left Port A for a 10-hour sightseeing tour and then returned to the same port (Port A)." (1-ER-40). Because the District Court found

30

it absurd that Congress meant to enforce "a waiver only for the first (very brief) journey," but not for a 10-hour sightseeing tour, the District Court "search[ed] for other evidence of congressional intent to lend the term its proper scope." (1-ER-40).

The Order discussed the legislative history of § 183c, which included testimony regarding the GENERAL SLOCUM steamship disaster and Congress's intent to (i) stop steamships from printing provisions limiting their liability on the back of passenger tickets, and (ii) prevent all such "practices of like character." (1-ER-42-44). The Order also contended that § 30502 of the LOLA "applies to seagoing vessels and vessels used on lakes or rivers or in inland navigation, including canal boats, barges, and lighters," which means that Congress intended for § 30509 to apply to all vessels listed in § 30502, not just common carriers. (1-ER-35). In addition, the Order noted that *Courtney* had held that Congress broadly intended to prohibit waivers involving passenger transportation and that *Courtney* and *Hambrook*, which applied the same judge's decision in *Courtney*, had never been appealed; as such, the District Court viewed these two decisions as "consistent with the intent of Congress to bar " ***'all' waivers with respect to the transportation of passengers***." (1-ER-45). (emphasis added).

31

The District Court's analogy is misguided, and its analysis of Congress's intent is erroneous for the following reasons.

First, the District Court's analogy to demonstrate the supposed absurdity of requiring different ports fails because a 10-hour **_sightseeing tour_** departing from and returning to the same port likely falls under a voluntary maritime excursion, which Congress did not intend for § 30509 to regulate; the purpose of the vessel, not the length of time of the voyage, determines the applicability of § 30509. *Shultz*, 224 F.3d at 1271. *Accord Rodriguez v. SeaBreeze Jetlev LLC*, No. 4:20-CV-07073-YGR, 2022 WL 3639305, at *5 (N.D. Cal. June 23, 2022) ("Congress intended to ensure that essential transportation services were safe for passengers, which is 'much different than the practice here—requiring a signed liability release to participate in [a] recreational and inherently risky activity' with no transportation purpose."). *See infra* §§ I.C, I.D.

Second, the District Court's analysis of § 183c's legislative history failed to recognize, or attempted to diminish, the relevance of the GENERAL SLOCUM's status as a common carrier.[12] Given that Congress enacted § 183c following

---

[12] The District Court concluded that the GENERAL SLOCUM was a vessel "taking passengers on day trips to and from the same port," impliedly without stopping at another port. (1-ER-43) But nothing in the legislative history considered in the Order (*see* 1-ER-41-43; 2-ER-120-202) indicates that the GENERAL SLOCUM was engaged in "the transportation of passengers from Port

testimony regarding a common carrier disaster, it is more logical to presume that Congress included terminology relevant to common carriers ("between a port in the United States and a port in a foreign country") because (a) the statute intended to bar waivers by common carriers (ex. steamships) rather than to assume (b) that Congress "merely meant that there had to be a nexus between the U.S. and…the voyage." (*See* 1-ER44; 2-ER-68:1-11).

To demonstrate, it is notable that in another part of Title 46—Shipping of the United States Code ("**Title 46**"), the definition of "common carrier" uses similar phrases and terminology as 46 U.S.C. § 30509. Subtitle IV—Regulation of Ocean Shipping defines "common carrier" as follows:

> (7) Common carrier.--The term "common carrier"--
>
> (A) means a person that--
>
> (i) holds itself out to the general public to *provide transportation by water of passengers* or cargo *between the United States and a foreign country* for compensation;

---

A … on an excursion that returns to Port A even if there is no intervening different port." (1-ER-44). Indeed, the historical evidence in the record establishes that the GENERAL SLOCUM was a common carrier steamship chartered to transport passengers between its origin port on Manhattan (Port A) to a picnic ground with its own pier on Long Island (Port B) before returning the passengers later that day from the picnic ground to the origin port. (*See generally* 2-ER-203-317).

(ii) *assumes responsibility for the transportation from the port* or point of receipt *to the port* or point of destination; and

(iii) uses, for all or part of that transportation, *a vessel operating* on the high seas or the Great Lakes *between a port in the United States and a port in a foreign country*; but....

46 U.S.C. § 40102 (emphasis added). *See also Am. Ass'n of Cruise Passengers, Inc.*, 911 F.2d at 791–92 ("The statute thus unambiguously provides that, in order to be a common carrier, a ship must call at a port in the United States.").

Given the similar language used in 46 U.S.C. § 40102(7) and 46. U.S.C. § 30509, it is unlikely that Congress referenced transporting passengers between a port in the United States in defining a common carrier under § 40102 in Title 46 without any intent to limit § 30509 to common carriers when § 30509 uses similar language referring to transporting passengers between ports in the United States. Also, applying § 30509 to common carriers is logical when considering that common carriers have historically had an "increased responsibility imposed upon [them] by the law upon the grounds of public policy...." *Carrier*, BLACK'S LAW DICTIONARY (11th ed. 2019) (citing Robert Hutchinson, A Treatise on the Law of Carriers 30–31 (1882).).

Third, the Order erroneously states: "Consistent with § 30502, § 30509 only requires that a vessel be 'transporting passengers,' not that it act as a common

34

carrier." (1-ER-35-36). While § 30502 defines the applicability of LOLA generally,

§ 30502 also contains the limitation "[e]xcept as otherwise provided," which the

Order and *Courtney*[13] both omit. 46 U.S.C. § 30502 states:

> ***Except as otherwise provided***, this chapter (except section 30503) applies to seagoing vessels and vessels used on lakes or rivers or in inland navigation, including canal boats, barges, and lighters.

