Case No. 22-16149

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

WILLIAM McMEIN EHART, JR., Individually and as Personal Representative
of the Estate of Maureen Anne Ehart, Deceased,
*Plaintiff-Appellee,*

v.

LAHAINA DIVERS, INC. and CORY DAM,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Hawaii
No. 21-cv-00475 SOM-KJM
Hon. Susan Oki Mollway

---

## APPELLEE'S ANSWERING BRIEF

---

John R. Hillsman, Esq.
McGuinn, Hillsman & Palefsky
535 Pacific Avenue, Suite 100
San Francisco, CA 94133
Telephone: (415) 421-9292
*jrhillsman@mhpsf.com*

Attorneys for Appellee
WILLIAM MCMEIN EHART, JR.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.    THE MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    II.    THE RELEVANT PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    I.    THE LIABILITY RELEASE ON WHICH LDI AND DAM BASE
        THEIR SECOND AFFIRMATIVE DEFENSE IS VOID UNDER 46
        U.S.C. § 30509 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        A.    NOT ONE OF THE CASES ON WHICH LDI, DAM, AND
               THE TOPSIDE AMICI REST THEIR CORE ARGUMENTS IS
               BINDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

             1.    In the Absence of Binding Precedent, Courts
                    Are Free to Forge a Different Path Than the
                    One Suggested by Prior Authorities . . . . . . . . . . . . . . . 22

             2.    District Court Decisions Are Never Binding . . . . . . . . 24

3.    State Court Opinions Are Entitled to No Deference on Issues of Federal Law . . . . . . . . . . . . . . 25

4.    Because the Ability to Develop Independent Interpretations of the Law Is Considered One of the Strengths of Our System, Not Even the Opinions of Another Circuit Court Are Binding on the Courts of This Circuit . . . . . . . . . . . . 25

B.    NOT ONE OF THE CASES ON WHICH LDI, DAM, AND THE TOPSIDE *AMICI* REST THEIR CORE ARGUMENTS IS PERSUASIVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

1.    Nothing in § 30509 Bars Its Application to the Owners or Agents of Vessels Engaged in Risky Water Sports . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

2.    Nothing in § 30509 Limits Its Application to Common Carriers . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

3.    Nothing in § 30509 Bars Its Application to Day Trips That Begin and End in the Same Port . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

4.    Mrs. Ehart Did Not Stray outside Admiralty Jurisdiction or the Protection of § 30509 When She Left the *Dauntless* to Go Snorkeling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

II.    THE LIABILITY RELEASE ON WHICH LDI AND DAM BASE THEIR SECOND AFFIRMATIVE DEFENSE IS ALSO VOID UNDER HAW.REV.STATS. § 663-1.54 . . . . . . . . . . . . . . . . . . . . . . 53

A.    THE EXERCISE OF ADMIRALTY JURISDICTION, 'DOES NOT RESULT IN AUTOMATIC DISPLACEMENT OF STATE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

-ii-

B.     STATE LAW MAY BE APPLIED TO SUPPLEMENT
MARITIME LAW SO LONG AS THERE IS NO CONFLICT . . . . . . . 53

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

# TABLE OF AUTHORITIES

Page(s)

## CASES

*In re Air Crash at Belle Harbor,*
  2006 U.S. District LEXIS 27387 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*In re Aramark Sports and Entertainment Servs., LLC,*
  2012 U.S. District LEXIS 123786 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Armstrong v. Chambers and Kennedy,*
  340 F. Supp. 1220 (S.D.Tex. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Borden v. Phillips,*
  752 So.2d 69 (Fla.App. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 16, 45, 46, 49, 50

*Borne v. A and P Boat Rentals Number 4, Inc.,*
  755 F.2d 1131 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Bostock v. Clayton Cty.,*
  ___U.S.___, 140 S. Ct. 1731, 1738 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Brooks v. Donovan,*
  699 F.2d 1010 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Brozyna v. Niagara Gorge Jetboating, Limited,*
  2011 U.S. District LEXIS 111546 (W.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . 15, 27

*Burks v. American River Transportation Company,*
  679 F.2d 69 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*In re Catalina Cruises,*
  137 F.3d 1422 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Charnis v. Watersport Pro, LLC,*
  2009 U.S. District LEXIS 76022 (D.Nev. 2009) . . . . . . . . . . . . . . . . . . . . 16, 34

*Chervy v. Peninsular and Oriental Steam Navigation Company,*
    243 F. Supp. 654 (S.D. Cal.1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 50

*Clinton Board of Park Com'rs v. Claussen,*
    410 F. Supp. 320 (S.D.Iowa 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 35

*Cobb v. Aramark Sports and Entertainment Servs., LLC,*
    933 F. Supp.2d 1295 (D.Nev. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Cook v. Crazy Boat of Key West, Inc.,*
    949 So. 2d 1202 (Fla. App. Ct. 2007) . . . . . . . . . . . . . . . . . . . . . . 24, 25, 30, 38

*Courtney v. Pacific Adventures,*
    5 F. Supp. 2d 874 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Cutchin v. Habitat Curacao-Maduro Dive Fantaseas, Inc.,*
    1999 U.S. District LEXIS 24121 (S.D.Fla. 1999) . . . . . . . . . . . . . . . . . . . . . 30

*Delta Country Ventures, Incorporated v. Magana,*
    986 F.2d 1260 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47

*Dempsey v. Wild Side Specialty Tours, LLC,*
    2022 U.S. District LEXIS 195201 . . . . . . . . . . . . . . . . . . . . . . . 9, 23, 33, 34, 44

*Doe v. Celebrity Cruises, Inc.,*
    394 F.3d 891 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 51

*East River Southern Southern Corporation v. Transamerica Delaval Inc.,*
    476 U.S. 858 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Ehart v. Lahaina Divers Inc.,*
    2022 U.S. District LEXIS 84040 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 28

*Esta Later Charters, Incorporated v. Ignacio,*
    875 F.2d 234 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 40

*Estate of Wenzel v. Seaward Marine Servs., Incorporated,*
709 F.2d 1326 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Exxon Shipping Company v. Baker,*
554 U.S. 471 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*First American Title Company v. Devaugh,*
480 F.3d 438 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*George Leary Const. Company v. Matson,*
272 F. 461 (4th Cir. 1921) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Gorman v. Cerasia,*
2 F.3d 519 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Grubart v. Great Lakes Dredge and Dock Company,*
513 U.S. 527 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hambrook v. Smith,*
2016 U.S. District LEXIS 109484 (D.Haw. 2016) . . . . . . . . . . . . . . . . . *passim*

*In re Hanford Nuclear Reservation Litig.,*
534 F.3d 986 (9th Cir.  2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Hart v. Massanari,*
266 F.3d 1155 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25, 26

*Heller Financial, Incorporated v. Midwhey Powder Company,*
883 F.2d 1286 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 28, 45

*Henson v. Seabourn Cruise Line Limited,*
410 F. Supp.2d 1246 (S.D.Fla. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

*Hodes v. S.N.C. Achille Lauro ed Altri-Gestione,*
858 F.2d 905 (3d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Hopkins v. The Boat Club, Inc.,*
 866 So. 2d 108 (Fla. App. Ct. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 30

*In re Horizon Dive Adventure, Incorporated,*
 2018 U.S. District LEXIS 202461 (S.D.Fla 2018) . . . . . . . . . . . . . . . . . . 13, 27

*Isham v. Padi Worldwide Corp.,*
 2008 U.S. District LEXIS 27325 (D.Haw. 2008) . . . . . . . . . . . . . . . . . . . . . . . 5

*Jerome B. Grubart, Incorporated v. Great Lakes Dredge and Dock Company,*
 513 U.S. 527 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Jerome v. Water Sports Adventure Rentals and Equipment., Inc.,*
 2013 U.S. District LEXIS 27286 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Kabogoza v. Blue Water Boating,*
 2019 U.S. District LEXIS 60346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*In re Kanoa, Inc.,*
 872 F. Supp. 740 (D. Haw. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47, 49

*Kermarec v. Compagnie Generale Transatlantique,*
 358 U.S. 625 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

*Keys Jet Ski, Incorporated v. Kays,*
 893 F.2d 1225 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 34, 36

*In re Knickerbocker S.B. Company,*
 136 F. 956 (S.D.N.Y. 1905) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Knickerbocker S.B. Company,*
 139 F. 713 (S.D.N.Y. 1905) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Kornberg v. Carnival Cruise Lines, Incorporated,*
 741 F.2d 1332 (11th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Kuhnle Brothers, Incorporated v. County of Geauga,*
103 F.3d 516 (6th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Lewis v. Lewis and Clark Marine, Inc.,*
531 U.S. 438 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

*In re Liebler,*
19 F. Supp. 829 (W.D.N.Y. 1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Lowe v. S.E.C.,*
472 U.S. 181 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Matheny v. Tennessee Valley Authority*
503 F. Supp.2d 917 (M.D.Tenn. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Matter of Carpe Diem,*
2019 U.S. District LEXIS 127744 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*McCarthy v. The Bark Peking,*
716 F.2d 130 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*McCoy v. Pacific Spruce Corp.,*
1 F.2d 853 (9th Cir. 1924) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Midlock v. Apple Vacations West, Inc.,*
406 F.3d 453 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Miles v. Apex Marine Corporation,*
498 U.S. 19 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Mission Bay Jet Sports, LLC,*
570 F.3d 1124 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 35

*Moore v. American Scantic Line, Inc.,*
121 F.2d 767 (2d Cir. 1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Moragne v. States Marine Lines, Inc.,*
    398 U.S. 375 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Morgan v. Water Toy Shop, Inc.,*
    2018 U.S. District LEXIS 61546 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Nurse v. United States,*
    226 F.3d 996 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Olivelli v. Sappo Corporation., Incorporated,*
    225 F. Supp.2d 109 (D.P.R. 2002) . . . . . . . . . . . . . . . . . . . . . . . 16, 30, 34, 38

*Olmo v. Atlantic City Parasail, LLC,*
    2016 U.S. District LEXIS 56572 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Oran v. Fair Wind Sailing, Incorporated,*
    2009 U.S. District LEXIS 110350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 38

*Pettis v. Bosarge Diving, Inc.,*
    751 F. Supp. 2d 1222 (S.D.Ala. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Piché v. Stockdale Holdings, LLC,*
    2009 U.S. District LEXIS 24237 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Pittston Coal Group v. Sebben,*
    488 U.S. 105 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Pleason v. Gulfport Shipbuilding Corp.,*
    221 F.2d 621 (5th Cir. 1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Protectus Alpha Navigation Company v. North Pacific Grain Growers, Inc.,*
    767 F.2d 1379 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Public Citizen v. U.S. Dept. of Justice,*
    491 U.S. 440 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Rainey v. Paquet Cruises, Incorporated,*
    709 F.2d 169 (2nd Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Renalds v. Sen. Rep. G. Restaurant Group, Chicago, LLC,*
    119 F. Supp.2d 800 (N.D.Ill. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Richards v. Blake Builders Supply Inc.,*
    528 F.2d 745 (4th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Robinson v. Shell Oil Company,*
    519 U.S. 337 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Rodriguez v. Seabreeze Jetlev LLC,*
    2022 U.S. District LEXIS 154478 (N.D.Cal 2022) . . . . . . . . . . . . . . . . 27, 28, 29

*In re Royal Caribbean Cruises,*
    991 F. Supp.2d 1171 (S.D.Fla. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19

*Semon v. Royal Indemnity Company,*
    *279 F.2d 737 (5th Cir. 1960)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *12, 32*

*Sennett v. Shell Oil Company,*
    325 F. Supp. 1 (E.D.LA. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Seven Resorts v. Cantlen,*
    57 F.3d 771 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Shultz v. Florida Keys Dive Center, Inc.,*
    224 F.3d 1269 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 16, 24, 26, 34, 38, 39

*Sinclair v. Soniform,*
    935 F.2d 599 (3rd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Smolnikar v. Royal Caribbean Cruises Limited,*
    787 F.Supp.2d 1308 (S.D.Fla. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Street Hilaire Moye v. Henderson,*
496 F.2d 973 (8th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Stacy v. Danielsen,*
609 F.3d 1033 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Stewart v. Dutra Construction Company,*
543 U.S. 481 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Strickert v. Neal,*
2015 U.S. District LEXIS 160442 (D.Haw.) . . . . . . . . . . . . . . . . . . . . . . 17, 49

*Sutton v. Earles,*
26 F.3d 903 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Taghadomi v. United States*,
401 F.3d 1080 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*In re Truth Aquatics,*
2020 U.S. District LEXIS 81040 (C.D.Cal. 2020) . . . . . . . . . . . . . . . . . . . . 14

*United States v. American Trucking Assoc.,*
310 U.S. 534 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Boos,*
127 F.3d 1207 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 6, 22

*United States v. Elliott,*
992 F.2d 853 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Templeton,*
378 F.3d 845 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*U. Southern v. 416.81 Acres of Land,*
514 F.2d 627 (7th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Van Schaick v. United States,*
    159 F. 847 (2nd Cir. 1908) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Waggoner v. Nags Head Water Sports, Inc.,*
    141 F.3d 1162 (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 16, 24, 25, 34, 38

*Wallis v. Princess Cruises, Inc.,*
    306 F.3d 827 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Warnken v. Moody,*
    22 F.2d 960 (5th Cir. 1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Witkowski v. Niagara Jet Adventures, LLC,*
    2018 U.S. District LEXIS 85080 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 38

*In re X-Treme Parasail, Inc.,*
    2006 U.S. District LEXIS 97541 (D.Haw. 2006) . . . . . . . . . . . . . . . . . . . . . . 13

*Yamaha Motor Corporation v. Calhoun,*
    516 U.S. 199 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8, 22, 52