46 U.S.C. § 30502 (emphasis added). Although sections of the LOLA refer simply

to a "vessel," which would make the unconditional application of § 30502 to a

section of the LOLA logical,[14] § 30509 "otherwise provides," or specifies, that

§ 30509 applies to "a vessel transporting passengers between ports in the United

---

[13] *Courtney* cited to § 188 (now § 30502) and stated: "Section 183c is not limited to common carriers but applies to 'all vessels used on lakes or rivers or in inland navigation, including canal boats, barges, and lighters.'" *Courtney*, 5 F. Supp. 2d at 879.

[14] The Order noted that Appellants sought application of 46 U.S.C. § 30505 under the LOLA, so it could not comprehend why the court should use different definitions under § 30505 versus § 30509. (1-ER-35-36 n.2). The answer is clear. While § 30505 refers to "a vessel", § 30509 applies to "a vessel transporting passengers between ports in the United States, or between a port in the United States and a port in a foreign country." 46 U.S.C. § 30505 ("Except as provided in section 30506 of this title, the liability of the owner of a ***vessel*** for any claim, debt, or liability described in subsection (b) shall not exceed the value of the ***vessel*** and pending freight...."). *See also Charnis v. Watersport Pro, LLC*, No. 2:07-CV-00623-RLHGWF, 2009 WL 2581699, at *5 (D. Nev. May 1, 2009) ("When Congress enacted the Limitation of Liability Act, it expressly limited the prohibition on liability waivers to common carriers. The fact that Congress implicitly allowed all other types of vessels to limit liability through contract indicates that such waivers do not contravene public policy.").

States, or between a port in the United States and a port in a foreign country." 46 U.S.C. § 30509(a)(1). *See Waggoner v. Nags Head Water Sports, Inc.*, 141 F.3d 1162 (4th Cir. 1998) (unpublished) ("Although the Act as a whole applies to pleasure craft, including jet skis, this section [46 U.S.C.App. § 183c(a)] is limited by its terms to common carriers.") (internal citations omitted).

Finally, the Order erred in concluding that § 30509 bars "all waivers by passengers being transported by ship" when two decisions from a single judge of the District of Hawai'i act as the only legal support for the District Court's expansive interpretation. (1-ER-36). As the District Court acknowledged, "multiple cases" have "determined that § 30509 (or its predecessor statute) was inapplicable to waivers involving recreational ocean sport activities." (1-ER-29). *E.g., Shultz v. Fla. Keys Dive Ctr., Inc.*, 224 F.3d 1269, 1273 (11th Cir. 2000) ("The federal common law's limitation on common carrier liability releases does not extend to the liability release signed by [the plaintiff]."). *See infra* § I.D. Other courts' application of § 30509 is unsurprising when the plain language — "a vessel transporting passengers between ports in the United States, or between a port in the United States and a port in a foreign country"— describes a common carrier. *See* 46 U.S.C.§ 40102.

Since the entry of the Order, another decision has rejected the Order's legislative analysis. In *Rodriguez*, 2022 WL 3639305, Mr. Ehart's counsel similarly argued that Congress intended for § 30509 to bar a liability waiver that a tubing ride participant had signed in Hawai'i. The *Rodriguez* court found the waiver inapplicable on other grounds[15] but note[d] that applying the statute … [was] made further untenable by legislative history." *Id.* at *4. The opinion is useful in that the district court recognized a well-settled policy of Congress "to ensure that essential transportation services were safe for passengers" but understood that preventing provisions limiting liability on steamship tickets is "much different than the practice [of] requiring a signed liability release to participate in [a] recreational and inherently risky activity' with no transportation purpose." *Id.* at *5 (citing *Shultz*, 224 F.3d at 1271). *See also infra* § I.D.

### C.    The District Court Misconstrued the Importance of the Vessel's Purpose and How it Affects the Application of § 30509

Lahaina Divers and Mr. Dam explained that the <u>DAUNTLESS</u> is not in the business of transporting passengers because the <u>DAUNTLESS</u> is a dive vessel

---

[15] The *Rodriguez* court determined that the tubing ride had no destination and would require straining the meaning of "transportation beyond its common use and to extend its current scope." *Id.* Because the district court found that the plaintiff was not transported, it did not reach the question of whether the statute applies only to common carriers. *Id.* at n.3. In dicta, the *Rodriguez* court accepted the District Court's analysis regarding a single port.

supporting a voluntary, recreational water activity; a participant may elect not to participate in the non-essential activity or go elsewhere to participate in the same activity. In contrast, a common carrier "holds itself out to the public as offering to transport … passengers for a fee," and "[a] common carrier is generally required by law to transport … passengers without refusal if the approved fare or charge is paid." *Carrier*, BLACK'S LAW DICTIONARY (11th ed. 2019).

In rejecting Lahaina Divers' and Mr. Dam's argument that § 30509 did not apply to the DAUNTLESS because it is a dive vessel, the District Court minimized the significance of a vessel's purpose and conflated (i) vessels with a transportation purpose that may include a recreational component with (ii) vessels with a recreational purpose that may carry participants as part of an activity. (*See* 1-ER-36-37).

The Order recognized that other courts have ruled that "dive boats differ from steamships, and that Congress was not thinking of dive boat excursions when it enacted §183c(a) (now § 30509)," but the District Court failed to understand the significance of the vessel's purpose. (*See* 1-ER-31). This is apparent from the Order's critique of the Eleventh Circuit's opinions in *Shultz* and *Johnson v. Royal Caribbean Cruises, Ltd.* (*See* 1-ER-45-46).