## STATUTES AND REGULATIONS

1 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

1 U.S.C. § 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 34, 35, 36

18 U.S.C. § 1115 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

28 U.S.C. § 1292(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 18

28 U.S.C. § 1292(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9

28 U.S.C. § 1333(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17, 35

33 U.S.C. § 901 et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

46 U.S.C § 40102(7)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

46 U.S.C.§ 8101(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8

46 U.S.C. §§ 30301-30308 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

46 U.S.C. §§30501-30512 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 33

46 U.S.C. § 183c. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

46 U.S.C. § 30104. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 52

46 U.S.C. § 30501 *et seq* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

46 U.S.C. § 30502. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 33, 34, 36, 37

46 U.S.C. § 30503. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 37

46 U.S.C. § 30503(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

46 U.S.C. § 30505. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 29

46 U.S.C. § 30509. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 22, 26

46 U.S.C. § 30509(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

46 U.S.C. § 30509(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

46 U.S.C. § 40102. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

46 U.S.C. §188 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

46. U.S.C. §§ 8100-8108 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

98 Stat. 67, 68 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Subchapter T of the United States Coast Guard Regulations . . . . . . . . . . . . . . . 5

46 C.F.R. Part 176 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Haw.Rev.Stats. § 663-1.54 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52, 53

## RULES

Fed.R.Civ.P. 9(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed.R.Civ.P. 12(f), 16(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Fed.R.Civ.P. 54(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## OTHER AUTHORITIES

*Evidence Before the Committee on Claims of the House of Representatives on H.R.Rep. 4154 for the Relief of the Victims of the General Slocum disaster* (Apr. 20, 1910) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Eyer, *"Shipowners' Limitation of Liability -- New Directions for an Old Doctrine,"* 16 *Stan.L.Rev.* (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Haw. Stand. Comm. Rep.* No. 1537, 1997 *Senate Journal* . . . . . . . . . . . . . . . . . . 53

*Hearings Before the Committee on Merchant Marine and Fisheries, House of Representatives, Seventy Fourth Congress, Second Session on H.R.Rep. 9969* (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*H.R.Rep. 74-2517* (Apr. 28, 1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*The Merriam-Webster Dictionary* (New Edition 2005) . . . . . . . . . . . . . . . . . . . . . 29

2 Schoenbaum, *Admiralty and Maritime Law* (2d ed. 1994) . . . . . . . . . . . . . 11, 40

*Sen.Rep. 74-2061* (May 12, 1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Sen. Rep. No. 94*, 101st Cong., 1st Sess. at 4 (1989) . . . . . . . . . . . . . . . . . . . . . . . 47

## CORPORATE DISCLOSURE STATEMENT

Plaintiff/Appellee William Ehart is an individual and is not a corporation or other form of business entity.

## STATEMENT OF JURISDICTION

Plaintiff/Appellee William Ehart agrees that this case was filed in admiralty under Fed.R.Civ.P. 9(h), that the district court exercised jurisdiction under 28 U.S.C. § 1333(1), and that this Court has jurisdiction under 28 U.S.C. § 1292(a)(3).

The order appealed from was entered on May 10, 2022. 1-ER-14. On June 6, 2022, Defendants/Appellants Lahaina Divers, Inc. ("LDI") and Cory Dam sought partial reconsideration of that order under Fed.R.Civ.P. 54(b) and, in the alternative, asked the district court to certify an interlocutory appeal under 28 U.S.C. § 1292(b). 1-ER-2-13. The district court denied both requests on July 13, 2022. *Id.* at 13. LDI and Dam noticed the instant appeal on July 29, 2022. 2-ER-335-336.

## STATEMENT OF THE ISSUES

Plaintiff/Appellee Ehart disagrees with LDI's and Dam's statement of the issues and would frame them instead as follows:

1.      According to 46 U.S.C. § 30509(a)(1)(A), which was originally enacted in 1936 and codified at 46 U.S.C. § 183c(a): "The owner, master, manager, or agent of a vessel transporting passengers between ports in the United States, or between a port in the United States and a port in a foreign country, may not include in a regulation or contract a provision limiting the liability of the owner, master, or agent for personal injury or death caused by the negligence or fault of the owner or the

owner's employees or agents." The first issue for determination is whether Congress intended § 30509 (and its predecessor § 183c) to apply to the owners, masters, managers, or agents of vessels transporting passengers to and from recreational excursions.

2. "'[W]ith admiralty jurisdiction comes the application of substantive admiralty law.'" *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 206 (1996) (quoting *East River S. S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 864 (1986)). "'The exercise of admiralty jurisdiction, however, 'does not result in automatic displacement of state law.'" *Id.* (quoting *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 545 (1995). "Since *Yamaha*, courts have held that state law may be applied to supplement general maritime law as long as there is no conflict." *Hambrook v. Smith*, 2016 U.S. Dist. LEXIS 109484, *67 (D.Haw. 2016) (compiling cases). Under Hawai'i law, no written liability waiver in favor of "[a]ny person who owns or operates a business providing recreational activities to the public, such as, without limitation, SCUBA or skin diving, sky diving, bicycle tours, and mountain climbing . . . shall be valid unless: (1) The owner or operator first provides full disclosure of the inherent risks associated with the recreational activity; and (2) The owner or operator takes reasonable steps to ensure that each patron is physically able to participate in the activity and is given the

-3-

necessary instruction to participate in the activity safely." Haw.Rev.Stats. § 663-1.54

(a). The second issue for determination is whether the provisions of Haw.Rev.Stats.

§ 663-1.54 conflict with federal maritime law.

Neither the Supreme Court nor the Ninth Circuit has considered either issue,

so each poses a question of first impression. Cf. *United States v. Boos*, 127 F.3d

1207, 1211 (9th Cir. 1997).

## STATEMENT OF THE CASE

### I.   THE MATERIAL FACTS

This action concerns the wrongful death of 65-year-old Maureen Ehart. 2-ER-

89. On September 14, 2021, Mrs. Ehart and her husband of 42-years, William Ehart,

departed Lahaina, Maui aboard the *M/V Dauntless* with fourteen other paying

passengers for a day trip to Molokini. *Id.* at 92 and 96. Molokini is a crescent-shaped

islet that sits in the territorial waters of the State of Hawai'i about three miles off the

southeast coast of Maui. *Id.* at 92. It is a popular location for diving and snorkeling,

*id.* at 15, and embraces a sheltered anchorage where passengers can disembark and

re-embark vessels at two dozen permanent moorings. *Id.* at 92, and 94.

The *Dauntless* was owned by Defendant/Appellant LDI, "a PADI Five-Star

Dive Center."[1]  *Id.* at 90-91.  LDI operated her as an "inspected vessel" within the meaning of Chapter 81 of the United States Shipping Code,[2] and a "small passenger vessel" within the meaning of Subchapter T of the United States Coast Guard Regulations.[3]  *Id.*  Among other things, that Code and those regulations required LDI to: (1) either adopt and enforce a safety management system that defined each crew member's responsibilities while passengers were diving and snorkeling *or* ensure that there were at least two crew members onboard *Dauntless* whenever passengers were in the water, *id.* at 92, 97, and 98; (2) monitor and supervise all in-water activities closely, *id.* at 93; (3) prepare and deploy a passenger-recall system, *id.*; and 4) perfect and employ standardized emergency-response and rescue procedures.  *Id.* at 97.  LDI did none of those things.  *Id.* at 98-99.

Worse, shortly after the *Dauntless* tied up to a mooring buoy on the west side of Molokini's anchorage on the morning of the accident, her master, Defendant/Appellant Dam, let all sixteen of his passengers and both of his deck hands

---

[1]    "PADI is the world's largest recreational diver-training organization.  It has developed diver programs that are conducted by professional PADI members in approximately 175 countries and territories."  *Isham v. Padi Worldwide Corp.*, 2008 U.S. Dist. LEXIS 27325, *4 (D.Haw. 2008).

[2]    46. U.S.C. §§ 8100-8108.

[3]    46 C.F.R. Part 176.

-5-

(or as the Opening Brief calls them, "SCUBA instructors," *LDI Br.* at 11) – Defendants Kaitlin Miller and Julianne Cricchio – disembark for in-water excursions while Dam remained aboard the vessel alone. *Id.* at 92-93. That was a black-letter violation of 46 U.S.C.§ 8101(d), the *Dauntless's* certificate of inspection, the Coast Guard Sector Honolulu's "Best Practices for Passenger Safety on Small Passenger Vessels Involved in Water Sports," and the PADI snorkeling-supervision requirements. *Id.* at 98-99.

After William Ehart and twelve other passengers departed on a pre-planned SCUBA dive led by Miller and Cricchio, *id.* at 92-93, Dam let Mrs. Ehart and the two remaining passengers go snorkeling without any life jackets, personal floatation devices, in-water supervision, or clearly communicated boundaries. *Id.* at 93. The winds, waves, and currents in the anchorage increased dramatically once all the passengers were in the water, but Dam did not recall anyone. *Id.* Once he was alone aboard the vessel, he was just too busy to keep an eye on the weather or the snorkelers; he had to maintain an anchor watch, serve as the topside lookout, track the SCUBA divers' bubbles, monitor the radio, act as a lifeguard, and be prepared to unmoor the *Dauntless* and get underway by himself should the situation require it. *Id.* at 92. Preoccupied by those other duties, Dam lost track of Mrs. Ehart. *Id.* at 94. The other snorkelers returned to the vessel on their own, but when Dam discovered

-6-

he could no longer see Mrs. Ehart, he neither recalled the SCUBA divers, reported a missing passenger to the Coast Guard, nor initiated an immediate search. *Id.* at 93-94. By the time Mr. Ehart completed his dive, re-boarded the *Dauntless*, and asked Dam where his wife was, she had already been missing for a long while. *Id.* It would be another hour before Dam called the Coast Guard. *Id.* at 95.

The anchorage at Molokini is almost a half-mile wide, runs as deep as 110 feet, has a surface area of some 23 acres, and opens directly onto the current-swept waters of the Alalakeiki Channel. *Id.* Instead of unmooring the *Dauntless* and searching the anchorage and the adjacent waters just as soon as all the remaining passengers and crew members were back aboard, Dam kept his vessel fast to the buoy and sent Miller and Cricchio on a pointless and time-consuming swim search inshore. *Id.* at 94-95. Mrs. Ehart would never be seen again. By the time Dam finally called the Coast Guard and got underway himself, his missing passenger had been swept out to sea where she eventually died hopeless and alone. *Id.* at 95-96.

## II.    THE RELEVANT PROCEEDINGS

Acting both as the Personal Representative of his late wife's Estate and in his own, individual capacity, Plaintiff/Appellee Ehart is suing LDI and Dam for wrongful-death damages, 2-ER-96-102, survival damages, *id.* at 102-105, and bystander-distress damages, *id.* at 105-106, on behalf of himself, his wife's Estate,

-7-

and the couple's three daughters – Andrea Ehart Fieri, Hayley Ehart, and Kimberly Ehart. See 2-ER-89; *Id.* at 88-89. The parties agree that Maureen Ehart was a tourist and a "nonseafarer"[4] who died on territorial waters, *id.* at 90 and 110, so each of those claims sounds under judge-made, general maritime law. See, e.g., *Yamaha*, 516 U.S. at 201 and 210 n. 7 (1996) (wrongful-death and survival damages); *Miles v. Apex Marine Corp.,* 498 U.S. 19, 34 (1990) (same); *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 409 (1970) (same); *Sutton v. Earles,* 26 F.3d 903, 920 (9th Cir. 1994) (survival damages); *Stacy v. Danielsen*, 609 F.3d 1033, 1035 (9th Cir. 2010) (bystander-distress damages).

Mr. Ehart and his daughters are charging LDI and Dam with both gross and simple negligence, see 1-ER-97-98 and 1-ER-102, and have prayed for punitive as well as compensatory recovery.[5] *Id.* at 106-107. For their Second Affirmative

---

[4] See *Yamaha,* 516 U.S. at 205 n. 2 ("By 'nonseafarers,' we mean persons who are neither seamen covered by the Jones Act, 46 U.S.C. § [30104], nor longshore workers covered by the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq*.").

[5] Punitive damages are available under general maritime law whenever "a defendant's conduct is 'outrageous' owing to 'gross negligence,' 'willful, wanton, and reckless indifference for the rights of others,' or behavior even more deplorable." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 493 (2008) (citations omitted); see also *Protectus Alpha Navigation Co. v. North Pacific Grain Growers, Inc.*, 767 F.2d 1379 1385, (9th Cir. 1985).

-8-

Defense, LDI and Dam have alleged that: "Plaintiff's Decedent and Plaintiff waived and released the claims that Plaintiff asserts in this action." 2-ER-117. That Defense rests the on the "Liability Waiver" LDI embedded in the Eharts' excursion tickets. *Id.* at 321 and 328. That Waiver purports to release LDI and Dam from "all liability whatsoever for personal injury, property damage, and wrongful death caused by negligence." *Id.*

Ehart moved the district court to strike LDI's and Dam's Second Affirmative Defense under Fed.R.Civ.P. 12(f), 16(c), or 56(a). SER-97-98. The district court granted that Motion on the face of the pleadings, under Rule 12(f), on the ground that "the waiver signed by the Eharts is void" per 46 U.S.C. § 30509. 1-ER-29.[6]

LDI and Dam appealed that ruling under 28 U.S.C. § 1292(a)(3), 2-ER-335-338, after the district court declined to certify an interlocutory appeal under 28 U.S.C. § 1292(b). 1-ER-6-13.

## STANDARD OF REVIEW

"By its terms, Rule 12(f) gives unrestricted authority to the district court to strike 'insufficient' defenses." *U. S. v. 416.81 Acres of Land*, 514 F.2d 627, 630 (7th

---

[6]      The decision below has been reported as *Ehart v. Lahaina Divers Inc.*, 2022 U.S. Dist. LEXIS 84040, 2022 WL 1472048 (D.Haw. May 10, 2022) reconsideration denied 2022 U.S. Dist. LEXIS 124173, 2022 WL 2716219 (D.Haw. Jul. 13, 2022).