38

In discussing *Shultz*, the District Court erroneously asserted that the Eleventh Circuit had held that "whether a waiver is void or enforceable under § 30509 turns on when the negligence occurred or what a person on a vessel was doing." (1-ER-45). According to the Order, the Eleventh Circuit's interpretation would "differentiate between a waiver signed by a passenger who drowns while being transported to a dive spot when a vessel sinks from a waiver signed by a passenger who gets off a vessel at a dive spot and then drowns while diving." (1-ER-45). However, this understanding overcomplicates the application of the statute; § 30509 would not apply in either of these circumstances because a dive vessel is in the business of diving, not transportation, and § 30509 applies only to common carriers. *Shultz*, 224 F.3d at 1273 ("The Dive Center's business was scuba diving, not general transportation. No court, as far as we have been informed, has ever relied upon federal common law to invalidate a liability release for scuba diving, even where the scuba diving involved the use of a dive boat."). *See also Olmo v. Atl. City Parasail, LLC*, No. CV 13-4923 (AMD), 2016 WL 1728964, at *10 (D.N.J. Apr. 28, 2016) (rejecting argument that release did not waive legal rights for duration of boat ride to and from parasailing site).

In analyzing the Eleventh Circuit's holding in *Johnson*, the Order states "the Eleventh Circuit recognized that the statute did not make exceptions with respect

to the type of activity underlying a waiver" as if *Johnson* contradicted the Eleventh Circuit's decision to invalidate a diving waiver in *Shultz*. (1-ER-46). But *Johnson* is consistent with *Shultz*. The Eleventh Circuit invalidated Royal Caribbean Cruises' waiver when a passenger of the cruise ship injured himself on a simulated surfing and body-boarding activity on the cruise ship—because cruise ships are "vessels transporting passengers between ports" (*i.e.*, common carriers). *Johnson*, 449 F. App'x at 849. The Eleventh Circuit in *Shultz* addressed the distinction between a recreational vessel and a common carrier when it recognized that the plaintiff's legal support for invalidating the dive waiver consisted of cases involving "carriers—*e.g.*, ferries, ocean liners, or cruise ships." *Shultz*, 224 F.3d at 1273.

The District Court rejected the Eleventh Circuit's analysis in favor of *Courtney*, which also misunderstood that the "purpose of the vessel" is controlling, not the activity that the individual is engaging in at the time of the incident. The *Courtney* court acknowledged that "no court [had] applied Section 183c to a release form relating to a scuba diving activity," but the *Courtney* court justified invalidating the scuba-diving waiver by relying on two cases involving activities sponsored by common carriers. In *Moore v. Am. Scantic Line*, 121 F.2d 767 (2d Cir. 1941), the Circuit Court of Appeals for the Second Circuit held that § 183c voided a provision on the back of a steamship ticket that limited liability for the defendant's

40

negligence when a passenger injured himself while skipping rope on the deck of the steamship. *Id.* at 768-69. In *Carlisle v. Ulysses Line Ltd., S.A.*, 475 So. 2d 248, 251 (Fla. Dist. Ct. App. 1985), a Florida appeals court, addressed the duty to warn passengers of known dangers at beaches recommended by the cruise ship's activities director; the appellate court recognized that § 183c prohibited the cruise ship from exculpating itself from liability for its own negligence and recognized that a cruise ship's duty to its passengers extends past the point of debarkation and embarkation. *Id.* at 249.

Because recreational activities provided by a cruise ship are an extension of the passenger's trip, the common carrier's duties towards its passengers extend to the cruise's activities; in these cases, the language of § 30509 prohibits common carriers from contractually waiving their negligence. *See Smolnikar v. Royal Caribbean Cruises Ltd.*, 787 F.Supp.2d 1308, 1316 (S.D. Fla. 2011) ("§ 30509 indisputably applies to common carriers and contains no language providing exceptions for activities sponsored by a common carrier."); *In re Royal Caribbean Cruises Ltd.*, 991 F. Supp. 2d 1171, 1181 (S.D. Fla. 2013) (applying § 30509 because port-of-call and the activities were "integral" to cruise in the present case).

The DAUNTLESS is a dive boat supporting a voluntary, recreational maritime activity—not a common carrier with a recreational component.

Therefore, the Eleventh Circuit's opinion in *Johnson* and the cases cited by

*Courtney* do not support the District Court's determination that § 30509 applies to

the DAUNTLESS just because it carried participants to the snorkeling/dive spot at

Molokini.

> **D.** **The District Court Disregarded Extensive Case Law Indicating Releases Waiving Negligence in Recreational Water Activities Are Enforceable Under Maritime Law, a Uniform Body of Law**

Since at least 1998, the majority of courts, if not all other courts, except the

*Courtney /Hambrook* court relied on by the District Court, have held that § 183c or

§ 30509 do not invalidate waivers for voluntary, recreational marine activities

under maritime law.[16] (2-ER-63:15-16; 68:1-11; 1-ER-45).

In 1998, in the month after the Hawai'i district court's *Courtney* ruling, the

Fourth Circuit, in an unpublished opinion, held that § 183c did not invalidate a

waiver signed to rent a jet ski. *Waggoner*, 141 F.3d 1162.

In 1999, a federal district court in the Southern District of Florida

determined that § 183c did not invalidate a scuba diving waiver because "[n]o

---

[16] Contrary to the numerous decisions supporting Appellants' position, Mr. Ehart contends that Congress meant to "codify the well-settled admiralty policy against exculpatory contracts" and that the only way to effectuate Congress's statutory objective would be to adopt the *Courtney* ruling and "assume Congress merely meant that there had to be a nexus between the U.S. and…the voyage." (2-ER-63:9-16; 68:1-11). *See Courtney, Inc.*, 5 F. Supp. 2d at 879.

common carrier was involved" in the case. *Cutchin v. Habitat Curacao-Maduro Dive Fanta-Seas, Inc.*, No. 98-1679-CIV-GOLD, 1999 WL 33232277, at *7 (S.D. Fla. Feb. 8, 1999).

In 2000, the Fourth Circuit affirmed a decision that held § 183c did not invalidate a liability release in a recreational scuba diving case. *Shultz*, 224 F.3d at 1270. The court explained that it was "follow[ing] the consistent lead of the few cases addressing the release issue and noted that "every district court and state court presented with the issue…ha[d] upheld such releases in recreational scuba diving cases … based on either the lack of application of § 183c(a) or based on a lack of admiralty jurisdiction." *Id* at 1271. The Fourth Circuit raised *Courtney* as the one case that found § 183c applicable but noted that the decision had been criticized. *Id.* (*See* 1-ER-29-31).