Cir. 1975). "Although it is said that a motion to strike a defense as insufficient is 'not favored' by the courts because of its potential as a dilatory tactic, it is nonetheless 'a useful and appropriate tool' for weighing the legal implications to be drawn from uncontroverted facts[.]" *Id.* at 630 (citations omitted). Affirmative defenses may thus be stricken under Rule 12(f) "when they are insufficient on the face of the pleadings." *Heller Financial, Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1987). The essence of a such a motion "is the consideration of the defense on its face without further facts or elaboration," *416.81 Acres of Land,* 514 F.2d at 630; "in other words, if it is impossible for defendants to prove a set of facts in support of the affirmative defense that would defeat the complaint, the matter must be stricken as legally insufficient." *Renalds v. Sen. Rep. G. Restaurant Group, Chicago, LLC*, 119 F. Supp.2d 800, 802-803 (N.D.Ill. 2000).

While this Court generally reviews a decision to strike matter under Rule 12(f) for abuse of discretion, see *Nurse v. United States*, 226 F.3d 996, 1000 (9th Cir. 2000), a motion to strike an insufficient defense is akin to a "Rule 12(b)(6) challenge." *Renalds*, 119 F. Supp.2d at 802-803. We therefore agree with LDI and Dam that this Court should review the decision below *de novo.* See *In re Hanford Nuclear Reservation Litig.*), 534 F.3d 986, 1000 (9th Cir. 2008).

-10-

## SUMMARY OF ARGUMENT

The purported liability waivers embedded in the tickets William Ehart and his wife purchased for their day trip aboard the *Dauntless* are "void" under 46 U.S.C. § 30509. It is thus impossible for LDI or Dam to prove any set of facts in support of their Second Affirmative Defense that would defeat the Eharts' Complaint.

LDI and Dam counter that "the plain language and legislative history indicate 46 U.S.C. § 30509 applies only to vessels providing essential services (i.e., common carriers like steamships, cruises, or ferries.)" *Appellant's Opening Brief* ("*LDI Br.*") at 2. In truth, while LOLA's ill-chosen language has never been "'a model of clarity,'"[7] the legislative history shows that Congress adopted § 30509, and its predecessor 46 U.S.C. § 183c, in light of the disaster aboard the excursion steamer *General Slocum* to bar ***all*** liability waivers posed by ***any*** vessel owner in relation to the transportation of passengers.

The *General Slocum* began her last voyage at 9:00 am on Tuesday, June 15, 1904, when she cast off from her pier in lower Manhattan and backed into the East River with 1,358 people on board. She was not operating as a cruise liner, or a ferry; she had been chartered for the day by St. Mark's Evangelical Lutheran Church to

---

[7] *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 447 (2001) (quoting 2 Schoenbaum, *Admiralty and Maritime Law*, 299 (2d ed. 1994)).

transport members of the congregation on their annual excursion to and from the Locust Grove Picnic Ground on Long Island.  It is well settled that the "chartering of a vessel is normally deemed a type of contract, not common, carriage."[8]  Barely a half-hour into that charter, the *General Slocum* caught fire and sank within sight of the City, killing 957 people.[9]  Tuesday, June 15, 1904, would remain the deadliest day in the history of New York until Tuesday, September 11, 2001.

The fire aboard the *General Slocum* seared the conscience of the nation.  Her master was convicted under the Seaman's Manslaughter Act[10] for his role in events,[11] but his employer was given special relief in admiralty[12] under the Vessel Owners Limitation of Liability Act ("LOLA").[13]  That Act was passed in 1851 to encourage

---

[8]     *Semon v. Royal Indem. Co.*, 279 F.2d 737, 740 (5th Cir. 1960) (compiling cases).

[9]     See e.g. *Evidence Before the Committee on Claims of the House of Representatives on H.R.Rep. 4154 for the Relief of the Victims of the* General Slocum *disaster* (Apr. 20, 1910) at 3-4; *Hearings Before the Committee on Merchant Marine and Fisheries, House of Representatives, Seventy Fourth Congress, Second Session on H.R.Rep. 9969* at 23 (1936); see also 2-ER-129, *Id.* at 165-173, 240, and *Id.* at 262-279.

[10]    Currently codified as 18 U.S.C. § 1115.

[11]    See *Van Schaick v. United States*, 159 F. 847 (2nd Cir. 1908).

[12]    See *In re Knickerbocker S.B. Co.*, 136 F. 956 (S.D.N.Y. 1905); *In re Knickerbocker S.B. Co.*, 139 F. 713 (S.D.N.Y. 1905).

[13]    Currently codified as 46 U.S.C. §§ 30501-30512.

investment in clipper ships[14] and descends from legal concepts that were originally developed during the Middle Ages.[15] LOLA's reach has since been extended beyond clipper ships and steamships to pleasure craft,[16] dive boats,[17] parasailing vessels,[18] jet skis,[19] or any "'other artificial contrivance used, or capable of being used, as a means of transportation on water.'"[20] The statute enables excursion operators like LDI to limit their liability to "the value of the vessel and pending freight" as assessed *after* the casualty provided they can show it occurred without their "privity or knowledge."[21] In the case of a disaster like the *General Slocum's* – or, to take a more recent example, the recreational excursion that ended during the pre-dawn hours of September 2, 2019, when the dive boat *Conception* erupted in flames off Southern

---

[14]  *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 453 (2001).

[15]  See generally Eyer, "Shipowners' Limitation of Liability -- New Directions for an Old Doctrine," 16 *Stan.L.Rev.* 370, 371 (1964).

[16]  *Gorman v. Cerasia*, 2 F.3d 519, 523 (3d Cir. 1993).

[17]  *In re Horizon Dive Adventure, Inc.*, 2018 U.S. Dist. LEXIS 202461, *6 n.1 (S.D.Fla 2018).

[18]  *In re X-Treme Parasail, Inc.*, 2006 U.S. Dist. LEXIS 97541, *2-3 (D.Haw. 2006).

[19]  *Keys Jet Ski, Inc. v. Kays*, 893 F.2d 1225, 1226 (11th Cir. 1990).

[20]  *Clinton Bd. of Park Com'rs v. Claussen,* 410 F. Supp. 320, 323-324 (S.D.Iowa 1976) (quoting 1 U.S.C. § 3).

[21]  46 U.S.C. § 30505.

-13-

California and killed 33 passengers and 1 crew member – there is nothing left to assess but smoldering flotsam.[22]  LOLA is thus a controversial "relic" of a time gone by that "provides shipowners a generous measure of protection not available to any other enterprise in our society."[23]  LDI and Dam have invoked that relic as their Twelfth Affirmative Defense.  2-ER-119.

But any vessel owner who invokes LOLA's protection must also acknowledge the provisions in § 30509(a)(1) and (2) that invalidate liability waivers like the one LDI imposed upon the Eharts.  As the decision below points out, Congress originally enacted those provisions in 1936 as 46 U.S.C. § 183c(a) when events like the *General Slocum* disaster inspired it "'to put a stop'" to the practice of inserting exculpatory language on "'the reverse side of steamship tickets'" and "'practices of like character.'"[24]  Congress was thus "well aware of vessels' taking passengers on day trips to and from the same port" when it drafted § 183c.[25]

The drafters' use of the qualifier "transporting passengers between ports of the

---

[22]      See *In re Truth Aquatics*, 2020 U.S. Dist. LEXIS 81040, *7-*8 (C.D.Cal. 2020).

[23]      *Esta Later Charters, Inc. v. Ignacio*, 875 F.2d 234, 239 (9th Cir. 1989).

[24]      1-ER- 43 (quoting *Sen.Rep. 74-2061* (May 12, 1936); *H.R.Rep. 74-2517* (Apr. 28, 1936).

[25]      *Id.*

-14-

United States" has nonetheless created lasting confusion – especially when it comes to vessels ferrying passengers to, from, or on recreational excursions. Neither the Supreme Court nor this Court has ever considered the issue, but one line of district court cases insists "that operators of inherently risky marine recreational activities may contract to disclaim liability for their own negligence."[26] Another holds that:

> Congress has spoken on this very type of waiver and has unequivocally prohibited it and rendered it void. 46 U.S.C. § 30509(a)(2). The "statute contains no exceptions regarding the type of activity – whether recreational, ultra-hazardous, or otherwise – in which the passenger is partaking."[27]

LDI, Dam, and the topside *amici* rely on the decisions that exempt recreational excursions from § 30509. Those decisions ignore the *General Slocum* and float their holdings on four mutually inconsistent rationales. The first overlooks § 30509 altogether and concludes that nothing in the maritime law prevents marine-excursion operators from embedding exculpatory clauses in their tickets and rental agreements.[28] The second acknowledges § 30509 but suggests that the "prohibition

---

[26] *Brozyna v. Niagara Gorge Jetboating, Ltd.*, 2011 U.S. Dist. LEXIS 111546 *11 (W.D.N.Y.) (jet-ski excursion).

[27] *In re Royal Caribbean Cruises*, 991 F. Supp.2d 1171, 1176 (S.D.Fla. 2013). (quoting *Johnson v. Royal Caribbean Cruises, LTD*., 449 Fed.Appx. 846, 848-849 (11th Cir. 2011)).

[28] *Brozyna*, 2011 U.S. Dist. LEXIS at *11.

on liability waivers applies only to common carriers[.]"[29]  The third concedes that neither LOLA nor § 30509 is limited to common carriers but holds that tour vessels conducting day trips are not engaged in "transporting passengers between ports of the United States or between any such port and a foreign port."[30]  And the fourth admits that covered vessels do not have to sail between different ports but reasons that excursion passengers cease being passengers and forfeit their nexus with traditional maritime activity when they disembark the vessel to go swimming or SCUBA diving.[31]

The decision below acknowledged each of those rationales[32] but recognized it was not bound by any of them[33] and pointing to "the infamous *General Slocum* disaster"[34] persuasively rejected all of them.[35]

---

[29]     *Charnis v. Watersport Pro, LLC*, 2009 U.S. Dist. LEXIS 76022, *12-13 (D.Nev. 2009) (wake-boarding excursion) (citing *Olivelli v. Sappo Corp., Inc.*, 225 F. Supp.2d 109, 119 (D.P.R. 2002) (SCUBA-diving excursion).

[30]     *Shultz v. Florida Keys Dive Ctr., Inc.*, 224 F.3d 1269, 1271-1272 (11th Cir. 2000) (SCUBA-diving excursion); see also *Olivelli, supra*; *Waggoner*, supra.

[31]     *Borden v. Phillips,* 752 So. 2d 69, 72-73 (Fla. App. 2000).

[32]     1-ER-29.

[33]     *Id.* at 31-32.

[34]     *Id.* at 42.

[35]     *Id.* at 28-46.

-16-

Breaking with LDI and Dam and hoping to knock over the whole chessboard,

topside *amicus* Marine Recreational Association ("MRA") argues that the Eharts'

case does not sound in admiralty because Mrs. Ehart was snorkeling and "not being

transported by the vessel when the incident occurred."[36] That argument carries a fatal

Catch-22; if it were correct, the Eharts could still press their suit against LDI and

---

[36]        *MRA Br.* at 8. To invest a court with admiralty jurisdiction under 28
U.S.C. § 1333(1), "a tort claim must satisfy conditions both of location and of
connection with maritime activity. A court applying the location test must determine
whether the tort occurred on navigable water or whether injury suffered on land was
caused by a vessel on navigable water. The connection test raises two issues. A
court, first, must assess the general features of the type of incident involved, to
determine whether the incident has a potentially disruptive impact on maritime
commerce. Second, a court must determine whether the general character of the
activity giving rise to the incident shows a substantial relationship to traditional
maritime activity." *Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534
(1995). The coastal waters off Molokini satisfy the "location prong." Cf. *Courtney
v. Pacific Adventures*, 5 F. Supp. 2d 874, 877 (1998) (coastal waters off Shark Fin
Rock, Lanai are navigable); *In re P/V Pearl Kai*, 1985 A.M.C. 1749, 1754 (D.Haw.
1985) (coastal waters off Kewalo Basin, Oahu, are navigable); *Strickert v. Neal*, 2015
U.S. Dist. LEXIS 160442 *12 (D.Haw.) (coastal waters off Molokini are navigable).
The "connection prong" is satisfied when the subject incident is "the sort of incident
that has a potentially disrupting impact on maritime commerce," *In re Mission Bay
Jet Sports, LLC*, 570 F.3d 1124, 1128-1129 (9th Cir. 2009), and "at least one alleged
tortfeasor was engaging in activity substantially related to traditional maritime
activity and such activity is claimed to have been a proximate cause of the incident."
*Grubart*, 513 U.S at 541. The loss of Maureen Ehart was more than just potentially
disruptive. The *Dauntless* delayed her voyage home to search the waters around
Molokini and Coast Guard divers, aircraft, and cutters scoured 747 square miles of
the Pacific for three days in hopes of spotting her. 2-ER-94-96. Finally, there is no
question LDI engaged in traditional maritime activity when it transported the Eharts
on their ill-fated day trip aboard the *Dauntless, id* at 92 and 112, and the crew's gross
negligence is an alleged, proximate cause of the accident. *Id.* at 100.

-17-

Dam in diversity, LDI's release would be void under Haw.Rev.Stats. § 663-1.54, and the threshold requirements of 28 U.S.C. § 1292(a)(3) would deprive this Court of interlocutory jurisdiction to review MRA's arguments – or anyone else's.[37] But MRA's argument is a non-starter. The Eharts have alleged,[38] LDI and Dam have conceded,[39] and the district court has concluded that this case satisfies all the requirements for admiralty tort jurisdiction.[40] LDI and Dam further "admit that Decedent was a 'passenger for hire' aboard the dive vessel *Dauntless*"[41] and it is undisputed that the *Dauntless* had not delivered the Eharts to their final destination when the accident occurred. Since LOLA "provides a procedure in admiralty whereby vessel owners can limit their liability for maritime damages"[42] but does not provide its own independent basis for admiralty jurisdiction,[43] LDI and Dam could not have invoked that procedure as their Twelfth Affirmative Defense had the Eharts'

---

[37] *Borne v. A & P Boat Rentals No. 4, Inc.*, 755 F.2d 1131, 1133 (5th Cir. 1985).