In 2002, a federal district court in Puerto Rico agreed with the analysis in *Shultz* and upheld a scuba diving waiver because the dive vessel was not a common carrier to which § 183c applied. *Olivelli v. Sappo Corp.*, 225 F. Supp. 2d 109, 119 (D.P.R. 2002). (*See* 1-ER-31).

In 2004, a Florida appellate court, upheld exculpatory clauses related to a boat rental "[b]ecause there [was] no indication that the Boat Club was operating as a commercial carrier or that the transportation involved was occurring from port

43

to port"; thus, § 183c did not apply. *Hopkins v. The Boat Club, Inc.*, 866 So. 2d 108, 112 (Fla. Dist. Ct. App. 2004).

In 2007, another Florida appellate court confirmed that § 183c did not void a release for a "thrill ride" because the participant willingly paid to participate, and the boat "was not in the business of 'transporting passengers' but rather it was in the business of providing a recreational activity." *Cook*, 949 So. 2d at 1203.

In 2009, a federal district court in the Virgin Islands upheld a release for a snorkeling tour under maritime law. *Piche v. Stockdale Holdings, LLC*, 51 V.I. 657, 666 (D.V.I. Mar. 24, 2009). The court did not discuss 183c but found that "there was no necessary or unavoidable water carriage" and that the defendant's services involved "a voluntary water-based excursion designed to entertain." *Id.* at 667.

A couple months later, a federal district court in Nevada analyzing a release for wakeboarding recognized that "federal courts applying maritime law" had held "that the prohibition on liability waivers [in § 183] applies only to common carriers and that owners of recreational vessels may enforce such waivers" as to ordinary negligence. *Charnis*, 2009 WL 2581699, at *4-5.

That same year, a federal district court in the Virgin Islands also recognized the enforceability of waivers in the context of a recreational vessel used for sailing

44

purposes. *Oran v. Fair Wind Sailing, Inc.*, No. CIV.A. 08-0034, 2009 WL 4349321, at *13 (D.V.I. Nov. 23, 2009).

In 2011, a federal district court in the Western District of New York did not reference § 30509 but explained that [t]he clear majority of federal cases … [had held] that operators of inherently risky marine recreational activities may contract to disclaim liability for their own negligence." *Brozyna v. Niagara Gorge Jetboating, Ltd.*, No. 10-CV-602-JTC, 2011 WL 4553100, at *4 (W.D.N.Y. Sept. 29, 2011). Thus, "the waiver and release of liability contained in [a] Whirlpool Jet Participation Agreement signed by plaintiffs [was] enforceable as a matter of well recognized admiralty law." *Id.* at * 6.

In 2012, a federal district court in Utah agreed with the Fourth Circuit's assessment in *Waggoner* when it found a liability waiver enforceable as to the parties of a rental boat agreement. *In re Aramark Sports & Ent. Servs., LLC*, No. 2:09-CV-637-TC, 2012 WL 3776859, at *7 (D. Utah Aug. 29, 2012).

In 2013, a federal district court in the Virgin Islands rejected *Courtney* and held that § 30509 did not apply to a recreational jet ski and snorkeling tour waiver because the case did not involve a "vessel transporting passengers between ports in the United States, or between a port in the United States and a port in a foreign

country." *Jerome v. Water Sports Adventure Rentals & Equip., Inc.*, No. 2009-092, 2013 WL 1499046, at *7 (D.V.I. Apr. 12, 2013). (*See* 1-ER-31).

Also in 2013, a federal district court in Nevada acknowledged that"[u]nder federal admiralty law, owners of recreational vessels may, through written waivers, disclaim liability for their own negligence." *Cobb v. Aramark Sports & Ent. Servs., LLC*, 933 F. Supp. 2d 1295, 1298 (D. Nev. 2013) (granting Defendants' summary judgment where the plaintiff signed a clear and unambiguous release for parasailing, "a voluntary recreational activity").

In 2016, a federal district court in New Jersey cited to *Olivelli*, *Charnis*, and *Cobb* as support for upholding a parasailing liability waiver even though none of these decisions came from a district court in New Jersey. *Olmo*, 2016 WL 1728964, at *10.

In 2018, a federal district court in Puerto Rico referenced *Olmo*, *Olivelli*, *Cobb*, and *Brozyna*, and *Waggoner* when it upheld jet ski liability waivers signed by the seriously injured plaintiffs who chose to participate in "a recreational, hazardous maritime activity." *Nicole Morgan v. Water Toy Shop, Inc.*, 2018 WL 1725550, at *8-11 (D.P.R. Mar. 30, 2018).

In 2019, a federal district court in the Virgin Islands recognized the holdings in *Olmo*, *Jerome*, *Charnis*, *Oran*, and *Waggoner* when it determined that § 30509 did

not invalidate a rental boat liability release, which waived the plaintiffs' claims of ordinary negligence. *Matter of Carpe Diem 1969 LLC*, No. CV 2017-56, 2019 WL 3413841, at *4–5 (D.V.I. July 29, 2019).

In 2020, a district court judge form the Western District of New York adopted the magistrate judge's recommendation to grant the defendant's summary judgment as to the plaintiffs' ordinary negligence claims because § 30509 did not bar the jet boat release under federal maritime law. *Witkowski*, 2020 WL 486876, at *2–6.