[38] 2-ER-88.

[39] *Id.* at 110; see also footnote 36, page 17 *supra*.

[40] 1-ER-22.

[41] 2-ER-99 and *Id.* at 110.

[42] *Seven Resorts v. Cantlen*, 57 F.3d 771, 772 (9th Cir. 1995).

[43] *Id.* at 772-773 (compiling cases).

claims not sounded in admiralty.[44] MRA's jurisdictional argument thus flies in everyone's face and is spectacularly erroneous.

Whether it is a cruise ship,[45] a ferry,[46] a platform tender,[47] a research ship,[48] or a dive boat,[49] every passenger-carrying vessel must exercise a "very high degree of care for the safety of its passengers."[50] It is therefore apodictic that "the transport and care of passengers" aboard a dive boat like the *Dauntless* "bears a substantial relationship to traditional maritime activity[.]"[51] The Eharts' dive-and-snorkel excursion, moreover, was not only "integral" to[52] but also "the *sine qua non*" of their voyage to Molokini.[53] MRA's notion that Mrs. Ehart forfeited either her status as a

---

[44]    See *Grubart*, 513 U.S. at 531-534.

[45]    *Rainey v. Paquet Cruises, Inc.*, 709 F.2d 169, 171-172 (2nd Cir. 1983).

[46]    *In re Catalina Cruises*, 137 F.3d 1422, 1425 (9th Cir. 1998).

[47]    *Armstrong v. Chambers & Kennedy*, 340 F. Supp. 1220, 1246 (S.D.Tex. 1972).

[48]    *Sennett v. Shell Oil Co.*, 325 F. Supp. 1, 8 (E.D.LA. 1971).

[49]    *Sinclair v. Soniform*, 935 F.2d 599, 602-603 (3rd Cir. 1991).

[50]    *Rainey.* 709 F.2d at 170 (citing *Moore v. American Scantic Line, Inc.*, 121 F.2d 767, 768 (2d Cir. 1941).

[51]    *Sinclair*, 935 F.2d at 602.

[52]    *In re Royal Caribbean Cruises*, 991 F. Supp. 2d at 1181.

[53]    See *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 901 (11th Cir. 2004).

-19-

passenger or the protection of § 30509 when she disembarked LDI's vessel to go snorkeling is just plain wrong.

The district court also dismissed the notion "that Congress was not thinking of dive boat excursions when it enacted § 183c(a) (now § 30509)."[54]  Many of the cases LDI, Dam, and the topside *amici* cite in support of that notion do not apply, consider, or even mention § 183c or § 30509, and the decision below found nothing in those enactments excluding the *Dauntless* from their reach.[55]

The argument that the *Dauntless* was not acting as a common carrier is also mistaken.  Appellants offer contradictory definitions of the phrase "common carrier."  One of those definitions clearly embraces the *Dauntless* and the other defeats any suggestion that Congress intended to limit § 30509 to common carriers.   As the decision below explains:

> [T]he plain language of § 30509 does not limit its application to common carriers.  To the contrary, Congress has explicitly stated that the statute 'applies to seagoing vessels and vessels used on lakes or rivers or in inland navigation, including canal boats, barges, and lighters.'[56]

LDI, Dam, and topside *amicus* Passenger Vessel Association ("PVA") also err

---

[54]     1-ER-31.

[55]     *Id.* at 31-35.

[56]     *Id.* at 35 (quoting 46 U.S.C. § 30502).

in arguing that the *Dauntless* was exempt from § 30509 because she was not transporting passengers between ports of the United States. Lahaina Harbor and the anchorage at Molokini are both ports of the United States. What is more, as we saw earlier, "Congress was well aware of vessels taking passengers on day trips to and from the same port" when it enacted § § 183c and 30509.[57] The decision below therefore followed the reasoning in *Courtney v. Pacific Adventures*, 5 F. Supp. 2d 874 (1998), and *Hambrook v. Smith*, 2015 U.S. Dist. LEXIS 70968 (D. Haw. 2015).[58] Those two cases also involved dive-boat accidents in Hawai'i and concluded that: "'The provision stating 'between ports of the United States or between any such port and a foreign port" means [only] that there must be a nexus between the voyage and the United States.'"[59] That conclusion is perfectly "consistent with the intent of Congress to bar 'all' waivers with respect to the transportation of passengers."[60]

Finally, it is important to remember that the judge-made, general maritime law held contractual provisions purporting to exculpate passenger-vessel owners void

---

[57]     *Id.* at 43.

[58]     See *Id.* at 44-45.

[59]     *Id.* (quoting *Courtney,* 5 F. Supp.2d at 879 (quoting 46 U.S.C. § 183c(a)).

[60]     *Id.* at 45.

-21-

even before the 1936 Congress codified that common-law policy in § 183c.[61]  Since

Maureen Ehart was a "nonseafarer" within the meaning of *Yamaha*, the district court

could have used the gap-filling provisions of Haw.Rev.Stats. § 663-1.54 to void the

release LDI imposed upon the Eharts even if Congress had not barred ***all*** waivers

with respect to the transportation of passengers.[62]

The decision below should be affirmed.

## ARGUMENT

**I.     THE LIABILITY RELEASE ON WHICH LDI AND DAM BASE THEIR SECOND
AFFIRMATIVE DEFENSE IS VOID UNDER 46 U.S.C. § 30509**

**A.     NOT ONE OF THE CASES ON WHICH LDI, DAM, AND THE TOPSIDE *AMICI*
REST THEIR CORE ARGUMENTS IS BINDING**

**1.     In the Absence of Binding Precedents, Courts Are Free to
Forge a Different Path Than the One Suggested by Prior
Authorities**

The issues presented by this appeal are questions of first impression.  Cf. *Boos*,

127 F.3d at 1211 ("Boos's appeal raises a question of first impression in this circuit.

Neither the Supreme Court nor the Ninth Circuit has ever squarely decided the precise

issue presented to the court today.").  LDI and Dam nonetheless insist that a "clear

---

[61]     *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1335 (11th Cir.
1984).

[62]     *Hambrook,* 2016 U.S.Dist.LEXIS 109484 at *68-69.

majority" of the relevant decisions favors their position. *LDI Br.* at 1, 8,14, 20, 23,

42, 55, and 67. Since LDI filed its Opening Brief last October 3rd, another district

judge has wielded § 30509 to invalidate the liability release in an excursion ticket

from a Hawaiʻi tour boat that made day trips which began and ended in the same port.

See *Dempsey v. Wild Side Specialty Tours, LLC*, 2022 U.S. Dist. LEXIS 195201 at

* 10-15 (D. Haw. October 26, 2022). The "clear majority" on which LDI and Dam

hang their arguments is dwindling fast, but the Opening Brief still protests that "the

District Court rejected over two decades of case law" when it adopted "the 'nexus-

between-the-voyage-and-the-United States' rationale" handed down in *Courtney* and

*Hambrook*. *Id.* at 25. LDI, Dan, and topside *amicus* PVA even suggest that the

decision below "overlooked the important tenet of maintaining maritime law's

uniformity" when it declined to follow the cases they cited. *LDR Br.* at 48; see also

*PVA Ltr. Br.* at 7-9. Such arguments are mistaken.

> [I]t is well understood that – in the absence of binding precedent –
> courts may forge a different path than suggested by prior authorities that
> have considered the issue. So long as the earlier authority is
> acknowledged and considered, courts are deemed to have complied
> with their common law responsibilities.

*Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001).

That is exactly what happened in this case; the decision under review explicitly

"acknowledges the multiple cases that Defendants cite in arguing that the waivers the

-23-

Eharts signed are enforceable." 1-ER-16. If that decision forged a different path than was suggested by those cases, it is because not one of them was either binding or persuasive. The need for uniformity in admiralty does not shackle developing maritime jurisprudence to authorities that are neither binding nor persuasive.

The Supreme Court has not considered the issues at bar, and the only circuit court decisions LDI, Dam, and the topside *amici* cite in support of their core arguments are *Shultz v. Florida Keys Dive Center, Inc*., 224 F.3d 1269 (11th Cir. 2000), *Waggoner v. Nags Head Water Sports, Inc*., 141 F.3d 1162 (4th Cir. 1998) (unpublished), and *In re Complaint and Petition of Blue Water Boating, Inc*., No. 18-55575, 786 Fed. Appx. 703 (9th Cir. 2019) (unpublished). Apart from two decisions from the Florida State Court of Appeal – *Cook v. Crazy Boat of Key West, Inc*., 949 So. 2d 1202, 1203 (Fla. App. Ct. 2007) and *Hopkins v. The Boat Club, Inc*., 866 So. 2d 108, 112 (Fla. App. Ct. 2004) – the rest of the authorities LDI and Dam cite to support their core arguments are district court decisions.

## 2. District Court Opinions Are Never Binding

"A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *DePaul Indus. v. Miller*, 14 F.4th 1021, 1029 (9th Cir. 2021) (internal quotation marks and citations omitted). Such a decision may persuade "by

-24-

the quality of its reasoning" – as do the District of Hawai'i's decisions in *Courtney*, *Hambrook*, and *Dempsey* – but it "does not have *stare decisis* effect; it is not a precedent." *Midlock v. Apple Vacations West, Inc.*, 406 F.3d 453, 458-459 (7th Cir. 2005).

### 3. State Court Opinions Are Entitled to No Deference on Issues of Federal Law

"A state court's opinion on an issue of federal law" – like the opinions in *Cook* and *Hopkins* – "is entitled to no deference whatsoever." *First Am. Title Co. v. Devaugh*, 480 F.3d 438, 455 (6th Cir. 2007); see also *Kuhnle Brothers, Inc. v. County of Geauga*, 103 F.3d 516, 520 (6th Cir. 1997) ("Notions of federalism do not require this court to follow a State court's holdings with respect to federal questions.").

### 4. Because the Ability to Develop Independent Interpretations of the Law Is Considered One of the Strengths of Our System, Not Even the Opinions of Another Circuit Court Are Binding on the Courts of This Circuit

Unpublished circuit court opinions like *Waggoner* and *In re Blue Water Boating, Inc.* are not precedents either. *Hart*, 266 F.3d at 1159. Indeed, the doctrine of *stare decisis* does not even require our local district courts to follow published, out-of-circuit, appellate decisions like *Shultz*. See *Hart*, 266 F.3d at 1172-1173.

> This ability to develop different interpretations of the law among the circuits is considered a strength of our system. It allows experimentation with different approaches to the same legal problem, so

-25-

that when the Supreme Court eventually reviews the issue it has the
benefit of percolation within the lower courts.

*Id.* at 1173. That strength is on full display in this case.

### B. NOT ONE OF THE CASES ON WHICH LDI, DAM, AND THE TOPSIDE *AMICI* REST THEIR CORE ARGUMENTS IS PERSUASIVE

#### 1. Nothing in § 30509 Bars Its Application to the Owners and Agents of Vessels Engaged in Risky Water Sports

The provisions of 46 U.S.C. § 30509 apply to the owner, master, manager, or

agent of any passenger-carrying vessel, including vessels that carry passengers to and

from recreational excursions. LDI and Dam float much of their appeal on the

argument that "the majority of courts" since 1998 "have held that § 183c or § 30509

do not invalidate waivers for voluntary, recreational marine activities under maritime

law." *LDI Br.* at 42. But that argument and the cases from which it flows are

unpersuasive.

Not one of the decisions on which the Opening Brief relies for the proposition

that "exculpatory clauses waiving liability for negligence in maritime recreational

activities are consistent with public policy"[63] cites, applies, considers, or even

---

[63]     *Morgan v. Water Toy Shop, Inc.*, 2018 U.S. Dist. LEXIS 61546 * 21
(D.P.R. 2018) (jet-ski excursion) (cited in *LDI Br.* at 46); see also *Witkowski v.
Niagara Jet Adventures, LLC*, 2018 U.S. Dist. LEXIS 85080 at *8-9 (E.D.N.Y. 2018)
(jet-boat excursion) (cited in *LDI Br.* at 27 and 47); *Olmo v. Atl. City Parasail, LLC*,
2016 U.S. Dist. LEXIS 56572 at *24 (D.N.J. 2016) (parasailing excursion) (cited in
*LDI Br.* at 39 and 46; *Brozyna*, 2011 U.S. Dist. LEXIS 111546 at *11 (jet-ski

-26-

mentions § 183c or § 30509.[64] Those decisions never considered whether vessels engaged in risky water sports are exempt from § 30509. An opinion cannot decide an issue it did not consider. See *United States v. Elliott*, 992 F.2d 853, 855 (8th Cir. 1993).

The only other decision LDI and Dam cite for the notion that recreational waivers are valid under maritime law is *Rodriguez v. Seabreeze Jetlev LLC*, 2022 U.S. Dist. LEXIS 154478 (N.D.Cal 2022). *LDI Br.* at 42 (quoting *Rodriguez,* 2022 U.S.Dist.LEXIS 154487 at *12). That case not only acknowledges the existence of § 30509, see *id.* at *9, it also agrees with the decision below "that 'had Congress intended to require different ports when it used the word "ports" it could have easily indicated that by using the phrase "between different ports."'" *Id.* at *11 (quoting

---

excursion) (cited by *LDI Br.* at 45); *Jerome v. Water Sports Adventure Rentals & Equip., Inc.*, 2013 U.S. Dist. LEXIS 27286 at *16-28 (D.V.I. 2013) (jet-ski excursion) (cited in *LDI Br.* at 46); *Cobb v. Aramark Sports & Entm't Servs.*, LLC, 933 F. Supp.2d 1295, 1298-1299 (D.Nev. 2013) (parasailing excursion) (cited in *LDI Br.* at 46 and 49); *In re Aramark Sports & Entm't Servs., LLC*, 2012 U.S. Dist. LEXIS 123786 at *14-22 (D.Utah) (power-boat rental) (cited in *LDI Br.* at 45; *Piché v. Stockdale Holdings, LLC*, 2009 U.S. Dist. LEXIS 24237 at *9-10 (D.V.I. 2009) (cited in *LDI Br.* at 44).