Following the District Court's 2021 ruling in this case, *Rodriguez*, recognized that "a review of cases addressing the question of whether such waivers are applicable in the context of recreational water activities indicates that such waivers are enforceable." *Rodriguez*, 2022 WL 3639305, at *6. *Rodriguez* observed that the plaintiff cited "one case to the contrary," *Hambrook*, which relies on *Courtney,* to assert that "it is not contrary to admiralty law for Hawai'i to bar such releases in the recreational context.*" Id.* However, *Rodriguez* declined to follow *Hambrook* because "[t]he *Hambrook* court did not acknowledge the extensive case law indicating that releases for negligence are generally enforceable in admiralty courts." *Id.* "With this context, the Court [found] that section 30509 exists to create a narrow and specific exception to the general rule." *Id.*

47

Importantly, the *Rodriguez* court recognized that courts are "tasked with protecting [maritime law's] uniformity."[17] *Id.* "[I]ndeed, the reason for the conferral of federal admiralty jurisdiction was to protect the maritime industry through the development of a uniform body of admiralty law." *State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld*, 921 F.2d 409, 414 (2d Cir. 1990). *See also Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 401–02, 90 S.Ct. 1772, 1788, 26 L.Ed.2d 339 (1970) ("[U]niformity … will give effect to the constitutionally based principle that federal admiralty law should be 'a system of law coextensive with, and operating uniformly in, the whole country.'").

By disregarding over two decades of case law holding that recreational waivers are enforceable under maritime law, the Order has overlooked the important tenet of maintaining maritime law's uniformity. While no one disputes a tragedy occurred, "[t]he Supreme Court has counseled that courts are not free to rewrite admiralty laws simply because the result seems unfair in a particular case. *Harper v. U.S. Seafoods LP*, 278 F.3d 971, 976 (9th Cir. 2002).

---

[17] The *Rodriguez* opinion addressed uniformity in relation to the plaintiff's arguments regarding the application of Hawai'i law, but the important principle of maintaining uniformity in maritime law still applies.

## II.   BECAUSE THE DISTRICT COURT ERRED IN INTERPRETING 46 U.S.C. § 30509, THE DISTRICT COURT ALSO ERRED IN STRIKING APPELLANTS' SECOND AFFIRMATIVE DEFENSE OF WAIVER AND RELEASE

The District Court recognized that a motion to strike is a "severe measure and is generally viewed with disfavor" but "may be granted when a defense is clearly insufficient." (1-ER-28). As discussed above, the plain language of the statute, the legislative history, and the need to maintain the uniformity of maritime law all demonstrate that the District Court erred in (1) applying § 30509 to the DAUNTLESS, which is not a common carrier, and (2) striking Lahaina Divers' and Mr. Dam's affirmative defense of waiver and release, which is a valid defense in a maritime case that does not involve a common carrier. *Compare Cobb*, 933 F. Supp. 2d at 1298 (affirmative defense of express waiver available in parasailing case), *with Small v. Carnival Corp.*, No. 20-21420-CIV, 2020 WL 13401894, at *3 (S.D. Fla. Sept. 4, 2020) (striking common carrier's affirmative defense of waiver).

"In assessing the validity of a waiver, courts almost universally consider the following: (1) whether the person signing the waiver had informed consent; (2) whether the clause was inconsistent with public policy; and (3) whether the clause constitutes an invalid adhesion contract." *Olivelli*, 225 F. Supp. 2d at 116. While this appeal does not address whether the Liability Waivers actually waive Lahaina Divers' and Mr. Dam's negligence, the facts indicate that this is a

49

possibility. No one disputes that the Eharts signed the Liability Waivers. Mr. Ehart does not allege that the DAUNTLESS provided essential transportation services like a common carrier. And Mr. Ehart admits this case involves "a recreational scuba-snorkel voyage." (ECF No. 31-1 at PageID# 163). The Eharts paid to participate in a voluntary pursuit. Unlike cases involving vessels that provide essential transportation services, the Eharts could have elected not to participate in the excursion, and they could have picked another scuba diving or snorkeling operator.

## CONCLUSION

Because the District Court erroneously determined that 46 U.S.C. § 30509 applies to void the Liability Waivers and struck Lahaina Divers' and Mr. Dam's valid affirmative defense, Appellants respectfully request that this Court vacate the Order of the District Court as to Appellants' second affirmative defense of waiver and release, which is the law of the case, and remand the case to the District Court with instructions consistent with this Court's opinion, which will allow Lahaina Divers, Mr. Dam, and the other named defendants to assert the affirmative defense of waiver and release.

//

//

Date:  October 3, 2022.

MacDONALD RUDY O'NEILL &
YAMAUCHI, LLP

*/s/ Jamie C.S. Madriaga*
RALPH J. O'NEILL
JAMIE C.S. MADRIAGA
MATTHEW A. HEMME

*Attorneys for Appellants*
LAHAINA DIVERS INC. and
CORY DAM

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

**9th Cir. Case Number(s)** 22 – 16149

The undersigned attorney or self-represented party states the following:

[**X**] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** s/ Jamie C.S. Madriaga                    **Date** October 3, 2022

*(use "*s/[typed name]*" to sign electronically-filed documents)*

52

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s):** <u>22 – 16149</u>

I am the attorney or self-represented party.

**This brief contains <u>11,379</u> words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[**X**] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Jamie C.S. Madriaga _____ **Date:** <u>10/3/2022</u>
*(use "*s/[typed name]*" to sign electronically-filed documents)*

**Case No. 22-16149**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

WILLIAM MCMEIN EHART, Jr., Individually and as Personal Representative of the Estate of Maureen Anne Ehart, Deceased,

*Plaintiff-Appellee*,

v.