[64]    *Jerome* (cited in *LDI Br.* at 46) relies on "the Shipowner's Limitation of Liability Act, 46 U.S.C. § 30501 *et seq.*" for its conclusion that a jet ski is a "vessel," see 2013 U.S. Dist. LEXIS 27286 at *12 n. 6, and *Morgan* (cited at *LDI Br.* at 46) does the same. See 2018 U.S. Dist. LEXIS 61546 at *16. But neither *Jerome* nor *Morgan* makes any mention of § 30509 or pauses to consider whether that section bars an exculpatory contract.

*Ehart v. Lahaina Divers Inc*., 2022 U.S. Dist. LEXIS 84040, at *27 (D.Haw. 2022)). But the language and logic of *Rodriguez* shed no further light on our case.

*Rodriguez* did not spring from an inter-island voyage like the one the *Dauntless* made; Jamal Jordan, the decedent in that case, died on a "'bumper-tubing' ride" which took him nowhere but round and round a near-shore "Fun Zone" in Maunalua Bay, O'ahu. *Id.* at *6. If the *Rodriguez* court ultimately persuaded itself that § 30509 did not invalidate the release on the backside of Jamal Jordan's bumper-tubing ticket, it was on the force of an unparented *ipse dixit* that: "The ordinary meaning of transporting is to convey to a particular destination." *Id.* at *11. LDI, Dam, and topside *amicus* MRA seize on that *ipse dixit* as a means of buoying up their mistaken insistence that § 30509 applies only to common carriers. *LDI Br.* at 37 n. 15; *MRA Br.* at 7. *Rodriguez* however neither holds, says, nor hints anything of the sort; it did "not reach the question of whether the statute applies only to common carriers." *Rodriguez,* 2022 U.S. Dist. LEXIS 154478 at *11 n. 3.

But the *ipse dixit* on which the *Rodriguez* court rested its conclusion that § 30509 does not cover bumper-tubing rides would not have been persuasive even if it had been applicable. As LDI and Dam concede, see *LDI Br.* at 23, n. 8, the ordinary meaning of the word "transporting" is "to carry from one place or another." *The Merriam-Webster Dictionary* (New Edition 2005) 522. That definition says

-28-

nothing about conveying people or things to a particular destination and does not support any of LDI's, Dam's, or MRA's arguments.

When a vessel owner urges a federal court to limit its liability under LOLA § 30505 – as LDI is doing in this case, see 1-ER-119 – that owner should not be able to evade the bar in § 30509 just because the vessel involved in the casualty was transporting passengers to (or as in the case of *Rodriguez* on) a potentially risky recreational activity. If anything, the operators of inherently risky marine activities should be less entitled to hide behind exculpatory agreements than should operators whose vessels ply the waters on more mundane voyages. As the better-reasoned decisions hold, § 30509 "'contains no exceptions regarding the type of activity – whether recreational, ultra-hazardous, or otherwise – in which the passenger is partaking.'" *In re Royal Caribbean Cruises*, 991 F. Supp.2d at 1176 (internal quotation marks and citation omitted) (quoting *Johnson*, 449 Fed. App'x at 848-849).

LDI and Dam overlook the Southern District of Florida's decision in *Royal Carribean Cruises* when they erroneously insist that all " courts, except the *Courtney /Hambrook* court . . . have held that § 183c or § 30509 do not invalidate waivers for voluntary, recreational marine activities under maritime law." See *LDI Br.* at 52. Appellants compound that error and conflate their arguments when they try to explain away the holding in *Royal Carribean* on the ground that it is a common-carrier case.

-29-

See *LDI Br.* at 51.  As we will explain on page 33 *infra*, that too is a losing argument.

> ### 2. Nothing in § 30509 Limits Its Application to Common Carriers

Apart from the declaration-of-value provisions in 46 U.S.C. § 30503, which apply only to break-bulk cargo carriers, there is nothing in LOLA that limits the application of any of its subparts to vessels engaged in a particular service.  For their primary argument, LDI and Dam nonetheless sedulously insist that "§ 30509 applies only to common carriers."  *LDI Br.* at 49; see also *Id.* at 12, 18, 23, 24, 28, 29, 30, 31, 34, 40, 43, 44, 46, 49, 50, 51, and 59.[45]  That argument and the cases on which it relies are unpersuasive.

LDI and Dam rest their leading argument on two contradictory definitions of the phrase "common carrier."  On the one hand, they rely on the definition Congress spelled out in 46 U.S.C. § 40102 and insist that: "'The term 'common carrier' means a person that holds itself out to the general public to ***provide transportation by water***

---

[45]    In support of their insistence that § 30509 and its predecessor § 183c apply only to common carriers, LDI, Dam, and the topside *amici* cite: *Olivelli*, 225 F. Supp. 2d at 119; *Matter of Carpe Diem*, 2019 U.S. Dist. LEXIS 127744 at *13-14 (D.V.I. 2019) (cited in *LDI Br.* at 43); *Oran v. Fair Wind Sailing, Inc.*, 2009 U.S. Dist. LEXIS 110350 at *41-42 (cited in *LDI Br.* at 45 and 46); *Cutchin v. Habitat Curacao-Maduro Dive Fantaseas, Inc.*, 1999 U.S. Dist. LEXIS 24121 (S.D.Fla. 1999) (cited in *LDI Br.* at 43); *Cook*, 949 So. 2d at 1203 (cited in *LDI Br.* at 27 and 44); and *Hopkins*, 866 So. 2d at 112 (cited in *LDI Br.* at 44); *Chervy v. Peninsular & Oriental Steam Navigation Co.*, 243 F. Supp. 654, 655 (S.D. Cal. 1964) (cited in *MRA Br.* at 6).

***of passengers or cargo between the United States and a foreign country*** for

compensation [and] uses, for all or part of that transportation, ***a vessel operating*** on

the high seas or the Great Lakes ***between a port in the United States and a port in***

***a foreign country***[.]'" *LDI Br.* at 33-34 (quoting 46 U.S.C. § 40102(7)(A)(i) and (iii))

(Appellants' emphasis).  A few pages later, the Opening Brief turns around and relies

on the definition this Court handed down in *McCoy v. Pac. Spruce Corp.*, 1 F.2d 853

(9th Cir. 1924), and maintains that: "'A common carrier is generally defined as one

who, by virtue of his calling and as a regular business, undertakes to transport persons

or commodities from place to place, offering his services to such as may choose to

employ him and pay his charges.'" *LDI Br.* at 36 (quoting *McCoy*, 1 F.2d at 855).  But

neither exegesis supports LDI's or Dam's assertions.

The 1936 Congress could not have possibly had the common-carrier definition

from 46 U.S.C. § 40102(7) in mind when it enacted 46 U.S.C. § 183c because that

definition would not be promulgated until 1984.  See Shipping Act of 1984, Pub. L.

98 237, § 3(6), 98 Stat. 67, 68 (1984) (codified at 46 U.S.C. app. § 1702(6) (1988),

recodified as amended at 46 U.S.C. § 40102(7)).  But if we nevertheless assume

*arguendo* that the phrase "common carrier" does indeed mean only those who own

vessels "operating on the high seas or the Great Lakes between a port of the United

States and a port in a foreign country," Congress's decision to apply § 183c to the

-31-

"owner, master, manager, or agent of a vessel transporting passengers between ports in the United States" demonstrates that it did not intend to limit that Section to common carriers. If on the other hand the phrase includes *any* vessel owner who "undertakes to transport persons or commodities from place to place," LDI is a common carrier.

Top-side *amicus* Daniel Bader cites *Semon v. Royal Indemnity Co.*, 279 F.2d 737 (5th Cir. 1960), for the well-settled proposition that: "A company that provides transportation for the exclusive use of its own patrons is a private carrier." *Bader Br.* at 7. But the owner of the charter-boat in *Semon* did not hold her it "to all of the public indifferently, or even to all groups who might come as fishing parties seeking a charter-party, and on the contrary he reserved the right to choose when and to whom he would charter the vessel[.]" 279 F.2d at 740. That is not the situation here; LDI did not reserve the *Dauntless* for the exclusive use of particular patrons or even for the use of groups seeking a charter party, but instead sold tickets to any member of the public who wanted to go diving, snorkeling, or sightseeing at Molokini. See 2-ER-110.

But even if we assume LDI is not a common carrier, the language of § 30509 "does not require that the contract containing the liability-limiting provision relates to the actual responsibilities of a common carrier – indeed, th[at section's] use of the

-32-

indefinite article 'a' implies that ***any*** owner's contract that contains a limiting-liability provision in favor of the owner would be covered (again, provided that the owner owns a vessel transporting passengers)." *In re Royal Caribbean Cruises*, 991 F. Supp.2d at 1178 (emphasis added); accord see *Dempsey,* 2022 U.S. Dist. LEXIS 195201 at *10 ("the statute is not limited to common carriers"). In fact, the provisions of 46 U.S.C. § 30502 say as much explicitly.

The provisions of §§ 30502 and 30509 are integral parts of the Vessel Owners' Limitation of Liability Act. 46 U.S.C. §§30501-30512. If that Act truly applies only to common carriers, and if LDI's and Dam's assertion that LDI is not such a carrier were true, LDI could not have requested limitation as its Twelfth Affirmative Defense. LDI is trying to have its cake and eat it too. Such gluttony is expressly forbidden by the provisions of § 30502.

As the decision below recognizes, 1-ER-35, and as the District of Hawai'i pointed out in *Courtney,* 5 F. Supp.2d at 879, *Hambrook*, 2016 U.S. Dist. LEXIS 109484 at *77, and *Dempsey,* 2022 U.S. Dist. LEXIS 195201 at *10,[46] those

---

[46] So far as we can determine, *Courtney*, *Hambrook, Dempsey,* and the decision below are the ***only*** reported opinions to recognize the interplay between § 30502 and § 30509. If, as LDI and Dam insist, those decisions can be described as outliers, it is only because they are shining lodestars in the wan cluster of opinions that either miss that interplay entirely, see e.g See *Shultz v. Florida Keys Dive Ctr., Inc*., 224 F.3d 1269 (11th Cir. 2000); *Olivelli v. Sappo Corp., Inc.*, 225 F. Supp. 2d 109 (D.P.R. 2002), and *Charnis v. Watersport Pro, LLC*, 2009 U.S. Dist. LEXIS

-33-

provisions stake out the ambit for LOLA as a whole and state that everything in "this chapter (except section 30503) applies to seagoing vessels and vessels used on lakes or rivers or in inland navigation, including canal boats, barges, and lighters." 46 U.S.C. § 30502 (parentheses original). In other words, LOLA covers not just common carriers but any vessel that satisfies the ecumenical definition spelled out in 1 U.S.C. § 3.

The definition of the term "vessel" in 1 U.S.C. § 3 "includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. That section "has remained virtually unchanged from 1873 to the present [and] continues to supply the default definition of 'vessel' throughout the U. S. Code, 'unless the context indicates otherwise.'" *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 489-490 (2005) (quoting 1 U.S.C. § 1). There is nothing about the context or legislative history of U.S. Code Chapter 305 to indicate that 1 U.S.C. § 3 does not define the term "vessel" for the whole of LOLA. See *Clinton Bd. of Park Com'rs v. Claussen,* 410 F. Supp. 320, 323-324 (S.D.Iowa

---

76022 (D.Nev. 2009), or brush it aside erroneously. See *Waggoner v. Nags Head Water Sports,* 1998 U.S. App. LEXIS 6792 (4th Cir 1998) at *14 ("Although the Act as a whole applies to pleasure craft, *Richards v. Blake Builders Supply Inc*., 528 F.2d 745, 748-49 (4th Cir. 1975), including jet skis, *Keys Jet Ski, Inc. v. Kays* , 893 F.2d 1225 *passim* (11th Cir. 1990), this section [30509] is limited by its terms to common carriers.").

1976). Besides jet skis, *In re Mission Bay Jet Sports, LLC*, 570 F.3d 1124, 1127 (9th Cir. 2009), dive skiffs, *Pettis v. Bosarge Diving, Inc.*, 751 F. Supp. 2d 1222, 1227-1228 (S.D.Ala. 2010), and speed boats, *St. Hilaire Moye v. Henderson*, 496 F.2d 973, 979 (8th Cir. 1974), the default definition in § 3 embraces mud dredges, *Stewart*, 543 U.S. at 490-491, pile-driving scows, *George Leary Const. Co. v. Matson*, 272 F. 461, 462-463 (4th Cir. 1921), floating shrimp plants, *Pleason v. Gulfport Shipbuilding Corp.*, 221 F.2d 621, 623 (5th Cir. 1955), museum ships, *McCarthy v. The Bark Peking*, 716 F.2d 130, 133-134 (2d Cir. 1983), showboats, *Clinton Bd. of Park Comm'rs*, 410 F. Supp. at 323-324, floating restaurants, *The Ark*, 17 F.2d 446, 447 (S.D.Fla. 1926), and shipyard submersibles. *Estate of Wenzel v. Seaward Marine Servs., Inc.*, 709 F.2d 1326, 1328 (9th Cir. 1983). As the circuit courts have wryly observed, "'no doubt the three men in a tub would also fit within our definition of a "vessel" under 1 U.S.C. § 3, and one probably could make a convincing case for Jonah inside the whale.'" *United States v. Templeton*, 378 F.3d 845, 850 (8th Cir. 2004) (quoting *Burks v. Am. River Transp. Co.*, 679 F.2d 69, 75 (5th Cir. 1982)) (brackets omitted). We cannot be certain what the drafters intended to do about Jonah or the whale, but Congress clearly enacted § 30509 to invalidate any liability release the owners of that tub might try to impose on the three men; that is the indisputable effect of 46 U.S.C. § 30502.