LAHAINA DIVERS INC. and CORY DAM,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Hawaii
No. 21-cv-00475 SOM-KJM
Hon. Susan Oki Mollway

---

**APPELLANTS' STATUTORY ADDENDUM**

---

Ralph J. O'Neill, Esq.
Jamie C.S. Madriaga, Esq.
Matthew A. Hemme, Esq.
MacDonald Rudy O'Neill & Yamauchi, LLP
1001 Bishop Street, Suite 2800
Telephone: (808) 523-3080
*ralphoneill@macdonaldrudy.com*
*jmadriaga@macdonaldrudy.com*
*matthemme@macdonaldrudy.com*

*Attorneys for Appellants*
LAHAINA DIVERS, INC. and
CORY DAM

## TABLE OF CONTENTS

46 U.S.C. §30509. Provisions limiting liability for personal injury or death............1

46 U.S.C. §30502. Application ................................................................3

46 U.S.C. §40102. Definitions ................................................................ 4

# STATUTORY ADDENDUM

**46 U.S.C.**
United States Code, 2020 Edition
Title 46 - SHIPPING
Subtitle III - Maritime Liability
CHAPTER 305 - EXONERATION AND LIMITATION OF LIABILITY
Sec. 30509 - Provisions limiting liability for personal injury or death
From the U.S. Government Publishing Office, www.gpo.gov

## §30509. Provisions limiting liability for personal injury or death

(a) Prohibition.—

(1) In general.—The owner, master, manager, or agent of a vessel transporting passengers between ports in the United States, or between a port in the United States and a port in a foreign country, may not include in a regulation or contract a provision limiting—

(A) the liability of the owner, master, or agent for personal injury or death caused by the negligence or fault of the owner or the owner's employees or agents; or

(B) the right of a claimant for personal injury or death to a trial by court of competent jurisdiction.

(2) Voidness.—A provision described in paragraph (1) is void.

(b) Emotional Distress, Mental Suffering, and Psychological Injury.—

(1) In general.—Subsection (a) does not prohibit a provision in a contract or in ticket conditions of carriage with a passenger that relieves an owner, master, manager, agent, operator, or crewmember of a vessel from liability for infliction of emotional distress, mental suffering, or psychological injury so long as the provision does not limit such liability when the emotional distress, mental suffering, or psychological injury is—

(A) the result of physical injury to the claimant caused by the negligence or fault of a crewmember or the owner, master, manager, agent, or operator;

(B) the result of the claimant having been at actual risk of physical injury, and the risk was caused by the negligence or fault of a crewmember or the owner, master, manager, agent, or operator; or

(C) intentionally inflicted by a crewmember or the owner, master, manager, agent, or operator.

(2) Sexual offenses.—This subsection does not limit the liability of a crewmember or the owner, master, manager, agent, or operator of a vessel in a case involving sexual harassment, sexual assault, or rape.

(Pub. L. 109–304, §6(c), Oct. 6, 2006, 120 Stat. 1514.)

## Historical and Revision Notes

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 30509 | 46 App.:183c. | R.S. §4283B, as added June 5, 1936, ch. 521, §2, 49 Stat. 1480; Oct. 19, 1996, Pub. L. 104–324, §1129(b), 110 Stat. 3984. |

In subsection (a)(1), before subparagraph (A), the words "may not" are substituted for "It shall be unlawful" for consistency in the revised title and with other titles of the United States Code. The words "rule" and "agreement" are omitted as covered by "regulation" and "contract", respectively. The words "a provision limiting" are substituted for "any provision or limitation (1) purporting . . . to relieve . . . , or (2) purporting . . . to lessen, weaken, or avoid" to eliminate unnecessary words. In subparagraph (A), the words "the owner's employees or agents" are substituted for "his servants" for consistency in the revised title. In subparagraph (B), the words "on the question of liability for such loss or injury, or the measure of damages therefor" are omitted as unnecessary.

Subsection (b)(2) is substituted for 46 App. U.S.C. 183c (last sentence) for consistency and to eliminate unnecessary words.

**46 U.S.C.**
United States Code, 2020 Edition
Title 46 - SHIPPING
Subtitle III - Maritime Liability
CHAPTER 305 - EXONERATION AND LIMITATION OF LIABILITY
Sec. 30502 - Application
From the U.S. Government Publishing Office, www.gpo.gov

### §30502. Application

Except as otherwise provided, this chapter (except section 30503) applies to seagoing vessels and vessels used on lakes or rivers or in inland navigation, including canal boats, barges, and lighters.

(Pub. L. 109–304, §6(c), Oct. 6, 2006, 120 Stat. 1512.)

| | Historical and Revision Notes | |
|---|---|---|
| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
| 30502 | 46 App.:188. | R.S. §4289; Feb. 18, 1875, ch. 80, §1 (related to R.S. §4289), 18 Stat. 320; June 19, 1886, ch. 421, §4, 24 Stat. 80; June 5, 1936, ch. 521, §4, 49 Stat. 1481. |

**46 U.S.C.**
United States Code, 2020 Edition
Title 46 - SHIPPING
Subtitle IV - Regulation of Ocean Shipping
Part A - Ocean Shipping
CHAPTER 401 - GENERAL
Sec. 40102 - Definitions
From the U.S. Government Publishing Office, www.gpo.gov

## §40102. Definitions

In this part:

(1) Agreement.—The term "agreement"—

(A) means a written or oral understanding, arrangement, or association, and any modification or cancellation thereof; but

(B) does not include a maritime labor agreement.

(2) Antitrust laws.—The term "antitrust laws" means—

(A) the Sherman Act (15 U.S.C. 1 et seq.);

(B) sections 73 and 74 of the Wilson Tariff Act (15 U.S.C. 8, 9);

(C) the Clayton Act (15 U.S.C. 12 et seq.);

(D) the Act of June 19, 1936 (15 U.S.C. 13, 13a, 13b, 21a);

(E) the Federal Trade Commission Act (15 U.S.C. 41 et seq.);

(F) the Antitrust Civil Process Act (15 U.S.C. 1311 et seq.); and

(G) Acts supplementary to those Acts.

(3) Assessment agreement.—The term "assessment agreement" means an agreement, whether part of a collective bargaining agreement or negotiated separately, to the extent the agreement provides for the funding of collectively bargained fringe-benefit obligations on other than a uniform worker-hour basis, regardless of the cargo handled or type of vessel or equipment used.

(4) Bulk cargo.—The term "bulk cargo" means cargo that is loaded and carried in bulk without mark or count.