In *Keys Jet Ski, Inc. v. Kays*, 893 F.2d 1225 (11ᵗʰ Cir. 1990), for example, where a company that rented jet skis sought relief under LOLA, the court discussed § 30502's prior iteration, 46 U.S.C. §188:

> In its original form the Limitation Act expressly stated that it did not apply to 'any canal boat, barge, or lighter, or to any vessel of any description whatsoever, used in rivers or inland navigation.' In 1886, Congress amended the Act to extend its application to 'all sea-going vessels, and also to all vessels used on lakes or rivers or in inland navigation, including canal boats, barges, and lighters.' ***Following the Act's amendment in 1886, one district court stated that 'the evident purpose of the amendment was to make the statute applicable to all vessels, irrespective of the purpose to which they are put.'*** *In re Liebler,* 19 F. Supp. 829, 832 (W.D.N.Y. 1937) (the 'FRANCESCA'). *See Warnken v. Moody,* 22 F.2d 960, 962 (5th Cir. 1927) (limitation of liability allowed to owner of thirty-foot pleasure craft). ***Congress's failure to limit the applicability of the Act when additional amendments were made in 1935, 1936, and 1984, supports the proposition that Congress intended the Act to apply to 'any vessel.'***

*Keys Jet Ski,* 893 F.2d at 1228 (emphasis added, footnotes and some citations omitted). Agreed the court in *Clinton Bd. of Park Com'rs v. Claussen,* 410 F.Supp. at 321, where the owners of a "showboat" and "nautical museum" sought limitation:

> Plaintiff in the instant action seeks to limit its liability arising from the drowning incident by invoking the operation of 46 U.S.C. § 183 *et seq*. Those sections are made applicable to: * * * all seagoing vessels, and also to all vessels used on lakes or rivers or in inland navigation, including canal boats, barges, and lighters. 46 U.S.C. § 188. ***Essentially, courts have construed the definition of vessel for limitation of liability purposes to be coextensive with the general statutory definition found in 1 U.S.C. § 3.***

*Id.* at 323-324 (emphasis added). Congress re-codified 46 U.S.C. § 188 in 2006

without any substantive changes as 46 U.S.C. § 30502. LDI's and Dam's assertion that §30509 applies only to common carriers is an affront to §30502.

The language of that section excepts only the provisions in §30503, which relate in turn only to a shipper's failure to give a cargo-carrying vessel owner "written notice of the character and true value" of lost cargo. 46 U.S.C. § 30503(a). Under the well settled canon *expressio unius est exclusio alterius*, the drafters' decision to exclude only § 30503 from the reach of § 30502 signals their clear intention to leave § 30509 squarely within that reach. Cf. *Pittston Coal Group v. Sebben*, 488 U.S. 105, 131 (1988). To belabor the dispositive point one last time, former § § 183c and 188 and current § § 30502 and 30509 say nothing at all about common carriers and apply instead to all "seagoing vessels and vessels used on lakes or rivers or in inland navigation, including canal boats, barges, and lighters." 46 U.S.C. § 30502; see also *Courtney,* 5 F. Supp.2d at 879; *Hambrook,* at *77-78; *In re Royal Caribbean Cruises*, 991 F. Supp.2d at 1178. The authorities LDI and Dam cite to the contrary simply miss the boat.

### 3. Nothing in § 30509 Bars Its Application to Day Trips That Begin and End in the Same Port

Read in context and in the light of its legislative history, § 30509 prohibits owners whose vessels transport passengers on day trips that begin and end in the

same port from embedding liability releases in their excursion tickets. Relying on the "plain-meaning rule" and a line of cases descending from the Eleventh Circuit's *per curiam* decision in *Shultz v. Florida Keys Dive Center, Inc.*, *supra*,[47] LDI and Dam nonetheless urge this Court to exclude the Eharts from the protection of that section on the ground that the *Dauntless* did not transport them "between ports of the United States or between any such port and a foreign port." *LDI Br.* at 39-47. *Shultz* and its progeny are easy to distinguish.

*Shultz* allowed the owners of the dive boat *Goody III* to use a release embedded in that vessel's trip tickets to exculpate themselves from the death of a SCUBA-diving passenger who drowned at an open-ocean dive site off the Florida Keys. Describing the route that vessel took on the day of the accident, the *Shultz* court reasoned that:

> The *Goody III* served only as a dive boat: it departed the port of Tavernier in the Florida Keys, brought the divers to the location of the dive, and after the dive returned them to Tavernier. It was not a 'vessel transporting passengers between ports of the United States or between any such port and a foreign port.'

---

[47]     See e.g. *Waggoner*, 1998 U.S. App. LEXIS at *15-16 (cited in *LDI Brf.* at 36 and 42; *Olivelli*, 225 F. Supp. 2d at 119 (cited in *LDI Brf.* at 43, 46, and 49); *Oran*, 2009 U.S. Dist. LEXIS 110350 at * 40-41 (cited in *LDI Brf.* at 45 and 46); *Witkowski v. Niagara Jet Adventures, LLC*, 2020 U.S. Dist. LEXIS 16551 at * 11 n. 4 (W.D.N.Y. 2020) (cited in *LDI Brf.* at 27); *Kabogoza v. Blue Water Boating*, 2019 U.S. Dist. LEXIS 60346 at *11 (E.D. Cal. Apr. 5, 2019) (cited in *MRA Br.* at 7); *Cook*, 949 So. 2d at 1203 (cited in *LDI Brf.* at 27).

224 F.3d at 1271.

That was not the case here. The *Dauntless* transported the Eharts from one port to another when she ferried them from Lahaina Harbor to the protected anchorage at Molokini. See SER-21-22 and *Id.* at 472-475. Even though LDI and Dam regularly allow passengers to disembark and re-embark at one or another of that anchorage's twenty-six permanent moorings, the Opening Brief refuses to admit Molokini is a port. But the plain-meaning rule would not give LDI or Dam safe harbor from the Eharts' claims even if the sheltered anchorage at Molokini were not a port.

According to the plain-meaning rule: "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341(1997). Looking at § 30509 through a keyhole and insisting that its meaning must be determined solely from the language on the face of the statute, LDI and Dam invite this Court to disregard both the specific context in which that language is used and the broader context of the statute as a whole, to rely on the dictionary rather than the legislative history, and to "'give effect to every word'" Congress included. *LDI Br.* at 27 (quoting *Lowe v. S.E.C.*, 472 U.S. 181, 207, n.53 (1985)). Picking up where Dam and LDI left off and using terminology that doesn't appear in the governing jurisprudence, topside *amicus* PVA

urges the Court to give § 30509 "its natural" and "understandable reading." *PVA Ltr. Br.* at 2 and 3. Those invitations are fraught with problems.

"No one who has had occasion to study the Limitation of Liability Act has been struck by its lucidity." *Esta Later Charters, Inc. v. Ignacio*, 875 F.2d 234, 236-237 (9th Cir. 1989). "'The Act is not a model of clarity.'" *Lewis,* 531 U.S. at 447 (2001) (quoting 2 Schoenbaum, *Admiralty and Maritime Law*, 299 (2d ed. 1994)). "Misshapen from the start, the subject of later incrustations, arthritic with age, the Limitation Act has provided the setting for judicial lawmaking seldom equaled." *Esta Later Charters, Inc*., 875 F.2d at 239 (internal quotation marks and citation omitted). The conflicting jurisprudence that has sprung up around § 30509's ill-begotten phrase "between ports of the United States" is a perfect example.

The purpose behind the bar in § 30509 could not be clearer. The 1936 Congress enacted that bar with the *General Slocum* in mind to prohibit the "practice of providing on the reverse side of steamship tickets that in the event of damage or injury caused by the negligence or fault of the owner or his servants, the liability of the owner shall be limited to a stipulated amount" and to "put a stop to all such practices and practices of like character." *Sen.Rep. 74-2061* (May 12, 1936) at 6-7; *H.R.Rep. 74-2517* (Apr. 28, 1936) at 6-7. "Thus," as the decision below points out, "in enacting § 183c, Congress was well aware of vessels taking passengers on day

-40-

trips to and from the same port." 1-ER-43. Even if there were some rational basis for

differentiating the day trip the parishioners of St. Mark's expected to take to and from

the Locust Grove Picnic Ground aboard the *General Slocum* from the one the Eharts

expected to take to and from Molokini aboard the *Dauntless*, it makes no more sense

to confine the application of § 30509 to vessels transporting passengers between

different ports than it does to limit that statute's protection to people booking passage

aboard steamships. Congress could not have possibly intended a result so plainly at

variance with the stated policy behind the statute.[48]

---

[48]     The interpretation called for by LDI, Dam, the topside *amici*, and the
authorities they cite turns on fortuities and produces outcomes that are difficult to
square with the statute's remedial purpose. Where several ports exist in close
proximity to each other – as they do, for example, on the south shore of O'ahu where
Pearl Harbor, Hickam Harbor, Keehi Small Boat Harbor, Honolulu Harbor, Kewalo
Basin, and Ala Wai Yacht Harbor share the same crowded stretch of coastline –
many types of tour-industry passenger vessels could sail into and out of § 30509(a)'s
coverage randomly, depending on whether their itinerary called for a simple return
to the original point of departure or an intermediate stop along the way. If this Court
adopts LDI's and Dam's interpretation, the same deep-sea sport fishing vessel could
take aboard guests staying at the Prince Hotel in Ala Wai Yacht Harbor one morning,
motor offshore, catch no fish, and return her disappointed passengers directly to the
hotel – and that afternoon, take aboard a new group of Prince-Hotel guests, catch
some marlin or ahi, stop at Kewalo Basin to pose the successful anglers for photos at
the fish hoist on the dock, clean and filet their catch, and then return those passengers
and their trophies to the hotel to celebrate. The afternoon group would be protected
by § 30509(a), while the morning group would not. Still worse, under such an
interpretation a callous vessel master would have a legal incentive to take an injured
passenger back to the port of embarkation, and not to the nearest point of shoreside
assistance, just to escape liability by keeping an otherwise void release outside the
ambit of § 30509(a). Congress could not have possibly intended such results.

We agree with topside *amicus* PVA that "'only the words on the page constitute the law adopted by Congress and approved by the President.'" *PVA Ltr. Br.* at 6 (quoting *Bostock v. Clayton Cty.*, ___U.S.___, ___ 140 S. Ct. 1731, 1738 (2020)). The problem in this case is how to interpret those words in a way that does not defeat the avowed purpose of § 30509.

In *Public Citizen v. U.S. Dept. of Justice,* 491 U.S. 440 (1989), for example, the Supreme Court excepted the American Bar Association's Standing Committee on Federal Judiciary Appointments from the disclosure requirements set forth in the Federal Advisory Committee Act (FACA), 5 U. S. C. App. § 1 *et seq*., even though "the President . . . routinely requests a potential [judicial] nominee to complete a questionnaire drawn up by the ABA," *Public Citizen,* 491 U.S. at 444, and even though FACA requires disclosures from any "'any committee, board, commission, council, conference, panel, task force, or other similar group . . . utilized by the President'" in connection with judicial appointments. *Id.* at 451 (quoting 5 U. S. C. App. § 3(2)(B)). The Court explained that exception on the ground that "reliance on the plain language of FACA alone is not entirely satisfactory" because "'[u]tilize' is a woolly verb." *Id.* at 452. While "'the words used, even in their literal sense are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing,' ***nevertheless 'it is one of the surest indexes of a mature and developed***

-42-

*jurisprudence not to make a fortress of the dictionary*; *but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning*.'" *Id.* at 444-445 (citation omitted, emphasis added); see also *Id.* at 470 (Kennedy, J., concurring) ("Where the plain language of the statute would lead to 'patently absurd consequences,' that 'Congress could not *possibly* have intended,' we need not apply the language in such a fashion") (citations omitted, emphasis original). The same is true in our case.

LDI's, Dam's, and PVA's insistence that § 30509 applies only to vessels transporting passengers between different ports on the day of the accident makes a fortress of the dictionary and ignores the remedial purpose that is the "surest guide" to that section's meaning. It is well settled that "even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' [courts have] followed that purpose, rather than the literal words." *United States v. American Trucking Assoc.*, 310 U.S. 534, 543 (1940) (footnotes and citations omitted); see also *Brooks v. Donovan,* 699 F.2d 1010, 1011 (9th Cir. 1983) ("This court must look beyond the express language of a statute where a literal interpretation 'would thwart the purpose of the overall statutory scheme or lead to an absurd result") (citations omitted). Such an approach is called for here.

-43-

According to its legislative history and avowed purpose, § 30509 was designed only to reach those passenger vessels that touch at a U.S. port and not to reach only those vessels transporting passengers between different U.S. ports. In *Wallis v. Princess Cruises, Inc.*, 306 F.3d 827 (9th Cir. 2002), for example, this Court recognized that the statutory bar in §§ 183c and 30509 "'limits the reach of American public policy to contracts of passage for voyages that touch the United States[.]'" *Id.* at 835 (quoting *Hodes v. S.N.C. Achille Lauro ed Altri-Gestione*, 858 F.2d 905, 915 (3d Cir. 1988)). And as the Southern District of Florida explained when it used § 183c to invalidate the release a Bahamian vessel owner tried to impose upon a passenger who was injured before leaving Canadian waters during a cruise that was scheduled to call on a U.S. port, "46 app. U.S.C. 183c prohibits contractual liability limitations ***any time*** a vessel enters a United States port." *Henson v. Seabourn Cruise Line Ltd.*, 410 F. Supp.2d 1246, 1248 (S.D.Fla. 2005) (emphasis added).