(5) Certain covered services.—For purposes of sections 41105 and 41307, the term "certain covered services" means, with respect to a vessel—

(A) the berthing or bunkering of the vessel;

(B) the loading or unloading of cargo to or from the vessel to or from a point on a wharf or terminal;

4

(C) the positioning, removal, or replacement of buoys related to the movement of the vessel; and

(D) with respect to injunctive relief under section 41307, towing vessel services provided to such a vessel.

(6) Chemical parcel-tanker.—The term "chemical parcel-tanker" means a vessel that has—

(A) a cargo-carrying capability consisting of individual cargo tanks for bulk chemicals that—

(i) are a permanent part of the vessel; and

(ii) have segregation capability with piping systems to permit simultaneous carriage of several bulk chemical cargoes with minimum risk of cross-contamination; and

(B) a valid certificate of fitness under the International Maritime Organization Code for the Construction and Equipment of Ships Carrying Dangerous Chemicals in Bulk.

(7) Common carrier.—The term "common carrier"—

(A) means a person that—

(i) holds itself out to the general public to provide transportation by water of passengers or cargo between the United States and a foreign country for compensation;

(ii) assumes responsibility for the transportation from the port or point of receipt to the port or point of destination; and

(iii) uses, for all or part of that transportation, a vessel operating on the high seas or the Great Lakes between a port in the United States and a port in a foreign country; but

(B) does not include a carrier engaged in ocean transportation by ferry boat, ocean tramp, or chemical parcel-tanker, or by vessel when primarily engaged in the carriage of perishable agricultural commodities—

(i) if the carrier and the owner of those commodities are wholly-owned, directly or indirectly, by a person primarily engaged in the marketing and distribution of those commodities; and

(ii) only with respect to the carriage of those commodities.

(8) Conference.—The term ″conference″—

(A) means an association of ocean common carriers permitted, pursuant to an approved or effective agreement, to engage in concerted activity and to use a common tariff; but

(B) does not include a joint service, consortium, pooling, sailing, or transshipment agreement.

(9) Controlled carrier.—The term ″controlled carrier″ means an ocean common carrier that is, or whose operating assets are, directly or indirectly, owned or controlled by a government, with ownership or control by a government being deemed to exist for a carrier if—

(A) a majority of the interest in the carrier is owned or controlled in any manner by that government, an agency of that government, or a public or private person controlled by that government; or

(B) that government has the right to appoint or disapprove the appointment of a majority of the directors, the chief operating officer, or the chief executive officer of the carrier.

(10) Deferred rebate.—The term ″deferred rebate″ means a return by a common carrier of any freight money to a shipper, where the return is—

(A) consideration for the shipper giving all or any portion of its shipments to that or any other common carrier over a fixed period of time;

(B) deferred beyond the completion of the service for which it was paid; and

(C) made only if the shipper has agreed to make a further shipment with that or any other common carrier.

(11) Forest products.—The term ″forest products″ includes lumber in bundles, rough timber, ties, poles, piling, laminated beams, bundled siding, bundled plywood, bundled core stock or veneers, bundled particle or fiber boards, bundled hardwood, wood pulp in rolls, wood pulp in unitized bales, and paper and paper board in rolls or in pallet or skid-sized sheets.

(12) Inland division.—The term ″inland division″ means the amount paid by a common carrier to an inland carrier for the inland portion of through transportation offered to the public by the common carrier.

(13) Inland portion.—The term ″inland portion″ means the charge to the public by a common carrier for the non-ocean portion of through transportation.

(14) Loyalty contract.—The term "loyalty contract" means a contract with an ocean common carrier or agreement providing for—

(A) a shipper to obtain lower rates by committing all or a fixed portion of its cargo to that carrier or agreement; and

(B) a deferred rebate arrangement.

(15) Marine terminal operator.—The term "marine terminal operator" means a person engaged in the United States in the business of providing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier, or in connection with a common carrier and a water carrier subject to subchapter II of chapter 135 of title 49.

(16) Maritime labor agreement.—The term "maritime labor agreement"—

(A) means—

(i) a collective bargaining agreement between an employer subject to this part, or a group of such employers, and a labor organization representing employees in the maritime or stevedoring industry;

(ii) an agreement preparatory to such a collective bargaining agreement among members of a multi-employer bargaining group; or

(iii) an agreement specifically implementing provisions of such a collective bargaining agreement or providing for the formation, financing, or administration of a multi-employer bargaining group; but

(B) does not include an assessment agreement.

(17) Non-vessel-operating common carrier.—The term "non-vessel-operating common carrier" means a common carrier that—

(A) does not operate the vessels by which the ocean transportation is provided; and

(B) is a shipper in its relationship with an ocean common carrier.

(18) Ocean common carrier.—The term "ocean common carrier" means a vessel-operating common carrier.

(19) Ocean freight forwarder.—The term "ocean freight forwarder" means a person that—

(A) in the United States, dispatches shipments from the United States via a common carrier and books or otherwise arranges space for those shipments on behalf of shippers; and

(B) processes the documentation or performs related activities incident to those shipments.

(20) Ocean transportation intermediary.—The term "ocean transportation intermediary" means an ocean freight forwarder or a non-vessel-operating common carrier.

(21) Service contract.—The term "service contract" means a written contract, other than a bill of lading or receipt, between one or more shippers, on the one hand, and an individual ocean common carrier or an agreement between or among ocean common carriers, on the other, in which—

(A) the shipper or shippers commit to providing a certain volume or portion of cargo over a fixed time period; and

(B) the ocean common carrier or the agreement commits to a certain rate or rate schedule and a defined service level, such as assured space, transit time, port rotation, or similar service features.

(22) Shipment.—The term "shipment" means all of the cargo carried under the terms of a single bill of lading.

(23) Shipper.—The term "shipper" means—

(A) a cargo owner;

(B) the person for whose account the ocean transportation of cargo is provided;

(C) the person to whom delivery is to be made;

(D) a shippers' association; or

(E) a non-vessel-operating common carrier that accepts responsibility for payment of all charges applicable under the tariff or service contract.