If a foreign-flagged vessel operating internationally like the one in *Henson* need only touch one U.S. port to trigger the statutory bar in § 30509, it is unreasonable if not absurd to require a domestic vessel operating entirely on U.S. waters to touch at least two. See *Dempsey,* 2022 U.S. Dist. LEXIS 195201 at *12 ("'applying "ports" only when journeys are between Port A and Port B leads to odd and absurd results'") (quoting the decision below, 1-ER-40). That is why the

-44-

decision below followed the reasoning in *Courtney* and *Hambrook* and concluded that: "'The provision stating "between ports of the United States or between any such port and a foreign port" means that there must be a nexus between the voyage and the United States.'" 1-ER-44 (quoting *Courtney,* 5 F. Supp.2d at 879. As the legislative focus on the *General Slocum* confirms, § 30509 was meant to apply any time a vessel scheduled to transport passengers in U.S. waters leaves the dock.

### 4. Mrs. Ehart Did Not Stray outside Admiralty Jurisdiction or the Protection of § 30509 When She Left the *Dauntless* to Go Snorkeling

Topside *amicus* MRA argues that Maureen Ehart terminated her voyage aboard the *Dauntless* and lost the protection of § 30509 when she went over the side to snorkel at Molokini. According to MRA: "If she died as a result of snorkeling, the associated transportation to get to the location is merely fortuitous and not only does the waiver apply but also the court lacks jurisdiction." *MRA Br.* at 2.

The Florida State Court of Appeal reached the same conclusion in *Borden v. Phillips*, 752 So.2d 69 (Fla.App. 2000), when it refused to use § 183c to void a release in a case involving a passenger from the dive boat *Manta Ray* who drowned during a SCUBA dive at an open-ocean site off the coast of Florida. *Id.* at 71. The *Borden* court unanimously concluded the "*Manta Ray* was a vessel transporting passengers for a SCUBA-diving excursion in navigable waters, and therefore 46

-45-

U.S.C. § 183c applies to its voyage." *Id.* at 72. The members of the *Borden* majority refused to enforce § 183c only because they felt admiralty jurisdiction did not exist over the plaintiff's claim. *Id.* In their view, the activity at issue was SCUBA diving, not boating, and the "decedent ceased being a passenger when he entered the water." *Id.*

MRA makes no mention of *Borden* and relies instead on this Court's unpublished decision in *Complaint and Petition of Blue Water Boating, Inc.*, 786 Fed. Appx. 703 (9th Cir. 2019). According to MRA, *Blue Water Boating* holds that "snorkeling itself is not a traditional maritime activity[.]" *MRA Br.* at 9. But *Blue Water Boating* holds nothing of the sort. The victim in that case "drowned in the Santa Barbara Harbor while using a stand-up paddleboard rented from Blue Water." *Id.* at 704. He was neither a snorkeler like Maureen Ehart nor a passenger-for-hire aboard a Coast-Guard-inspected tour boat like the *Dauntless,* and there is nothing in the decision to suggest that the paddleboard he rented from Blue Water transported him between ports like Lahaina and Molikini. 786 Fed. Appx. at 703-704. As we will explain on pages 47 and 48 *infra*, the paddleboard's owner sought limitation or exoneration in admiralty under LOLA, *id.* at 703, so the holding that paddleboarding on navigable water lacks "maritime flavor," *id.* at 705, may be an example of what Judge Kozinski has described as "gerrymandering." Be that as it may, the decision

-46-

in *Blue Water Boating* has no application here.

Neither does the Florida State Court of Appeal's holding in *Borden.* The Eharts have alleged, LDI and Dam have admitted, and the district court has concluded that this is a case of admiralty and maritime jurisdiction. 1-ER-33; 2-ER-88; 2-ER-110. It is obvious in retrospect that *Borden* was too. See 752 So.2d at 74 (Benton J. dissenting).

MRA cites *In re Kanoa, Inc.*, 872 F. Supp. 740, 745 (D. Haw. 1994), for the notion that any relationship between Mrs. Ehart's death and her voyage to Molokini was "wholly fortuitous and completely unrelated to the tort itself." See *MRA Br.* at 9. But *Kanoa* was decided before the Supreme Court handed down the current, "two-part" maritime-nexus test in *Grubart*, 513 U.S. at 534, when the courts of this circuit were still bound by the old, "four-part" approach spelled out in *Delta Country Ventures, Inc. v. Magana*, 986 F.2d 1260, 1263 (9th Cir. 1993).[49] See *In re Kanoa,* 872 F. Supp. at 743 (citing *Delta County Ventures,* 986 F.,2d at 1263). As this Court explained in *Taghadomi v. United States*, 401 F.3d 1080 (9th Cir. 2005), "the *Delta County Ventures* approach is flatly inconsistent with the Supreme Court's subsequent

---

[49] That test determined "whether a substantial relationship to traditional maritime activity existed" by examining: "(1) traditional concepts of the role of admiralty law; (2) the function and role of the parties; (3) the types of vehicles and instrumentalities involved; and (4) the causation and nature of the injury suffered." *Delta County Ventures,* 986 F.2d at 1263.

decision in *Grubart* and hence is no longer good law." *Id.* at 1087. Neither is *Kanoa.*

What is more, *Blue Water Boating, Kanoa,* and *Delta County Ventures* were actions where vessel owners were pressing for exoneration or limitation, and as Judge Kozinski observed when he dissented from *Delta County Ventures*: "One of the many unfortunate consequences of the Limitation of Liability Act is that it leads courts to contort the law to avoid unjust results." 986 F.2d at 1266 (Kozinski J. dissenting).

> Although Congress has acknowledged our suggestion that the Limitation of Liability Act be repealed, see *S. Rep. No. 94, 101st Cong., 1st Sess*. at 4 (1989) (citing *Esta Later*), the statute remains on the books, a sad reminder of the power of legislative inertia. Until Congress sees fit to decommission the Act, we're bound to apply it. Incongruous as we may find its outmoded assumptions, we will do more harm than good by gerrymandering our admiralty jurisdiction in an effort to avoid the statute's plain import.

*Id.* at 1267.

The jurisdictional gerrymandering in *Delta County Ventures, Blue Water Boating,* and *Kanoa* – and MRA's argument that Mrs. Ehart's voyage aboard the *Dauntless* was "wholly fortuitous and completely unrelated to the tort" LDI committed off Molokini – ignore the general maritime duty of care that all vessel owners owe their passengers. See e.g. *In re Catalina Cruises*, 137 F.3d at 1425-1426 (citing *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959)). As this Court has explained:

-48-

The degree of care required is always that which is reasonable, but the application of reasonable will of course change with the circumstances of each particular case. The Second Circuit has described the standard accurately:

> What is required is merely the conduct of the reasonable man of ordinary prudence under the circumstances, and the greater danger, or the greater responsibility, is merely one of the circumstances, demanding only an increased amount of care.

*Id.* at 1426 (quoting *Rainey*, 709 F.2d at 170-171) (internal quotation marks, ellipses, and citations omitted). Such increased care is demanded of a vessel owner like LDI whenever passengers like Maureen Ehart are exposed to winds, waves, seas, currents, and other marine hazards that are not typically encountered ashore. *Id.* at 1426. LDI and Dam breached that duty when they "failed to use even slight care" to:

(a.)    "man, equip, equip, and operate the dive boat *Dauntless* in accordance with the requirements of its Certificate of Inspection;"

(b.)    "comply with the provisions of 46 C.F.R. Subchapter T;"

(c.)    "adopt, implement, or enforce a small-passenger-vessel Safety Management System;"

(d.)    "comply with U.S. Coast Guard Sector Honolulu's Best Practices for Passenger Safety on Small Passenger Vessels Involved in Water Sports;"

(e.)    "comply with PADI Retailer Association Membership Standards, PADI safety rules, PADI IRRA standards, and/or PADI snorkeling supervision requirements;"

(f.)    "adopt, implement, or enforce safe and suitable snorkeling, SCUBA-diving, and rescue procedures;"

-49-

(g.)    "provide *Dauntless* with a master, crew members, lifeguards, dive masters, open-water SCUBA instructors, and/or snorkeling supervisors who were properly trained, certified, and equipped for their respective jobs;

(h.)    "supervise DECEDENT during her snorkeling excursion;"

(i.)    "initiate a timely and effective search for DECEDENT;"

(j.)    "radio for timely assistance from the U.S. Coast Guard and/or local authorities over Channel 16;"

(k.)    "rescue  DECEDENT after recklessly and wantonly placing her in peril.

2-ER-98-100.

Whatever *in re Kanoa* or the *Borden* majority may have held, "the transport and care of passengers" aboard a Coast-Guard-regulated dive boat like the *Dauntless* "bears a substantial relationship to traditional maritime activity" and unarguably invokes admiralty tort jurisdiction. *Sinclair*, 935 F.2d at 602 (SCUBA-diving injury suffered nine miles off the Coast of New Jersey by a passenger aboard the dive boat *Destitute*); see also *Strickert*, 2015 U.S. Dist. LEXIS 160442 at *14-15 (snorkeling death at Molokini involving a passenger from the dive boat *Double Scoop*).  Agreed the dissent in *Borden*:

> That the decedent had been SCUBA diving was, indeed, fortuitous, under the allegations of the complaint. As in [*Courtney*], where the United States District  Court of Hawaii  concluded that 46 U.S.C. app. § 183c precluded enforcement of a release signed by a SCUBA diver,

the complaint in the present case alleges that the crew of the dive boat failed to operate the dive boat properly. 5 F. Supp.2d at 880.

Although in the water, Mr. Borden was still attached to the boat as a passenger. The *Manta Ray* had not put Mr. Borden off at his ultimate destination.

752 So.2d at 74 (Benton J. dissenting) (some citations omitted). The same is true here. Mrs. Ehart was one of the *Dauntless's* passengers and still under the care of its crew when Dam permitted her to drift away on the current; LDI had not put her off at her ultimate destination.

It is finally worth noting that it was "immaterial – under the view shared by the whole panel [in *Borden*] – that the voyage ended where it began." *Id.* at 74 (Benton J., dissenting) (citing *Courtney*, 5 F. Supp. 2d at 879). But for the majority's erroneous jurisdictional holding, the *Borden* court would have voided the release in that case under § 183c. *Id.* at 72.

Quite apart from its jurisdictional argument, MRA also contends Mrs. Ehart and her husband lost the protection of § 30509 because the *Dauntless* "was no longer transporting her or anyone else at the time of her disappearance." *MRA Br.* at 2. MRA tries to buttress that contention with *Chervy v. Peninsular & Oriental Steam Navigation Co.*, 243 F. Supp. 654 (S.D. Cal.1964). But the holding in *Chervy* doesn't help Dam or LDI in any way. The *Chervy* court refused to apply § 183c to the claims

brought by a pair of former passengers who were injured aboard the ocean liner *Arcadia* in the port of Long Beach when they returned to that vessel as mere visitors. Explains the decision:

> The court finds that libelants' status as passengers terminated the morning upon which the *SS Arcadia* arrived at Long Beach. After libelants had left the ship and removed their luggage their rights to re-board the ship as passengers no longer existed. When they went aboard in the evening, they boarded not as passengers, but as guests. This being so, the respondents are entitled to rely upon the exculpatory provisions of the boarding pass as relieving them from ordinary acts of negligence.

243 F.Supp. at 654-655. That is not the case here. LDI and Dam admit that Mr and Mrs. Ehart were "passengers for hire" at all times material to this claim. 2-ER-99 and 2-ER-110. Mr. Ehart's passage aboard the *Dauntless* did not end when she went over the side to go snorkeling. Molokini was only a stopover.

As *In re Royal Caribbean* ruled when it rejected a cruise-ship owner's attempt to keep § 30509 from protecting a passenger who left the ship to participate in a jet-ski excursion during a stopover at Coco Cay in the Bahamas: "Coco Cay and the activities available there—including the jet-ski tour—were 'integral' to the cruise in the present case." 991 F. Supp. 2d at 1181. Whether at Coco Cay or Molokini, "these stopovers are the *sine qua non* of the cruise." *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 901 (11th Cir. 2004). The protection § 30509 afforded the Eharts was

-52-

not diluted in any fashion when they went over the side for their in-water activities.

## II. THE LIABILITY RELEASE ON WHICH LDI AND DAM REST THEIR SECOND AFFIRMATIVE DEFENSE IS ALSO VOID UNDER HAW.REV.STATS. § 663-1.54

### A. THE EXERCISE OF ADMIRALTY JURISDICTION DOES NOT RESULT IN AUTOMATIC DISPLACEMENT OF STATE LAW

The release LDI embedded in the Eharts' excursion tickets is also void under Hawai'i state law. As we just explained, the Eharts' claims are clearly subject to admiralty jurisdiction. 1-ER-33; 2-ER-88; 2-ER-110. "'The exercise of admiralty jurisdiction, however, 'does not result in automatic displacement of state law.'" *Yamaha*, 516 U.S. at 206 (1996) (quoting *Jerome B. Grubart, Inc.,* 513 U.S. at 545).

### B. STATE LAW MAY BE APPLIED TO SUPPLEMENT MARITIME LAW SO LONG AS THERE IS NO CONFLICT

LDI and Dam "admit that Decedent was a 'nonseafarer,' as that term is used in *Yamaha*[.]" 2-ER-110. The *Yamaha* decision recognized that nonseafarers who perish on the territorial waters of a State like Hawai'i fall into a remedial gap between the Jones Act, 46 U.S.C. § 30104, and the Death on the High Seas Act. 46 U.S.C. §§ 30301-30308. See *Yamaha,* 516 U.S at 214. "In the wake of *Yamaha* … the federal courts … have applied state laws to admiralty cases where those state laws 'fill gaps' or add additional avenues for recovery[.]" *Matheny v. Tennessee Valley Authority* 503 F. Supp.2d 917, 924 (M.D.Tenn. 2001); see also *In re Air Crash at Belle Harbor,* 2006 U.S. Dist. LEXIS 27387 at *48 (S.D.N.Y. 2006) ("Subsequent federal courts, consistent with the rationale of *Yamaha*, have allowed more generous state law to

supplement the [general maritime] death action").