(24) Shippers' association.—The term "shippers' association" means a group of shippers that consolidates or distributes freight on a nonprofit basis for the members of the group to obtain carload, truckload, or other volume rates or service contracts.

(25) Through rate.—The term "through rate" means the single amount charged by a common carrier in connection with through transportation.

(26) Through transportation.—The term "through transportation" means continuous transportation between origin and destination for which a through rate is assessed and which is offered or performed by one or more carriers, at

least one of which is a common carrier, between a United States port or point and a foreign port or point.

(Pub. L. 109–304, §7, Oct. 6, 2006, 120 Stat. 1523; Pub. L. 115–282, title VII, §704, Dec. 4, 2018, 132 Stat. 4294.)

<hr>

### Historical and Revision Notes

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
| --- | --- | --- |
| 40102(1) | 46 App.:1702(1). | Pub. L. 98–237, §3, Mar. 20, 1984, 98 Stat. 67; Pub. L. 99–307, §11, May 19, 1986, 100 Stat. 447; Pub. L. 105–258, title I, §102, Oct. 14, 1998, 112 Stat. 1902; Pub. L. 105–383, title IV, §424(d), Nov. 13, 1998, 112 Stat. 3441. |
| 40102(2) | 46 App.:1702(2). | |
| 40102(3) | 46 App.:1702(3). | |
| 40102(4) | 46 App.:1702(4). | |
| 40102(5) | 46 App.:1702(6) (last sentence). | |
| 40102(6) | 46 App.:1702(6) (1st sentence). | |
| 40102(7) | 46 App.:1702(7). | |
| 40102(8) | 46 App.:1702(8). | |
| 40102(9) | 46 App.:1702(9). | |
| 40102(10) | 46 App.:1702(10). | |
| 40102(11) | 46 App.:1702(11). | |
| 40102(12) | 46 App.:1702(12). | |
| 40102(13) | 46 App.:1702(13). | |
| 40102(14) | 46 App.:1702(14). | |
| 40102(15) | 46 App.:1702(15). | |
| 40102(16) | 46 App.:1702(17)(B). | |
| 40102(17) | 46 App.:1702(16). | |
| 40102(18) | 46 App.:1702(17)(A). | |

| 40102(19) | 46 App.:1702(17) (1st sentence). | |
| 40102(20) | 46 App.:1702(19). | |
| 40102(21) | 46 App.:1702(20). | |
| 40102(22) | 46 App.:1702(21). | |
| 40102(23) | 46 App.:1702(22). | |
| 40102(24) | 46 App.:1702(23). | |
| 40102(25) | 46 App.:1702(24). | |

In the definition of "service contract", the words "The contract may also specify provisions in the event of nonperformance on the part of any party" are omitted as unnecessary and inappropriate for a definition.

In the definition of "shipper", the words "non-vessel-operating common carrier" are substituted for "ocean transportation intermediary, as defined in paragraph (17)(B) of this section" because paragraph (17)(B) contains a definition of "non-vessel-operating common carrier" which is restated as a separate definition.

The definition of "Commission" is omitted because the full name of the Federal Maritime Commission is used the first time the Commission is referred to in each section. The definition of "person" is omitted as unnecessary because of 1 U.S.C. 1. The definition of "United States" is omitted because the term is defined in chapter 1 of the revised title for purposes of the title.

## EDITORIAL NOTES

### REFERENCES IN TEXT

The Sherman Act, referred to in par. (2)(A), is act July 2, 1890, ch. 647, 26 Stat. 209, which is classified to sections 1 to 7 of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 1 of Title 15 and Tables.

The Clayton Act, referred to in par. (2)(C), is act Oct. 15, 1914, ch. 323, 38 Stat. 730, which is classified generally to sections 12, 13, 14 to 19, 21, and 22 to 27 of Title 15, Commerce and Trade, and sections 52 and 53 of Title 29, Labor. For further details and complete classification of this Act to the Code, see References in Text note set out under section 12 of Title 15 and Tables.

Act of June 19, 1936, referred to in par. (2)(D), is act June 19, 1936, ch. 592, 49 Stat. 1526, popularly known as the Robinson-Patman Act, the Robinson-Patman

Antidiscrimination Act, and the Robinson-Patman Price Discrimination Act, which enacted sections 13a, 13b, and 21a of Title 15, Commerce and Trade, and amended section 13 of Title 15. For complete classification of this Act to the Code, see Short Title note set out under section 13 of Title 15 and Tables.

The Federal Trade Commission Act, referred to in par. (2)(E), is act Sept. 26, 1914, ch. 311, 38 Stat. 717, which is classified generally to subchapter I (§41 et seq.) of chapter 2 of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see section 58 of Title 15 and Tables.

The Antitrust Civil Process Act, referred to in par. (2)(F), is Pub. L. 87–664, Sept. 19, 1962, 76 Stat. 548, which is classified principally to chapter 34 (§1311 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 1311 of Title 15 and Tables.

## AMENDMENTS

**2018**—Pars. (5) to (26). Pub. L. 115–282 added par. (5) and redesignated former pars. (5) to (25) as (6) to (26), respectively.

## STATUTORY NOTES AND RELATED SUBSIDIARIES

## AGREEMENTS UNAFFECTED

Pub. L. 115–282, title VII, §714, Dec. 4, 2018, 132 Stat. 4299, provided that: "Nothing in this Act [probably should be "this title", enacting section 41105A of this title, amending sections 40102, 40104, 40304, 40307, 40901, 40902, 41104, 41105, 41307, 46103, 46106, and 46108 of this title, and enacting provisions set out as notes under sections 40304, 41104, 41307, and 46105 of this title] may be construed—

"(1) to limit or amend the definition of 'agreement' in section 40102(1) of title 46, United States Code, with respect to the exclusion of maritime labor agreements; or

"(2) to apply to a maritime labor agreement (as defined in section 40102(15) of that title)."