In *Hambrook*, the District of Hawai'i held that Haw.Rev.Stats. § 663-1.54 fills just such a gap. See 2016 U.S. Dist. LEXIS 109484 at *81-82. That section "precludes any waiver of liability for negligence against the owner or operator of a business providing recreational activities, including SCUBA-diving excursions, and only permits waivers for damages resulting from 'inherent risks' that have been fully disclosed to the customer." *Id.* at *82. In *Hambrook*, the District of Hawai'i held that § 663-1.54 "may be applied to supplement general maritime law as long as there is no conflict." *Id.* at 67. Contracts purporting to exculpate vessel owners were void under the judge-made, general maritime even before the 1936 Congress codified that common-law policy in § 183c. *Kornberg*, 741 F.2d at 1335; *Smolnikar v. Royal Caribbean Cruises Ltd.*, 787 F.Supp.2d 1308, 1316 (S.D.Fla. 2011). The State of Hawai'i enacted H.R.Rep.S. § 663-1.54 "'to more clearly define the liability of providers of commercial recreational activities by statutorily invalidating inherent risk waivers signed by the participants.'" *Hambrook*, 2016 U.S. Dist. LEXIS 109484 at *81-82 (quoting Haw. Stand. Comm. Rep. No. 1537, 1997 Senate Journal, at 1476). Nothing about that statute or its purpose conflicts with federal maritime law. *Id.* at *82-84.

## CONCLUSION

WHEREFORE, we respectfully urge the Court to affirm the decision below.

Dated:  November 10, 2022        McGUINN, HILLSMAN & PALEFSKY

By:  /s/   JOHN R. HILLSMAN
          JOHN R. HILLSMAN

Attorneys for Appellee William McMein Ehart, Jr.

**Case No. 22-16149**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

WILLIAM McMEIN EHART, JR., Individually and as Personal Representative
of the Estate of Maureen Anne Ehart, Deceased,
*Plaintiff-Appellee,*

v.

LAHAINA DIVERS, INC. and CORY DAM,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Hawaii
No. 21-cv-00475 SOM-KJM
Hon. Susan Oki Mollway

---

## APPELLEE'S STATUTORY ADDENDUM

---

John R. Hillsman, Esq.
McGuinn, Hillsman & Palefsky
535 Pacific Avenue, Suite 100
San Francisco, CA 94133
Telephone: (415) 421-9292
*jrhillsman@mhpsf.com*

Attorneys for Appellee
WILLIAM MCMEIN EHART, JR.

# TABLE OF CONTENTS

1 U.S.C. § 3 ("Vessel" as Including All Means of Water Transportation). . . . . . . 1

46 U.S.C. § 8101 (Complement of Inspected Vessels). . . . . . . . . . . . . . . . . . . . . 1

46 U.S.C. § 30503 (Declaration of Nature and Value of Goods) . . . . . . . . . . . . . 3

46 U.S.C. § 30505 (General Limit of Liability). . . . . . . . . . . . . . . . . . . . . . . . . . . 3

33 CFR § 101.105 (2)(v) (Definition, Passenger for Hire) . . . . . . . . . . . . . . . . . . 4

46 C.F.R. § 175.110.  Small Passenger Vessels General Applicability . . . . . . . . 4

46 C.F.R. § 176.100 (Certificate of Inspection, When Required). . . . . . . . . . . . . 6

H.R.S. § 663-154 (Recreational Activity Liability). . . . . . . . . . . . . . . . . . . . . . . . 6

**STATUTORY ADDENDA**

**–oo00((*))00oo--**

**1 U.S.C. § 3. "Vessel" as Including All Means of Water Transportation**

The word "vessel" includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water.

**–oo00((*))00oo--**

**46 U.S.C. § 8101. Complement of inspected vessels**

**(a)** The certificate of inspection issued to a vessel under part B of this subtitle [46 USCS §§ 3101 et seq.] shall state the complement of licensed individuals and crew (including lifeboatmen) considered by the Secretary to be necessary for safe operation. A manning requirement imposed on—

**(1)** a sailing school vessel shall consider the participation of sailing school instructors and sailing school students in the operation of that vessel;

**(2)** a mobile offshore drilling unit shall consider the specialized nature of the unit; and

**(3)** a tank vessel shall consider the navigation, cargo handling, and maintenance functions of that vessel for protection of life, property, and the environment.

**(b)** The Secretary may modify the complement, by endorsement on the certificate, for reasons of changed conditions or employment.

**(c)** A requirement made under this section by an authorized official may be appealed to the Secretary under prescribed regulations.

**(d)** A vessel to which this section applies may not be operated without having in its service the complement required in the certificate of inspection.

**(e)**     When a vessel is deprived of the service of a member of its complement without the consent, fault, or collusion of the owner, charterer, managing operator, agent, master, or individual in charge of the vessel, the master shall engage, if obtainable, a number of members equal to the number of those of whose services the master has been deprived. The replacements must be of the same or a higher grade or rating than those whose places they fill. If the master finds the vessel is sufficiently manned for the voyage, and replacements are not available to fill all the vacancies, the vessel may proceed on its voyage. Within 12 hours after the vessel arrives at its destination, the master shall report in writing to the Secretary the cause of each deficiency in the complement. A master failing to make the report is liable to the United States Government for a civil penalty of $1,000 for each deficiency.

**(f)**     The owner, charterer, or managing operator of a vessel not manned as required by this section is liable to the Government for a civil penalty of $10,000.

**(g)**     A person may not employ an individual as, and an individual may not serve as, a master, mate, engineer, radio officer, or pilot of a vessel to which this part [46 USCS §§ 8101 et seq.] applies or which is subject to inspection under chapter 33 of this title [46 USCS §§ 3301 et seq.] if the individual is not licensed by the Secretary. A person (including an individual) violating this subsection is liable to the Government for a civil penalty of not more than $10,000. Each day of a continuing violation is a separate offense.

**(h)**     The owner, charterer, or managing operator of a freight vessel of less than 100 gross tons as measured under section 14502 of this title [46 USCS § 14502], or an alternate tonnage measured under section 14302 of this title [46 USCS § 14302] as prescribed by the Secretary under section 14104 of this title [46 USCS § 14104], a small passenger vessel, or a sailing school vessel not manned as required by this section is liable to the Government for a civil penalty of $1,000. The vessel also is liable in rem for the penalty.

**(i)**     When the 2 next most senior licensed officers on a vessel reasonably believe that the master or individual in charge of the vessel is under the influence of alcohol or a dangerous drug and is incapable of commanding the vessel, the next most senior master, mate, or operator licensed under section 7101(c)(1) or (3) of this title [46 USCS § 7101(c)(1) or (3)] shall—

**(1)** temporarily relieve the master or individual in charge;

**(2)** temporarily take command of the vessel;

**(3)** in the case of a vessel required to have a log under chapter 113 of this title [46 USCS §§ 11301 et seq.], immediately enter the details of the incident in the log; and

(4) report those details to the Secretary—

(A) by the most expeditious means available; and

(B) in written form transmitted within 12 hours after the vessel arrives at its next port.

**–oo00((*))00oo--**

## 46 U.S.C. § 30503. Declaration of nature and value of goods

**(a)** **In general**. If a shipper of an item named in subsection (b), contained in a parcel, package, or trunk, loads the item as freight or baggage on a vessel, without at the time of loading giving to the person receiving the item a written notice of the true character and value of the item and having that information entered on the bill of lading, the owner and master of the vessel are not liable as carriers. The owner and master are not liable beyond the value entered on the bill of lading.

**(b)** **Items**. The items referred to in subsection (a) are precious metals, gold or silver plated articles, precious stones, jewelry, trinkets, watches, clocks, glass, china, coins, bills, securities, printings, engravings, pictures, stamps, maps, papers, silks, furs, lace, and similar items of high value and small size.

**–oo00((*))00oo–**

## 46 U.S.C. § 30505. General Limit of Liability

**(a)** **In general.** Except as provided in section 30506 of this title [46 USCS § 30506], the liability of the owner of a vessel for any claim, debt, or liability described

in subsection (b) shall not exceed the value of the vessel and pending freight. If the vessel has more than one owner, the proportionate share of the liability of any one owner shall not exceed that owner's proportionate interest in the vessel and pending freight.

**(b)     Claims subject to limitation.** Unless otherwise excluded by law, claims, debts, and liabilities subject to limitation under subsection (a) are those arising from any embezzlement, loss, or destruction of any property, goods, or merchandise shipped or put on board the vessel, any loss, damage, or injury by collision, or any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of the owner.

**(c)     Wages.** Subsection (a) does not apply to a claim for wages.

–oo00((*))00oo–

### 33 C.F.R. § 105(2)(v).  Definition, Passenger for Hire

Passenger-for-hire means a passenger for whom consideration is contributed as a condition of carriage on the vessel, whether directly or indirectly flowing to the owner, charterer, operator, agent, or any other person having an interest in the vessel.

–oo00((*))00oo–

### 46 C.F.R. § 175.110.  Small Passenger Vessels General Applicability

**(a)** Except as in paragraph (b) of this section, this subchapter applies to each vessel of less than 100 gross tons that carries 150 or less passengers, or has overnight accommodations for 49 or less passengers, and that —

**(1)** Carries more than six passengers, including at least one for hire;

**(2)** Is chartered with a crew provided or specified by the owner or the owner's representative and is carrying more than six passengers;

**(3)** Is chartered with no crew provided or specified by the owner or the owner's representative and is carrying more than 12 passengers; or

-4-

**(4)** If a submersible vessel, carries at least one passenger for hire; or

**(5)** Is a ferry carrying more than six passengers.

**(b)** This subchapter does not apply to:

**(1)** A vessel operating exclusively on inland waters that are not navigable waters of the United States;

**(2)** An oceanographic research vessel;

**(3)** A boat forming part of a vessel's lifesaving equipment and that is not used for carrying passengers except in emergencies or during emergency drills;

**(4)** A vessel of a foreign country that is a party to the International Convention for the Safety of Life at Sea, 1974, as amended (SOLAS), to which the United States Government is currently a party, and that has on board a current valid SOLAS Passenger Ship Safety Certificate; or

**(5)** A vessel of a foreign country, whose government has inspection laws approximating those of the United States and that by its laws accords similar privileges to vessels of the United States, which has on board a current valid certificate of inspection, permitting the carrying of passengers, issued by its government.

**(c)** Irrespective of build date, a vessel to which this subchapter applies must meet 46 CFR 181.405, 181.450, 181.500, 185.364, and 185.420(b), if it is not a ferry, and if it—

**(1)** Has overnight accommodations for passengers; or

**(2)** Is operating on a Coastwise or Oceans route.

**(d)** Irrespective of build date, a vessel to which this subchapter applies must meet 46 CFR 177.115(c), 177.500(n), 185.410(b), 185.507, and 185.515, if it is not a ferry and has overnight accommodations for passengers.

**(e)** The requirements outlined in paragraphs (c) and (d) of this section must be met no later than March 28, 2022, except for:

**(1)** The requirements to implement 46 CFR 181.405, 181.450, and 181.500, which must be met no later than December 27, 2022; and

**(2)** The requirements to implement 46 CFR 177.115(c) and 177.500(n), which must be met no later than December 27, 2023.

−oo00((*))00oo−

## 46 C.F.R. § 176.100.  Certificate of Inspection, When Required

**(a)** A vessel to which this subchapter applies may not be operated without having on board a valid U.S. Coast Guard Certificate of Inspection.

**(b)** Except as noted in § 176.114 of this part, each vessel inspected and certificated under the provisions of this subchapter must, when any passengers are aboard during the tenure of the certificate, be in full compliance with the terms of the certificate.

**(c)** If necessary to prevent delay of the vessel, a temporary Certificate of Inspection may be issued pending the issuance and delivery of the regular Certificate of Inspection. The temporary certificate must be carried in the same manner as the regular certificate and is considered the same as the regular Certificate of Inspection that it represents.

**(d)** A vessel on a foreign voyage between a port in the United States and a port in a foreign country, whose Certificate of Inspection expires during the voyage, may lawfully complete the voyage without a valid Certificate of Inspection provided the voyage is completed within 30 days of expiration and the certificate did not expire within 15 days of sailing on the foreign voyage from a U.S. port.

−oo00((*))00oo--

## H.R.S. § 663-1.54.  Recreational Activity Liability.

**(a)** Any person who owns or operates a business providing recreational activities

to the public, such as, without limitation, scuba or skin diving, sky diving, bicycle tours, and mountain climbing, shall exercise reasonable care to ensure the safety of patrons and the public, and shall be liable for damages resulting from negligent acts or omissions of the person which cause injury.

**(b)**     Notwithstanding subsection (a), owners and operators of recreational activities shall not be liable for damages for injuries to a patron resulting from inherent risks associated with the recreational activity if the patron participating in the recreational activity voluntarily signs a written release waiving the owner or operator's liability for damages for injuries resulting from the inherent risks. No waiver shall be valid unless:

> **(1)**     The owner or operator first provides full disclosure of the inherent risks associated with the recreational activity; and

> **(2)**     The owner or operator takes reasonable steps to ensure that each patron is physically able to participate in the activity and is given the necessary instruction to participate in the activity safely.

**(c)**     The determination of whether a risk is inherent or not is for the trier of fact. As used in this section an "inherent risk":

> **(1)**     Is a danger that a reasonable person would understand to be associated with the activity by the very nature of the activity engaged in;

> **(2)**     Is a danger that a reasonable person would understand to exist despite the owner or operator's exercise of reasonable care to eliminate or minimize the danger, and is generally beyond the control of the owner or operator; and

> **(3)**     Does not result from the negligence, gross negligence, or wanton act or omission of the owner or operator.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**   | 22-16149 |

I am the attorney or self-represented party.

**This brief contains** | 13,666 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated | | .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/  JOHN R. HILLSMAN |   **Date** | November 10, 2022 |

*(use "*s/[typed name]*" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov